# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARTIN G. MCNULTY

               Plaintiff,                         Case Number: 08-CV-13178

v.                                        JUDGE PAUL D. BORMAN
                                                UNITED STATES DISTRICT COURT

REDDY ICE HOLDINGS, INC., REDDY ICE
CORPORATION, ARCTIC GLACIER
INCOME FUND, ARCTIC GLACIER, INC.,
ARCTIC GLACIER INTERNATIONAL, INC.,
HOME CITY ICE COMPANY, INC., KEITH
CORBIN, CHARLES KNOWLTON, JOSEPH
RILEY,

               Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

Now before the Court are Defendants' Motions to Dismiss Plaintiff Martin McNulty's ("Plaintiff") Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Defendants Arctic Glacier Income Fund's and Arctic Glacier, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint for want of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Plaintiff responded to all the Motions on December 21, 2008 and Defendants all replied on January 9, 2009. A hearing on the matter was held on April 2, 2009. For the following reasons, the Court DENIES IN PART and GRANTS IN PART Defendants' Motions to Dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(2) and 12(b)(6).

## I.     BACKGROUND

This action arises from Plaintiff's allegations that Defendants were involved in an unlawful

conspiracy and enterprise among competing distributors of packaged ice to (1) terminate Plaintiff

from Arctic Glacier for refusing to participate in an unlawful market allocation scheme and (2)

conspire to boycott Plaintiff from employment in the packaged ice industry.  (Am. Compl. ¶ 1).

Packaged ice is sold at retail stores and gas stations.

Plaintiff is a resident of Michigan, residing at various times in Wayne, Livingston, and

Oakland Counties.  (*Id*. ¶ 2).

Defendant Arctic Glacier Income Fund ("Arctic Fund") is a Canadian company with its

principal place of business in Winnipeg, Manitoba. (*Id*. ¶ 3).  Defendant Arctic Glacier, Inc. (Arctic

Inc."), a Canadian corporation also with its principal place of business in Winnipeg, Manitoba, is

a wholly-owned subsidiary of Arctic Fund and the parent of Defendant Arctic Glacier International

Inc.  (*Id*. ¶ 4).  Defendant Arctic Glacier International Inc. ("Arctic International") is a Delaware

corporation with its principal place of business in West St. Paul, Minnesota. (*Id*. ¶ 5).  Arctic Fund,

Arctic Inc., and Arctic International are collectively referred to as "Arctic Glacier." Arctic Glacier

is the second largest manufacturer and distributor of packaged ice in the United States.  (*Id*. ¶ 6).

Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal

place of business in Cincinnati, Ohio.  (*Id*. ¶ 8).  Home City manufactures and distributes packaged

ice primarily in the upper-Midwest.  (*Id*.)  With sales of approximately $50 million per year, Home

City represents the third largest manufacturer and distributor of packaged ice in the United States.

(*Id*.)

Defendants Reddy Ice Holdings, Inc. and Reddy Ice Corporation (collectively "Reddy Ice")

are Delaware corporations with their principal place of business in Dallas, Texas.  (*Id*. ¶ 9).  Reddy

Ice is the largest manufacturer and distributor of packaged ice in the United States.

2

Defendant Keith E. Corbin resides in Hendersonville, Tennessee and was employed by Arctic Glacier as Vice President of Sales. (*Id.* ¶ 11).

Defendant Charles Knowlton resides in Port Huron, Michigan. (*Id.* ¶ 12). Mr. Knowlton owned Party Time Ice ("Party Time") prior to it being acquired by Arctic Glacier in 2004 and then served as Director, Franchise Operations for Arctic Glacier. (*Id.*)

Defendant Joseph Riley resides in Traverse City, Michigan. (*Id.* ¶ 13). Mr. Riley owned Tropic Ice Company ("Tropic Ice") prior to it being acquired by Arctic Glacier and served as its president. (*Id.* ¶¶ 13, 45).

**A.     Plaintiff's Career in the Packaged Ice Industry**

Plaintiff is a packaged ice salesman. (*Id.* ¶ 16). In 1991, Plaintiff began his career as a sales representative for Great Lakes Ice Company ("Great Lakes") in Warren, Michigan. (*Id.* ¶ 17). Within his first six months of being at Great Lakes, the company promoted him to sales manager, and then in 1994, Great Lakes promoted him again, this time to Vice President of Sales. (*Id.*) Also, in 1994, Great Lakes was acquired by a larger competitor, Party Time. (*Id.* ¶ 19). By 1996, Party Time promoted Plaintiff from sales manager to Vice President of Sales. (*Id.* ¶ 23).

In October 2004, Party Time announced that it was being purchased by Arctic Glacier. (*Id.* ¶ 25). Arctic Glacier allegedly offered Plaintiff a five year employment contract in exchange for him agreeing not to work for one of Arctic Glacier's competitors for five years. (*Id.* ¶ 26). Also at this time, Arctic Glacier offered Plaintiff and some of the other Party Time employee an "earn out" of two year's salary if the employees did not resign within a certain time frame after the acquisition and if Arctic Glacier met certain financial goals. (*Id.* ¶ 26). Although Plaintiff accepted the "earn out" offer, Plaintiff declined the five year contract because he wanted to ensure that Arctic

3

Glacier's culture and environment were satisfying before accepting a long-term commitment.  (*Id.* ¶ 27).  After Plaintiff denied Arctic Glacier's five-year contract offer, Plaintiff alleges that Mr. Corbin contacted Plaintiff to ensure that he planned to stay with Arctic Glacier and told him that Plaintiff would succeed Mr. Corbin, who was roughly 70 years old at the time, when Mr. Corbin retired in the near future.  (*Id.* ¶ 28).

### B.    Alleged Collusion Between Competitors in the Packaged Ice Industry

Plaintiff alleges that while at Party Time, and as early as 1997, he heard rumors about possible cooperation between Party Time and Home City.  (*Id.* ¶ 29).  For instance, he heard that Party Time declined to service certain stores because they were serviced by Home City and that both companies agreed in advance which company would submit a lower bid to potential customers. (*Id.*)

Plaintiff claims that he never directly had been privy to information about explicit or widespread collusion until late 2004, when Steven Knowlton, on behalf of his father Defendant Charles Knowlton, asked Plaintiff to save a Party Time account that was in danger of being lost.  (*Id.* ¶ 30).  According to Plaintiff, Steve Knowlton told him that his father had received a phone call from a Home City executive informing him that one of Party Time's customers had approached Home City because the customer was not satisfied with Party Time's prices and services.  (*Id.*) Allegedly, Home City declined to supply ice to the customer because of an agreement it had with Party Time not to compete for customers in specific geographic areas.  (*Id.*)  Plaintiff refused to take over the account.  (*Id.*)

Plaintiff claims that he spoke with Charles Knowlton about the cooperation on at least two separate occasions.  (*Id.* ¶ 31).  During one such occasion, Plaintiff informed Mr. Knowlton that he would not participate in the alleged conspiracy and that if necessary he would go work for another

4

packaged ice company. (*Id.*)  During another conversation, Mr. Knowlton allegedly told Plaintiff

that he would perjure himself if necessary to maintain the secrecy of the alleged conspiracy.  (*Id.*)

Shortly thereafter, Plaintiff discovered that Arctic Glacier was also colluding with Home City

when Mr. Corbin told Plaintiff that Arctic Glacier maintained the same agreement with Home City

as Party Time, after Plaintiff attempted to warn Mr. Corbin of Party Time's agreement with Home

City.  (*Id.* ¶ 32).

In December 2004, Arctic Glacier acquired Party Time and Plaintiff became an Arctic

Glacier employee. (*Id.* ¶ 33).

In January 2005, Plaintiff traveled with Mr. Corbin, who at that point was Plaintiff's

supervisor, to Ohio to meet with one of Plaintiff's accounts, Speedway SuperAmerica, LLC

("Speedway").  (*Id.* ¶ 34).  During the trip, Plaintiff claims that he questioned Mr. Corbin about the

details of the market allocation between Arctic Glacier and Home City.  (*Id.* ¶ 35).   According to

Plaintiff, Corbin explained that Arctic Glacier, Home City, and Reddy Ice agreed to geographically

divide the market for the sale and delivery of packaged ice.  (*Id.*)  In addition, since Mr. Corbin did

not want to disrupt Arctic City's commitment to its competitors, he could not allow Plaintiff to

compete aggressively for Speedway's business in a broad geographic area.  (*Id.* ¶ 35).  Plaintiff

alleges that he told Mr. Corbin that he believed these arrangements between Arctic Glacier and its

competitors were illegal and that he could not participate in such unlawful activity.  (*Id.*)

### C.      Plaintiff's Termination from Arctic Glacier

In late January 2005, less than one week after learning of Plaintiff's unwillingness to

participate in the alleged conspiracy, Plaintiff received a phone call from an Arctic Glacier human

resources employee informing Plaintiff that he had been terminated.  (*Id.* ¶ 38).  On January 27,

2005, Arctic Glacier sent a letter to Plaintiff confirming his termination.   (*Id*. ¶ 39). The letter purportedly stated that the termination decision "was made as a result of the restructuring of the Corporate Marketing department." (*Id*.)

Following his termination, Plaintiff signed a severance agreement, titled "FULL AND FINAL RECEIPT, RELEASE, DISCHARGE AND NON-COMPETITION AGREEMENT" ("Release") with the Arctic Glacier. (*Id*. ¶ 42).  The Release contains a non-compete clause, which restricted Plaintiff's ability to work for one of Arctic Glacier's competitors for a period of six months, expiring on July 28, 2005. (*Id*.)   During this six month non-compete period, Plaintiff contacted federal authorities and informed them of the collusion in the packaged ice industry.  (*Id*.)  He then began working with the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") in their investigation of the alleged unlawful business practices of Arctic Glacier, Home City, and Reddy Ice.  (*Id*.)

Once the six month non-compete period ended, Plaintiff claims that he actively began looking for employment with manufacturers and distributors of packaged ice. (*Id*. ¶ 43).  For instance, on September 16, 2005, Plaintiff sent a letter to Home City seeking employment with the company, but Home City informed Plaintiff that it was not interested in hiring him. (*Id*. ¶ 44).

Plaintiff also sent a letter to Mr. Riley.  (*Id*. ¶ 45).  In response to the letter, Mr. Riley agreed to meet with Plaintiff on January 27, 2006 at a restaurant in Lansing, Michigan to discuss Plaintiff's application for employment. (*Id*. ¶¶ 45–46).  Because the DOJ and FBI suspected that Tropic Ice was conspiring with Arctic Glacier and Home City, Plaintiff wore a recording device to the meeting. During the meeting, Mr. Riley allegedly told Plaintiff that Arctic Glacier and its co-conspirators in the market allocation scheme had agreed not to hire Plaintiff—that is, Plaintiff was being

6

"blackballed" from the industry. (*Id*. ¶ 46). Plaintiff claims that Mr. Riley also admitted that Tropic Ice had been conspiring with Arctic Glacier to allocate markets. (*Id*. ¶ 47). Nevertheless, Mr. Riley allegedly said that he would call Plaintiff within several weeks to discuss employment opportunities with Tropic Ice. (*Id*.) When Mr. Riley never called, Plaintiff called him and was told by Mr. Riley that Tropic Ice had agreed with Arctic Glacier that it would not hire Plaintiff. (*Id*. ¶ 48).

Over two years after Plaintiff began providing information to federal authorities, Home City entered a plea agreement where it admitted to participating in a conspiracy among packaged ice producers with the purpose of allocating customers and territories for packaged ice at least as early as January 1, 2001. (*Id*. ¶ 49).

On July 23, 2008, Plaintiff filed an action in this Court alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO"); the Sherman Act, 15. U.S.C. § 1; the Michigan Antitrust Reform Act, M.C.L. § 445.772; and common law tortious interference with business relations, and tortious interference with prospective economic advantage. From October 3, 2008 through October 13, 2008, Defendants Reddy Ice, Riley, Arctic Glacier, Mr. Knowlton, Home City, and Mr. Corbin each filed a Motion to Dismiss Plaintiff's Complaint. (Dkt. Nos. 23, 26-29, and 35). On December 2, 2008, Plaintiff filed an Amended Complaint, setting forth the same causes of action as those in his original Complaint, with the exception of his tortious interference with business relations claim, which he eliminated. (Dkt. No. 43). Defendants now move this Court to dismiss Plaintiff's Amended Complaint. (Dkt. Nos. 54–59).

## II.   ANALYSIS

### A.   Personal Jurisdiction over Arctic Fund or Arctic Inc.

At the hearing, Arctic Glacier conceded that the issue of whether this Court enjoys personal

7

jurisdiction over Arctic Fund and Arctic Inc. could wait until trial. Therefore, the Court declines to address whether it has personal jurisdiction over Arctic Fund and Arctic Inc until after the conclusion of discovery.

### B.   Defendants' Motions to Dismiss

#### 1.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). This "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 127 S. Ct. at 1974). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the

material elements to sustain recovery under some viable legal theory." *LULAC*, 500 F.3d at 527

(citing *Twombly*, 127 S.Ct. at 1969).

### 2.       Release Agreement

Nearly all of the Defendants attached the Release to their respective motions.  Although

Plaintiff mentioned the Release in his Complaint, he did not attach it to his pleadings.

Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded

by the court,  the motion shall be treated as one for summary judgment and disposed of as provided

in Rule 56, and all parties shall be given reasonable opportunity to present all material made

pertinent to such a motion by Rule 56." But, in addition to the allegations and exhibits of the

complaint, a court may consider "public records, items appearing in the record of the case and

exhibits attached to [the] defendant's motion to dismiss so long as they are referred to in the

[c]omplaint and are central to the claims contained therein."  *Bassett v. NCAA*, 528 F.3d 426, 430

(6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *see also Pension*

*Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court

may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion

to dismiss if the plaintiff's claims are based on the document.") (citations omitted).  "Otherwise, a

plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach

a dispositive document upon which it relied."  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th

Cir.1997).

Defendants attached the Release as an exhibit to the their motions.  Plaintiff does not dispute

its authenticity and even referenced the Release—which he refers to as a "Severance

Agreement"—in his Amended Complaint.  (*See* Am. Comp. ¶ 43).  Therefore, the issue becomes

9

whether the Release is central to Plaintiff's claims.

Plaintiff's various causes of action can be boiled down to two overarching claims: (1) Plaintiff was terminated for refusing to participate in the alleged unlawful collusion and (2) Defendants conspired against Plaintiff and effectively blackballed him from the packaged ice industry. Between the time that Plaintiff was terminated and being blackballed, he signed the Release, which provides in pertinent part:

> In consideration of the money to be paid . . . as severance (the "Severance Pay") and other good and valuable consideration, [Plaintiff] release[s], and agree[s] not to sue the Company, its current, former and successor subsidiaries, parent corporations, affiliates, and partners, and each of their officers, directors, employees, agents, representatives, insurance carriers, benefit plans, fiduciaries and attorneys, or any other related parties, with respect to any claims that [Plaintiff has] . . . prior to or as of the time [he] sign[s] this [Release]. These claims include, but are not limited to, claims arising under any . . . federal, state or local civil rights, employee benefit, labor contract, tort, or common law.

Plaintiff points to several factors that counsel against dealing with the Release at this stage in the proceedings. First, Plaintiff argues that while the release may be "central" to Defendants' affirmative defense, it is not "central" to Plaintiff's claims as that term has been expressed in relevant case law. For support, Plaintiff cites *JP Morgan Trust Co. v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244, 1258 (D. Kan. 2008), where the court refused to consider three authenticated State of Delaware certificates, which were not attached to the Complaint because they were "central to [an] affirmative defense, not to plaintiff's claims." Unlike the instant action, however, the documents in *JP Morgan Trust* were *not* referenced in the complaint and only related to a collateral issue—namely, whether the defendant has the capacity to be sued. *Id*. Furthermore, Plaintiff failed to fully explain the contents of the "Severance Agreement"—i.e. the Release—in his Complaint, thereby rendering it someone misleading. By revealing only those portions that help his case, while

10

hiding those which clearly are relevant and applicable, Plaintiff has put the Release in play.

Plaintiff also claims that the facts demonstrate that the Release was procured through fraud and economic duress and cites paragraphs thirty-nine and fifty three in the Amended Complaint for support.  Both Plaintiff's economic duress and fraud arguments are unconvincing as pled in the Amended Complaint.   Plaintiff claims that the economic hardship he suffered was a result of the Defendants' boycott against him, not his termination from Arctic Glacier.  (*Id*. ¶ 53) ("Defendants' *boycott* deprived [Plaintiff] of employment opportunities.") (emphasis added).  In support of his fraud argument, Plaintiff cites a paragraph from his Amended Complaint, where he claims that a January 27, 2005 letter from Arctic Glacier falsely states that the decision to terminate him "was made as a result of the restructuring of the Corporate Marketing department."  (*Id*. at ¶ 39).  While Plaintiff's claim may be true, Plaintiff does not provide any indication in his Complaint that he relied on this statement in any way when he signed the Release.   In fact, the gravamen of his Amended Complaint leads to an opposite conclusion.

Finally, Plaintiff argues that factual issues counsel against resolving the validity of the release on a motion to dismiss.  In support of that argument, Plaintiff cites *Cottman Transmission Sys., LLC v. Kershner*, which held that a pre-answer motion "is not the time to raise or decide the validity of a prior settlement." 492 F. Supp. 2d 461, 473 (E.D. Pa. 2007) (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003).  At least one court in this district, in addressing a release governed by Michigan law  held, however, that a release may be considered on a motion to dismiss where the release is unambiguous.  *See Mady v. Commodity Futures Trading Comm'n*, No. 05-73745, 2006 U.S. Dist. LEXIS 17947, at *4 (E.D. Mich. 2006).  The *Mady* court also

acknowledged that "Michigan law[1] holds that if the language used in a release is unambiguous, 'the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.'" *Id.* (citing *Taggart v United States*, 880 F.2d 867, 870 (6th Cir. 1989)).

Here, the Release is unambiguous as to some of the claims and parties its covers and ambiguous as to others. The Release clearly covers Arctic Glacier, Mr. Knowlton, and Mr. Corbin, as Mr. Knowlton and Mr. Corbin were employees of Arctic Glacier at the time Plaintiff signed the Release. In addition, the Release unambiguously provides that it covers "any claims that [Plaintiff has] . . . prior to or as of the time [he] sign[s] this [Release]." Because the Complaint clearly demonstrates that Plaintiff knew of the alleged market allocation scheme at the time he signed the Release, any claims based on Arctic Ice's involvement in that scheme are barred by the Release.

What is not so clear, however, is whether the Release bars Plaintiff's claims against Defendants as to the alleged conspiracy against him. In the Complaint, Plaintiff alleges that Mr. Corbin told him before he was fired—and before Arctic Glacier acquired Party Time—that "if [Plaintiff] left Party Time/Arctic Glacier, Mr. Corbin would ensure that [Plaintiff] would not be hired by a competing ice manufacturer." (Comp. ¶ 32). While such a statement may have put Plaintiff on notice of some sort of retaliation by at least Mr. Corbin, the Court cannot find that at the time he was terminated, Plaintiff was aware of any alleged conspiracy to boycott him from the packaged ice industry. Therefore, to the extent that Plaintiff's RICO, antitrust, and tortious interference claims are based on the alleged conspiracy to boycott Plaintiff from the packaged ice

---

[1] "Under well-established law, courts construe releases consistent with general state law contract principles." *Barden Detroit Casino, L.L.C. v City of Detroit*, 59 F. Supp. 2d 641, 659 (E.D. Mich. 1999).

industry, they are not barred by the Release. *See Forry, Inc v. Neundorfer, Inc.*, 837 F.2d 259, 263 (6th Cir. 1988) ("It has also been held that general language of the release will not encompass claims of which the releasor was unaware. . . ."); *Medtronic Ave., Inc v. Advance Cardiovascular Sys. Inc.*, 247 F.3d 44, 58 (3d Cir. 2001) ("[A] release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release.").

Also not clear is whether the Release pertains to the other Defendants: Home City, Reddy Ice, and Mr. Riley. The Release states that it applies to Arctic Ice; its subsidiaries, employees, agents, fiduciaries, etc.; and "any other related parties." Given the corporate relationship of the other parties benefitting from the Release, it appears that the "any other related parties" language does not apply to Home City, Reddy Ice, or Mr. Riley, as their relationship with Arctic Ice is that of a competitor or co-conspirator in corporate wrongdoing. The Court need not reach a conclusion on this issue yet. At this point, it is enough to find that the language of the Release is ambiguous as to the meaning of "any other related parties." *See Mady*, 2006 U.S. Dist. LEXIS 17947, at *4; *see also Zenith Radio Corp v. Hazeltine Research, Inc.*, 401 U.S. 321, 343–48 (1971) (holding that a release did not apply to co-conspirators where the language of the release did not indicate that they were included in the release). Because the reach of the Release is at best unclear, the Court finds that the Release does not bar any of Plaintiff's claims against Home City, Reddy Ice, and Mr. Riley.

### 3.    Standing to Assert RICO Claims

RICO allows a civil cause of action for treble damages and attorney's fees to "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The "by reason of" language means that a plaintiff must demonstrate that the alleged RICO violation

caused his injury. *Sedima v. Imrex*, 473 U.S. 479, 496 (1985). In *Holmes v. Securities Investors Protection Corp.*, 503 U.S. 258, 268–69 (1992), the Supreme Court held that a plaintiff may sue under section 1964(c) only if the alleged RICO violation is both the "but for" and proximate cause of the plaintiff's injury. Thus, to establish standing to assert a caused of action under section 1964(c), a civil RICO plaintiff must establish: (1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury. *See id*. at 268; *Sedima*, 473 U.S. at 496.

### a.    Violation of Section 1962(c)

In the case at bar, Plaintiff asserts RICO claims under subsections (c) and (d) of section 1962. Section 1962(c) of the RICO Act provides, in part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). Section 1961(1)(B) of the RICO Act defines the requisite "racketeering activity" to include so called predicate acts: "any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . section 1512 (relating to tampering with a witness, victim, or an informant), [and] section 1513 (relating to retaliating against a witness, victim, or an informant)." 18 U.S.C. § 1961(1)(B). In addition, a "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

The Supreme Court has stated the elements of a viable cause of action under 18 U.S.C. § 1962(c) as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th

14

Cir. 2006).

### (1)   Acts of Racketeering Activity – Predicate Acts

The Court first analyzes whether Plaintiff adequately pled the predicate acts of mail fraud,

wire fraud, and witness retaliation and witness tampering against the Defendants.

To state a claim for mail or wire fraud, a plaintiff must show that: "1) the defendants formed

a scheme or artifice to defraud; 2) the defendants used the United States mails [or interstate wires]

. . . in furtherance of the scheme; and 3) the defendants did so with the specific intent to deceive or

defraud." *Central Distributors of Beer, Inc. v. Conn.*, 5 F.3d 181, 184 (6th Cir. 1993).  Although

reliance on the false statements or omissions is not required, *Bridge v. Phoenix Bond & Indem. Co.*,

__ U.S. __, 128 S. Ct. 2131 (2008), a defendant must have made false statements or omissions of

material fact.

Plaintiff asserts that Defendants committed the predicate act of witness tampering by

violating 18 U.S.C. § 1512(b)-(d).  Those subsections provide:

> (b) Whoever knowingly uses intimidation, threatens or corruptly persuades another
> person, or attempts to do so, or engages in misleading conduct toward another
> person, with intent to--
>    (1) influence, delay or prevent the testimony of any person in an official
> proceeding;
>    (2) cause or induce any person to--
>     (A) withhold testimony, or withhold a record, document, or other object, from
> an official proceeding;
>     (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's
> integrity or availability for use in an official proceeding;
>     (C) evade legal process summoning that person to appear as a witness, or to
> produce a record, document, or other object, in an official proceeding; or
>     (D) be absent from an official proceeding to which such person has been
> summoned by legal process; or
>    (3) hinder, delay, or prevent the communication to a law enforcement officer or
> judge of the United States of information relating to the commission or possible
> commission of a Federal offense or a violation of conditions of probation, supervised
> release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly--
  (1) alters, destroys, mutilates, or conceals a record, document, or other object, or
attempts to do so, with the intent to impair the object's integrity or availability for
use in an official proceeding; or
  (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts
to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays,
prevents, or dissuades any person from--
  (1) attending or testifying in an official proceeding;
  (2) reporting to a law enforcement officer or judge of the United States the
commission or possible commission of a Federal offense or a violation of conditions
of probation, supervised release, parole, or release pending judicial proceedings;
  (3) arresting or seeking the arrest of another person in connection with a Federal
offense; or
    (4) causing a criminal prosecution, or a parole or probation revocation
proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3
years, or both.

In addition, in his responses to Defendants' Motions but not in his Amended Complaint,

Plaintiff cites 18 U.S.C. § 1512(k), which provides: "Whoever conspires to commit any offense

under this section shall be subject to the same penalties as those prescribed for the offense the

commission of which was the object of the conspiracy."

In his Amended Complaint, Plaintiff also alleges that Defendants committed the predicate

act of witness retaliation in violation of 18 U.S.C. § 1513(e)-(f), which provides as follows:

(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any
person, including interference with the lawful employment or livelihood of any
person, for providing to a law enforcement officer any truthful information relating
to the commission or possible commission of any Federal offense, shall be fined
under this title or imprisoned not more than 10 years, or both.

16

(f) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.[2]

Plaintiff alleges that Defendants used interstate mails and wires to further their fraudulent customer and territorial allocation scheme. (Am. Compl.¶ 61). Namely, throughout the duration of the conspiracy, Defendants used interstate mails and wires to submit rigged bids to potential customers, and submitted fraudulently inflated monthly or periodic invoices to customers, who submitted payments using interstate mails and wires." (*Id*. ¶ 62).

In addition, Defendant claims that Arctic Glacier used interstate mails to terminate his employment, providing false and fraudulent reasons for doing so; that Mr. Corbin and Arctic Glacier used interstate wires to fraudulently corroborate the letter; and that Home City utilized interstate wires to provide false and fraudulent reasons for its unwillingness to discuss potential employment opportunities with Plaintiff.

Plaintiff's first mention in his Amended Complaint of any type of intimidation, threat or retaliation against Plaintiff was Mr. Knowlton's statement in response to Plaintiff's statement that he would leave Party Time before participating in the market allocation scheme, where Mr. Knowlton allegedly told him: "Marty, everyone knows that you are the best corporate salesman in the ice industry. Now, see what that will do for you." (*Id*. ¶ 31). Plaintiff then alleges that after he talked with Mr. Corbin about the alleged unlawful price-fixing conspiracy, Mr. Corbin told Plaintiff if he left Party Time or Arctic Glacier, "Mr. Corbin would ensure that [Plaintiff] would not

---

[2] Unlike a conspiracy to commit mail or wire fraud, a conspiracy to commit to retaliate against a witness may serve as a predicate act because it is specifically included in the statutory offense and therefore "indictable under" the listed statute. *Cf. United States v. Brooklier*, 685 F.2d 1208, 1216 (9th Cir. 1983) (finding conspiracy to extort under 18 U.S.C. 1951 a proper predicate because conspiracy is "indictable under" that provision).

be hired by a competing ice manufacturer." (*Id.* ¶ 31).

Plaintiff further alleges that after he was terminated and contacted the authorities regarding the price-fixing scheme, Mr. Knowlton,[3] through two different intermediaries, offered to re-hire Plaintiff if he stopped cooperating with authorities and informed Plaintiff that he was being blacklisted because of this cooperation and that he would not receive his earn-out bonus until he ceased the cooperation. (*Id.* ¶¶ 41, 49). In addition, Plaintiff alleges that during two conversations that he tape recorded with Mr. Riley, Mr. Riley told him that "Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire [Plaintiff]" and that Tropic Ice had agreed with Arctic Glacier that Tropic Ice would not hire Plaintiff. (*Id.* ¶ 46; *see id.* ¶ 48).

As to the predicate acts of mail fraud and wire fraud, in drawing all inferences in favor of Plaintiff, accepting his factual allegations as true, and construing the Amended Complaint in the light most favorable to him, Plaintiff has properly alleged the predicate acts of mail and wire fraud only against Home City, Reddy Ice, and Mr. Riley, as any mail or fraud claims against Arctic Glacier, Mr. Knowlton, and Mr. Corbin are barred by the Release.

A plaintiff must plead the circumstances constituting the fraud, including mail and wire fraud, with particularity. *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984); FED. R. CIV. P. 9(b). Here, Plaintiff has thoroughly described the circumstances surrounding the price-fixing scheme, including detailed accounts of Home City's and Reddy Ice's involvement in that scheme[4]

---

[3] Plaintiff alleges that at this point, Mr. Knowlton was working for Arctic Glacier after it purchased Party Time.

[4] For instance, Plaintiff claims that Home City has already entered into a plea agreement with the United States, in which Home City admits that it participated in a conspiracy among packaged ice producers to allocate customers and territories for packaged ice. (Compl. ¶ 51). Plaintiff also alleges that while he was still working at Arctic Glacier, Mr. Corbin told him that

and an admission from Mr. Riley as to his company's involvement in the scheme.   While it is true that Plaintiff has not alleged any specific instances where Home City, Reddy Ice, or Mr. Riley used the mails in furtherance of the alleged market allocation scheme, Plaintiff does allege that they were involved in a scheme to defraud and that they used the mails to submit rigged bids to potential customers and fraudulently inflated invoices.  Given Plaintiff's numerous years of experience in the packaged ice industry, it is reasonable to infer that Home City, Reddy Ice, and Mr. Riley generally used the mails and wires as Plaintiff described to carry out the market allocation scheme.

As to Plaintiff's alleged predicate acts of witness tampering and retaliation, the Court finds that Plaintiff has properly alleged the predicate act of witness tampering against Mr. Knowlton and Arctic Glacier, and witness retaliation against Arctic Glacier, Home City, Reddy Ice, and Mr. Riley.

First, any allegation of retaliation or tampering by Mr. Knowlton, Mr. Corbin, or Arctic Glacier that took place before February 17, 2005 is barred by the Release.

Second, Plaintiff provides specific allegations of how Mr. Knowlton, through other Arctic Glacier agents, attempted to persuade Plaintiff to stop cooperating with the authorities and to come back to work at Arctic Glacier.  Given Mr. Knowlton's alleged involvement in the price-fixing conspiracy, his prior supervisory role over Plaintiff, and his new position of Director of Franchise Operations at Arctic Glacier, it certainly is plausible that Mr. Knowlton had two different employees of Arctic Glacier call Plaintiff and first offer him his job back and then threaten him with the withholding of his earn out.

---

"Arctic Glacier had agreed with both Home City and Reddy Ice to geographically divide the market for the sale and delivery of packaged ice." (Compl. ¶ 35).   Plaintiff further provides an account from Mr. Corbin, where he describes how Arctic Ice backed away from buying an ice company in Nevada as part of an agreement between Arctic Ice and Reddy Ice, where Arctic Ice agreed to stay out of the South and Southwest.   (Compl. ¶ 36).

Third, Plaintiff provides two specific allegations regarding acts of intimidation or retaliation by Home City.  The first is his claim that he sent a letter to Home City and that when he called later to inquire about a position, "Home City provided false and fraudulent reasons for why it was not interested in speaking to [Plaintiff] about potential employment opportunities."  (Am. Compl. ¶ 44).  The second is his allegation that Mr. Riley told him that Arctic Glacier and "its co-conspirators in the market allocation scheme" had all agreed not to hire Plaintiff.  (*Id*. at ¶ 46). While Plaintiff does not name Home City here, given that Plaintiff provided several in-depth factual allegations of Arctic Glacier's alleged collusion with Home City, and that Home City allegedly entered a plea agreement where it admitted to participating in a conspiracy among package ice producers, the Court can infer that Home City was one of the co-conspirators mentioned in paragraph forty-fix.  Reading the two allegations together—and certainly in the light most favorable to Plaintiff—the Court finds that Plaintiff adequately alleged that Home City committed the predicate act witness retaliation under section 1513(e) and (f).

Fourth, the only allegation alluding to any retaliation by Reddy Ice is Mr. Riley's alleged statement that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire Plaintiff.  Still, because of Plaintiff's allegations regarding Reddy Ice's involvement in that scheme, *see* footnote four *supra*, the Court can reasonably infer that Mr. Riley was referring to Reddy Ice.  Reading this allegation in the light move favorable to the Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Reddy Ice conspired with Arctic Glacier to retaliate against Plaintiff in violation of section 1513(f).

Finally, as to Mr. Riley, Plaintiff claims that he tape recorded a telephone conversation between them, where Mr. Riley admits that "Tropic Ice had agreed with Arctic Glacier that Tropic

20

Ice would not hire Plaintiff." (Compl. ¶ 48). Because Mr. Riley allegedly was not only the owner of Tropic Ice but also served as its president, the Court finds that Plaintiff has stated a claim against Mr. Riley for witness retaliation under section 1513(f). At this point in the proceedings, the Court cannot summarily dismiss Plaintiff's claim against Mr. Riley merely because it would have been against Mr. Riley's better judgment to inform Plaintiff that Tropic Ice was boycotting Plaintiff if Mr. Riley had known that Plaintiff was cooperating with the federal authorities. The alleged facts demonstrate that Mr. Riley, on behalf of Tropic Ice, agreed to boycott Plaintiff, and at that point in time, Arctic Glacier knew that Plaintiff may have been cooperating with the authorities. This is sufficient to state a claim against Mr. Riley for conspiring to retaliate against Plaintiff as a potential witness in a federal investigation.

### (2)     Enterprise

A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. 1961(4). As the Sixth Circuit has recently set forth, it must have some "enterprise-like structure":

> The hallmark of an enterprise is structure. . . . [T]here must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise.

*United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006) (alterations in original) (quoting *United States v. Rogers*, 89 F.3d 1326, 1137 (7th Cir. 1996)).[5]

_____

[5] "The standard is the same for both criminal and civil RICO violations." *United States v. Shifman*, 124 F.3d 31, 35 n.1 (1st Cir. 1997) (citing 18 U.S.C. § 1962).

21

Defendants argue that "[t]o satisfy the enterprise requirement, an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and it *must be separate from* the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (emphasis added). Plaintiff, however, asks this Court to adopt the recent holding in *United States v. Hammoud*, 556 F. Supp. 2d 710 (E.D. Mich. 2008), which explicitly rejected *Frank's* requirement that the enterprise "must be separate from the pattern of racketeering activity." The court concluded as much because *Frank* "loosely used [this] language in dicta" and because the language was inconsistent with *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985), a case that the "*Frank* court never acknowledged." *Id*. at 714 n.6. *Hammoud* further noted that because the *Frank* opinion was not *en banc*, it could not have overruled *Qaoud*. *Id*. Further, the Sixth Circuit's decision in *Johnson*, 440 F.3d at 840,[6] which was subsequent to *Frank*, "reaffirmed its holding in *Qaoud*." *Id*. In other words, "Defendant[] rel[ies] upon an interpretation of the RICO statute and *United States v. Turkette*, 452 U.S. 576 . . . (1981), which has been squarely rejected by the Sixth Circuit." *Hammoud*, 556 F. Supp. 2d at 713.

As noted by Plaintiff, just last year, the Ninth Circuit joined the D.C., First, Second, and Eleventh Circuits in finding that "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise." *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007). The Ninth Circuit explained:

> To require that an associated-in-fact enterprise have a structure beyond that necessary to carry out its racketeering activities would be to require precisely what

---

[6] *Johnson*, 440 F.3d at 840 ("'*Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent[.]'") (quoting *Qaoud*, 777 F.2d at 1115).

the Court in *Turkette* held that RICO does not require. Such a requirement would necessitate that the enterprise have a structure to serve both illegal racketeering activities as well as legitimate activities. In other words, it would require-as the First Circuit sought to require in *Turkette*-that the enterprise have a structure serving both illegitimate and legitimate purposes. But the Court in *Turkette* held precisely the opposite. It held that a purely criminal enterprise can be an associated-in-fact enterprise within the meaning of RICO.

*Id*. at 551-52.

Here, because of the apparent diverging views within this circuit and among the several circuits, this Court applies the standards set forth in *Johnson*, as it is the most recent published articulation of this Circuit, and *Turkette*, which held that the existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 452 U.S. at 583.

Because Plaintiff has not alleged facts that establish any kind of meaningful structure among Defendants that would otherwise distinguish their relationship from a mere conspiracy, especially given the conflict with the Release, Plaintiff has not alleged that Defendants, or any combination of Defendants, constitute a RICO enterprise. Nevertheless, the Court finds that Plaintiff has alleged facts showing that Arctic Glacier functioned as an enterprise under section 1962(c).

### (3)    Pattern of Racketeering Activity

In the instant action, Plaintiff asserts that Defendants committed multiple fraudulent and racketeering acts, which constitute a pattern of racketeering, as Defendants engaged in a scheme to defraud customers and deprive Plaintiff of employment in the packaged ice industry. The Court initially notes that for the purposes of establishing a pattern of racketeering activity, it is irrelevant whether or not Plaintiff was harmed by all of the alleged predicate acts (e.g., mail fraud and wire fraud). *See Vild v. Visonsi*, 956 F.2d 560, 567 (6th Cir. 1992) ("We do not hold that a civil RICO

plaintiff must necessarily be directly harmed by all the alleged predicate acts, because harm from one enumerated violation may, in certain situations, be sufficiently connected). What is relevant, though, is that, as set forth above, Plaintiff only has alleged facts sufficient to show that Arctic Glacier acted as a RICO enterprise. Therefore, only those predicate acts, which were committed by Arctic Glacier, or its representatives, and which were not barred by the Release, can be considered in determining whether Plaintiff has pled a pattern of racketeering. Those predicate acts consist of witness tampering by Arctic Ice and Mr. Knowlton and witness retaliation by Arctic Ice.

"[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *H.J. Inc v. NW Bell Telephone Co.*, 492 U.S. 229, 239 (1989). "Continuity and relationship constitute two analytically distinct prongs of the pattern requirement." *Vild v. Visonsi*, 956 F.2d 560, 566 (6th Cir. 1992).

Predicate acts are "related" for RICO purposes if they "'have the same or similar purposes, results, participants, victims, or method of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). The predicate acts of witness tampering and witness retaliation clearly share the same purpose and involve the same participants and victims.

The continuity prong is rather more complex. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241. "Whether a pattern of racketeering activity satisfies the continuity requirement depends on the particular facts of each case." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006). At the pleading stage, continuity may

24

be established by alleging facts of either closed- or open-ended racketeering activity. A plaintiff may demonstrate a closed period of continuity "by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242. Open-ended continuity may be "pleaded through facts showing 'a distinct threat of long-term racketeering activity' *or* by showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Moon*, 465 F.3d at 727 (quoting *H.J., Inc.*, 492 U.S. at 242) (emphasis added)).[7]

In the case at bar, while some of the predicate acts alleged by Plaintiff extend over a lengthy period of time, the predicate acts available for establishing a pattern of racketeering activity began around March 2005 and ended in March 2006, a period of roughly twelve months. The pattern of racketeering here involved only one victim, but that single victim was allegedly subject to multiple predicate acts of witness tampering and witness retaliation. In addition, although Plaintiff has reported the alleged predicate acts to the federal authorities,[8] under the facts alleged here, there is

_____

[7] Both Arctic Glacier and Home City cite *Moon* for the proposition that "open-ended continuity . . . requires that 'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" (Arctic Glacier Br. at 9 (quoting *Moon*, 465 F.3d at 726–27)). As the quoted passage above from *Moon* indicates, this simply is not the case. A plaintiff may also set forth factual allegations showing a distinct threat of continuing racketeering activity.

[8] In *Moon*, the Sixth Circuit reasoned that there was no risk of ongoing racketeering because the plaintiff petitioned the Michigan Workers' Disability Compensation Bureau ("Bureau"), which could result in a final binding decision to prevent the defendants from continuing to commit the alleged predicate acts against the plaintiff—namely, suspending the plaintiff's benefits—without first going through the Bureau. That is, once a decision was made by the Bureau, the defendants would have to seek approval from the Bureau before petitioning the plaintiff's benefits. In the instant case, there is no such mechanism that would essentially guarantee the cessation of the alleged predicate acts.

a distinct threat that Arctic Ice or Mr. Knowlton or their co-conspirators in the market allocation scheme continued or will continue to blacklist Plaintiff from the packaged ice industry or retaliate against Plaintiff again.  In fact, even after Plaintiff had gone to the federal authorities, Arctic Ice allegedly got Tropic Ice to agree that it too would boycott Plaintiff.  While the threat of repetition here may not involve a more systematic threat of repetition as that offered as an example in *H.J., Inc.*, the fact that Plaintiff was allegedly retaliated against after he went to the authorities makes it distinct for our purposes.  Therefore, the Court finds that Plaintiff has pled facts, which establish at least an open-ended continuity.

Accordingly, in sufficiently alleging facts that satisfy the continuity and relationship prongs of the pattern of racketeering element, Plaintiff has adequately pled the *Sedima* factors of a section 1962(c) violation against Arctic Ice.   In addition, because Plaintiff alleges that Mr. Knowlton held a management position within Arctic Glacier—namely, director of franchise operations—and that he committed predicate acts that were part of the alleged pattern of racketeering activity, the Court finds  that he has adequately pled a 1962(c) violation against Mr. Knowlton.  *See Reves v. Ernst & Young*, 507 U.S. 170 (1993) ("'[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs," § 1962(c), one must participate in the operation or management of the enterprise itself.").

**b.     Violation of Section 1962(d)**

Section 1962(d) provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."  In order for a plaintiff to establish a RICO conspiracy, the plaintiff need not "prove that the defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed." *United States v. Saadey*,

26

393 F.3d 669, 676 (6th Cir. 2005) (citing *Salinas v. United States*, 522 U.S. 52, 63 (1997).  In

*Salinas*, the Court held:

> A conspirator must intend to further an endeavor which, if completed, would satisfy
> all of the elements of a substantive criminal offense, but it suffices that he adopt the
> goal of furthering or facilitating the criminal endeavor.  He may do so in any number
> of ways short of agreeing to undertake all of the acts necessary for the crime's
> completion.  One can be a conspirator by agreeing to facilitate only some of the acts
> leading to the substantive offense. It is elementary that a conspiracy may exist and
> be punished whether or not the substantive crime ensues, for the conspiracy is a
> distinct evil, dangerous to the public, and so punishable in itself.

*Id*. at 65.  Thus, a plaintiff need only show that the defendant agreed "that someone would commit

two predicate acts." *United States v. Driver*, 535 F.3d 424, 432 (6th Cir.  2008).[9]

As set forth above, Plaintiff sufficiently alleged that Home City, Reddy Ice, and Mr. Riley

all agreed with Arctic Glacier not to hire Plaintiff and that such an agreement to retaliate against

Plaintiff was in violation of 18 U.S.C. § 1513(f).  Plaintiff, however, has not provided the Court with

any factual allegations tending to show that Home City, Reddy Ice, or Mr. Riley agreed to any acts

of tampering against Plaintiff that are in violation of 18 U.S.C. § 1512.  That is, Plaintiff has not

alleged that any of the other Defendants agreed with Arctic Ice for it to commit two predicate acts.

Plaintiff asserts that Arctic Glacier employees, at the behest of Mr. Knowlton, offered to re-

hire Plaintiff if he ceased his cooperation with the federal authorities and then after he refused

---

[9] Some circuits have more exacting standards, while others are less stringent.  *Compare Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 995 (7th Cir. 2001) ("'[The plaintiff] must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals.'") *with United States v. Browne*, 505 F.3d 1229, 1263 (11th Cir. 2007) ("The touchstone of liability is an agreement to participate in a RICO conspiracy, which may be shown in two ways: (1) showing an agreement on the overall objective of the conspiracy, or (2) showing that a defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a 'single objective.'").

informed him that he was being blacklisted because of this cooperation and that he would not receive his earn-out bonus until he ceased the cooperation.   While such factual allegations support a claim witness tampering claim against Arctic Glacier and Mr. Knowlton, there are no allegations that Home City, Reddy Ice, or Mr. Riley ever agreed to these alleged acts of retaliation.   Likewise, their alleged agreement with Arctic Glacier to boycott Plaintiff does not give rise a witness tampering claim.   Because Plaintiff has only alleged facts that show that Home City, Reddy Ice, and Mr. Riley agreed with Arctic Glacier not to hire Plaintiff, the Court dismisses Plaintiff's RICO conspiracy claims against all Defendants.

### c.    Injury

Defendant Home City contends that Plaintiff does not have standing to assert his civil RICO claims for the additional reason that he does not allege an injury to his "business and property."  As noted by Plaintiff, however, "courts have generally viewed the loss of employment as an injury to one's business or property." *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 712–13 (D.N.J. 1998) (citing *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1170 (3d Cir. 1989); *see also Quinonez v. Nat'l Asso. of Sec. Dealers, Inc.*, 540 F.2d 824, 830 (5th Cir. 1976) (holding that "the loss of the opportunity to perform work [i]s an injury contemplated by the 'injury to business' language"); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 334 (7th Cir. 1967) ("[W]e readily conclude that one who has been damaged by loss of employment as a result of the antitrust laws is 'injured in his business or property'"). [10]   Because Plaintiff seeks to recover for a continued loss of employment,

--------

[10] Although *Quinonez* and *Nichols* addressed the "business or property" requirement of the Clayton Act, the RICO "business or property" requirement was modeled after and has been interpreted consistent with the Clayton Act. *Evans v. City of Chicago*, 434 F.3d 916, 929 n. 23 (7th Cir. 2003).

28

Plaintiff has sufficiently alleged an injury to his "business or property."

### d.      Proximate Cause

To establish proximate cause for a section 1962(c) violation, Plaintiff must allege that the Defendants' violations of section 1962(c) led directly to his injuries. *See Anza v. Ideal Steel Supply*, 547 U.S. 451, 461 (2006)("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Defendants contend that, as a matter of law, their alleged violations of section 1962 are not the proximate cause of Plaintiff's alleged injuries and that consequently, Plaintiff lacks RICO standing to pursue his claims.   Throughout their Motions, Defendants assume that the requisite pattern of racketeering includes predicate acts pertaining to Plaintiff's termination and Defendants' alleged participation in the market allocation scheme.   The Court, however, found that the pattern of racketeering activity here is limited to the alleged acts of witness retaliation and witness tampering. Unlike the several cases cited by both parties, where the pattern of racketeering activity was larger in scope and included predicate acts directed at third parties as well as those directed toward the plaintiff, the pattern of racketeering involving the predicate acts of witness tampering and witness retaliation are squarely directed at Plaintiff.   Therefore, the Court finds that the pattern of racketeering was the direct cause of his inability to find employment in the packaged ice industry.

Accordingly, the Court GRANTS Home City's, Reddy Ice's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C. 1962(c) but DENIES Defendants Arctic Glacier's and Mr. Knowlton's Motions to Dismiss as to that claim.  In addition, the Court GRANTS Defendants Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C. 1962(d).

### 3.      Plaintiff's Antitrust Claims

29

In his Amended Complaint, Plaintiff avers that "Defendants have engaged in a *per se* unlawful conspiracy by agreeing that [Plaintiff] should be terminated from Arctic Glacier and then terminating [Plaintiff] from Arctic Glacier [and] . . . by agreeing to boycott [Plaintiff] from the packaged ice industry." (Am. Compl. ¶¶ 72). Plaintiff then claims that "Defendants by and through their anticompetitive actions as outlined herein,[11] have violated Section 1 of the Sherman Act, 15 U.S.C. § 1."[12]

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared illegal." 15 U.S.C. § 1. A private party who is injured due to actions in violation of antitrust laws may bring a private suit but must show that it has standing to sue under the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

"The Supreme Court has articulated certain factors to be analyzed in determining whether a plaintiff has established antitrust standing." *Indeck Energy Servs. v. Consumers Energy Co.*, 250

---

[11] Both Home City and Arctic Glacier initially based their Motions to Dismiss, in part, on the grounds that Plaintiff cannot recover for Defendants' alleged conspiracy to allocate markets. Such an interpretation is understandable given Plaintiff's somewhat vague allegation that Defendants have violated the Sherman Act "by and through their anticompetitive actions as outlined herein," which might seem to include the alleged conspiracy to allocate markets. In his Response to those motions, however, Plaintiff clarifies that his antitrust claims seek recovery for Defendants' conspiracy to boycott Plaintiff from the packaged ice industry, not for their conspiracy to allocate markets. (Pl.'s Resp. to Home City's Mot. to Dismiss at 6). Therefore, the Court only focuses on the alleged conspiracy to boycott Plaintiff from the packaged ice industry.

[12] "The private cause of action for antitrust violations is provided in section 4 of the Clayton Act, which states that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States.'" *In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc.*, 246 F. Supp. 2d 469, 474 (S.D. W.V. 2003) (quoting 15 U.S.C. 15(a)).

F.3d 972, 976 (6th Cir. 2000) (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45 (1983)). Those factors include:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* (citations omitted).

Of the various requirements for establishing antitrust standing, the one primarily at issue here is antitrust injury, "which is a 'necessary, but not always sufficient,' condition of antitrust standing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Antitrust injury is an "injury the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* This requirement "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

Traditionally, the Sixth Circuit "has been reasonably aggressive in using the antitrust doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Prods. Co.*, 128 F.3d at 403. The Sixth Circuit has adopted a two-part test to analyze antitrust injury under *Brunswick*:

"the antitrust plaintiff 'must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989) (citing P. Areeda & H. Hovenkamp, Antitrust Law P 334.1b at 299 (1988 Supp.)).  In *Tennessean Truckstop*, the Sixth Circuit concluded that because the plaintiff was really not complaining about a decrease in competition in general, its injury did not flow from a competition-reducing aspect of the act at issue. *Id*.

      In support of his argument that he suffered antitrust injury, Plaintiff relies primarily upon *Radovich v. National Football League*, 352 U.S. 445 (1957); *Quinonex v. National Association of Securities Dealers, Inc.*, 540 F.2d 824 (5th Cir. 1976); and *Roman v. Cessna Aircraft Co.*, 55 F.3d 542 (10th Cir. 1995).

      *Radovich* involved an alleged agreement among defendant football teams of the National Football League ("NFL") to blacklist any player who violated a standard player contract by signing with another team without the consent of the team holding the player's contract.  *Id*. at 449.  The plaintiff originally signed with the Detroit Lions, an NFL team.  *Id*. at 448.  But after his father became ill, he requested a transfer to an NFL team in Los Angeles.  *Id*.  When the Lions refused his transfer request, the plaintiff broke his contract with the Lions by signing and playing two seasons for the Los Angeles Dons, a member of the All-America Conference and a competing league to the NFL.  *Id*.  Subsequently, the plaintiff attempted to sign with the San Francisco Clippers, a member of the Pacific Coast League, which was affiliated with but not a competitor of the NFL.  *Id*.  The NFL, however, advised the plaintiff that he was black-listed and any team attempting to sign him would suffer severe penalties.  *Id*.  The Clippers refused to sign him to any position.  *Id*. Plaintiff

then filed suit against the NFL, alleging that the defendants purportedly had utilized the player boycott as the means by which to destroy the rival league, with the object of the overall conspiracy to monopolize professional football.  *Id*. 448–49.  The Supreme Court held that the plaintiff had adequately stated a cause of action under the Sherman Act.  *Id*. at 446, 453.

In *Quinonez*, the Fifth Circuit held that a terminated securities salesman stated a treble damage claim under Section 4 of the Clayton Act where he alleged that securities dealers conspired to deny employment to persons who had been fired by another dealer.  540 F.2d at 830.  Specifically, the plaintiff alleged that there was an express or tacit agreement among the securities dealers not to "pirate" persons from the other firms and would deny employment to persons who had either been fired or rejected for employment by any other securities dealer.  *Id*. at 827.  The plaintiff further alleged that such agreements artificially reduced competition in the sale and purchase of securities in the United States.  *Id*.  The *Quinonez* court found that these "no-switching agreements," which may impair competition among the security dealers, was sufficient to state a claim under the Sherman Act.  *Id*. at 829.

The *Roman* opinion relied upon both *Radovich* and *Quinonez*.  In *Roman*, the plaintiff, an airplane engineer at Boeing, applied  for an engineering position at Cessna while he was still employed at Boeing.  55 F.3d at .  Initially, Cessna told him that he could expect a firm offer but later informed him that it would not hire him "solely because of an agreement between Cessna and Boeing that they would not hire engineers away from each other."  *Id*.   In reversing the district court's dismissal under Rule 12(b)(6), the court cited *Radovich* and *Quinonez* for the proposition that "plaintiffs whose opportunities in the employment market have been impaired by an anticompetitive agreement directed at them *as a particular segment of employees* have suffered an

33

antitrust injury under the governing standard." *Id.* (emphasis added).

Notwithstanding that both *Radovich* and *Quinonez* were decided before the Supreme Court's promulgation of the antitrust injury requirement in *Brunswick*, they, like *Roman*, are critically distinct from the case at bar.   That is, although *Radovich*, *Quinonez*, and *Roman* support Plaintiff's argument that loss of employment is actionable under the antitrust laws, these cases are not controlling.   The plaintiffs in all three cases alleged an anti-competitive conspiracy directed at a respective employment market—football players in *Radovich*, securities brokers in *Quinonez*, and airplane engineers in *Roman*.   In his Complaint, under the heading "Relevant Markets," Plaintiff states that "[t]he United States market for the purchasing of packaged ice sales service is a distinct and separate market." (Am. Compl. ¶ 55).   Even assuming that this is a proper market,[13] Plaintiff has not alleged any anti-competitive effect on that market.  Plaintiff appears to acknowledge this in his responses to Defendants' Motions, when he contends that "he is the immediate victim of an anticompetitive boycott that diminished competition for *his* services."   (Pl.'s Resp. to Arctic Glacier's Mot. to Dismiss 9).   Plaintiff's adaptation of the alleged relevant market from packaged ice sale representatives in his Complaint to the market for his services in his responses may be explained by language found in *Roman*.   There, after noting that the plaintiff alleged being part of the labor market for airplane engineers and discussing how competition in that market was suppressed, the Court held that:

> Mr. Roman has alleged that competition in *the market for his services* as an
> employee has been directly impeded by defendant's agreement not to compete for

---

[13] The Sixth Circuit explained in "supplier markets such as the employment market in the instant case: the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005).

> each other's employees.  He further alleges that he was injured by that agreement
> because it prevented him from selling his services to the highest bidder. . . . We
> believe this is sufficient to allege antitrust standing.

*Roman*, 55 F.3d at 544–55.   But any purported narrowing of the market by the *Roman* court to

encompass only individual markets for one's respective services was not only unnecessary in that

case but also would have been in conflict with the antitrust standing factors articulated in *Associated*

*General Contractors*.   The second factor requires courts to analyze "the nature of the plaintiff's

alleged injury" including whether the plaintiff was a "consumer []or a competitor in the market in

which trade was restrained."  *Associated Gen. Contractors*, 459 U.S. at 538–39; *see also Vinci v.*

*Waste Mgmt. Inc.*, 80 F.3d 1372, 1376 ("[A] plaintiff who is neither a competitor nor a consumer'

in the relevant market does not suffer 'antitrust injury.'") (citations and internal quotations omitted)).

Just like in the instant action, the plaintiff in *Roman* was not a consumer or competitor in any market

for his services.  Rather, he was a competitor in the market for airplane engineers.

Plaintiff also relies on *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 742 (9th Cir. 1984), which

was expressly limited by *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372 (9th Cir.1996).  In *Ostrofe*, the

plaintiff, a sales manager, allegedly was forced to resign after his employer, a manufacturer of paper

lithograph labels, coerced the plaintiff to rig bids, fix prices, and allocate markets.  740 F.2d at 742.

The plaintiff then claims that there was an implied agreement among label manufacturers to boycott

him from the label industry.  The Ninth Circuit held that the plaintiff satisfied the *Associated*

*General Contractors* antitrust standing factors, including alleging antitrust injury:

> [Plaintiff's] injury flowed from a violation of the antitrust policy, since it resulted
> from the elimination of competition in the market for managerial services and would
> be ameliorated by the restoration of competition in that market. . . . As the immediate
> victim of the breach of antitrust policy he was its natural vindicator.  No one else had
> a greater incentive to sue to restore competition in the market for his services.

35

*Id*. at 742–43.  So, like the Tenth Circuit in *Roman*, the *Ostrofe* Court vacillated between a larger market for managerial services and an individual market for the plaintiff's services.  But, just like in *Roman*, any narrowing of the market to include only the plaintiff appears to be both unintentional and inconsequential as both courts focused on the anticompetitive effects on the larger market, where both of the plaintiffs were competitors.

Regardless of the purported basis of the holdings in *Roman* or *Ostrofe*, Plaintiff's Amended Complaint clearly states that the relevant market is the market for packaged ice sales representatives. Instead of alleging an anticompetive effect on that market, however, Plaintiff—under the heading "The Anticompetitive Effects of the Defendants' Termination and Boycott of [Plaintiff]"—merely alleges that the group boycott injured him personally.  His Complaint does not mention any injury to the packaged ice sales market as a result of the alleged group boycott against him.   Precedent from this Circuit clearly instructs that an antitrust plaintiff must allege not only an injury to himself but also an injury to the relevant market.  *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (affirming dismissal of a complaint on antitrust injury grounds that alleged a similar "group boycott" of an employee); *see also Indeck Energy Servs., Inc v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000).  Because Plaintiff has not alleged an anticompetive effect on the market for packaged ice sales representatives, his antitrust claim must fail.

Finally, Plaintiff argues that since he alleges that Defendants' conspiracy to boycott Plaintiff is *per se* unlawful under the Sherman Act, he has stated a claim under the Sherman Act.  But as noted by Home City, a plaintiff who pleads a *per se* violation must also plead antitrust injury.  *See Atl. Richfield Co v. USA Petroleum Co.*, 495 U.S. 328, 344, 339–40, n.8 (1990) ("'[P]roof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently.'") (quoting

36

P. Areeda & H. Hovenkamp, Antitrust Law para. 334.2c, p. 330 (1989 Supp.).

Accordingly, the Court dismisses Plaintiff's antitrust claims because Plaintiff has failed to properly allege antitrust injury.

### c.      Plaintiff's State Law Antitrust Claims

In *Blair v. Checker Cab Co.*, 219 Mich. App. 667, 675 (1996), the Michigan Court of Appeals held that Michigan's antitrust law, the Michigan Antitrust Reform Act ("MARA") and the federal antitrust law (Sherman Act) "require similar evidence of concerted action or combination [such that the court must] consider federal precedent interpreting the Sherman Act's prohibition on combination in restraint of trade." The court then went on to analyze the plaintiff's claims solely with reference to federal case law interpreting the Sherman Act. Therefore, because Michigan courts apply Sherman Act analysis to the MARA, the preceding analysis applies to Count III as well as Count IV, for the allegations of both state and federal antitrust violations.

Accordingly, the Court dismisses Plaintiff's state law antitrust claims under MARA.

### 7.      Tortious Interference with Prospective Economic Advantage

Defendants argue that Plaintiff fails to allege the required elements of his tortious interference claim.

In Michigan, the elements of a claim of tortious interference with a business relations are: "[1] the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the expectancy, and [4] resultant damage to the plaintiff." *BPS Clinical Labs. v. Blue Cross & Blue Shield*, 217 Mich. App. 687, 698–99 (1996) (citing *Lakeshore Community Hosp., Inc. v. Perry*, 212 Mich. App. 396, 401 (1995)).

Plaintiff alleges that he had an "expectancy of a valid business relationship with manufacturers and distributors of packaged ice, given his acumen, experience, contacts, and accounts in the packaged ice industry." (Am. Compl. ¶ 85). Plaintiff also claims that Defendants agreed to boycott him from the packaged ice industry with the purpose of perpetuating their unlawful market allocation scheme and that as a result of this boycott, Plaintiff was deprived of employment opportunities in the only industry in which he had professional experience. (*Id.* ¶¶ 53, 88).

Several courts have held that tortious interference with business relations includes the interference with the prospect of obtaining employment. *See, e.g.*, *Hoffman v. Roberto*, 85 B.R. 406, 415 (W.D. Mich. 1987) (citing *Schipano v. Ford Motor Co.*, 102 Mich. App. 606, 621 (1981)); *Wilkerson v. Carlo*, 101 Mich. App. 629 (1980)); *see also* Restatement (Second) of Torts § 766B cmt. c (1979). But, "'[t]he [business relationship or expectancy of a relationship]  must be a reasonable likelihood or a probability, not mere wishful thinking.'" *Grand Rapids Plastic, Inc v. Lakian*, 188 F.3d 401, 408 (6th Cir. 1999) (quoting *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361 (1984)).

For instance, in *Wilkinson*, the plaintiff, an owner and trainer of standardbred horses, filed suit alleging tortious interference with advantageous economic relations after the executive manager at a local horse racing track made public accusations implicating plaintiff in a race-fixing scheme at the track. 101 Mich. App. at 631. Plaintiff's Complaint merely asserted that the executive manager disseminated the statements to the "community at large," and not to individuals who might maintain some influence on the type of economic relationships plaintiff might enjoy in the racing community. *Id.* at 661. Nonetheless, the Michigan Court of Appeals found that the plaintiff

38

adequately stated a claim:

> Considering the facts most favorable to plaintiff, there are only a small number of places where plaintiff could ply his trade. These tracks could reasonably, if not certainly be expected to be aware of defendant's accusations. Defendant reasonably could have expected other tracks to bar plaintiff from entering his horses in their races, and thus, ruin plaintiff's business.

*Id*.

Likewise, in *Hoffman*, the plaintiff, a former president of a trucking company, filed suit against a union official and the union itself after the union official sent two allegedly defamatory teleflexes to union locals with members employed by the trucking company. *Id*. at 408. Plaintiff alleged that "he had a reasonable expectation of obtaining further employment as a manager in the trucking industry since he had several years of experience working in that industry and that since prior to the alleged interference, his reputation in that industry was generally good." *Id*. at 416. He further averred that since the defendants knew of his experience and good reputation, they must have been aware of this expectation. *Id*. Finally, he submitted that the defendants distributed the teleflexes with the purpose of hampering plaintiff from finding further employment in the trucking industry. *Id*. In addition to these allegations in opposition to the defendant's motion for summary judgment, plaintiff offered as evidence (1) his testimony that although he distributed over 350 resumes over a four-year period, he never received a serious job offer in the trucking industry; and (2) the testimony of two employment counselors who found plaintiff's inability to find a job "unusual." *Id*. The court found that a reasonable jury could conclude that plaintiff had a reasonable expectation of finding employment in the trucking industry. *Id*. at 416. In so holding, the court focused on the appearance of an industry-wide blacklist and noted that while the trucking industry is not as small as the horse-racing community in *Wilkinson*, "it is still a relatively small community

39

where one's reputation would be a valuable tool in finding employment." *Id*.

Plaintiff's Amended Complaint thoroughly details Plaintiff's experience in the packaged ice industry, his ascension into sales management at Great Lakes, and his continued success at Party Time and then at Arctic Glacier. In addition, the Amended Complaint describes how the packaged ice industry is dominated by a few large companies—three of which are defendants in this case. Finally, Plaintiff alleges specific factual allegations of Arctic Glacier's and Home City's involvement in a scheme to boycott Plaintiff from the packaged ice industry.

In addition to these general allegations of a business expectancy in the industry as a whole—like those in *Wilkinson* and *Hoffman*—Plaintiff provides specific allegations of the existence of a valid business relationship or expectancy. Plaintiff avers that in response to a letter he sent to Mr. Riley, the President of Tropical Ice, Mr. Riley agreed to meet with Plaintiff to discuss his employment application. (Am. Compl. ¶ 45). During the course of that meeting, after informing Plaintiff that he was being "blackballed" from the industry by Arctic Glacier and its co-conspirators, Mr. Riley allegedly informed Plaintiff that he would call Plaintiff within several weeks to discuss Plaintiff's potential employment at Tropical Ice. (*Id*. ¶¶ 46–47). Lastly, Plaintiff alleges that after not hearing from Mr. Riley for roughly six weeks, Plaintiff called Mr. Riley, who told Plaintiff that Tropic Ice had agreed with Arctic Glacier to boycott Plaintiff as well. (*Id*. ¶ 48). In fact, according to Plaintiff, these conversations between Mr. Riley and Plaintiff at the restaurant and over the telephone were tape recorded. (*Id*. ¶¶ 46–48).

This alleged business expectancy with Tropic Ice was not mere "wishful thinking," as Plaintiff not only met with the president of a packaged ice corporation to discuss employment prospects, but at the conclusion of the meeting, Mr. Riley allegedly informed Plaintiff that he wanted

40

to discuss Plaintiff's employment prospects further.   Once Plaintiff called to inquire further about a position at Tropic Ice, he was informed that Tropic Ice had agreed with Arctic Ice not to hire Plaintiff.  From this, the Court concludes that Plaintiff has adequately pled a cause of action for tortious interference of prospective economic advantage against Arctic Ice.

Plaintiff's tortious interference claims against the remaining Defendants are based on a business expectancy similar to that found in *Wilkinson* and *Hoffman*.  As noted above, Plaintiff alleged that before his termination he had a very good reputation in an industry dominated by a few major players.  Therefore, Plaintiff has sufficiently pled the first element of his tortious interference claim.

The issue of whether Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, and Mr. Riley knew of the expectancy and whether they intentionally interfered with it—the second and  third elements of Plaintiff's tortious interference claim—is not so easily resolved.   Plaintiff alleges that during the course of his first meeting with Mr. Riley, "Mr. Riley told him that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire [Plaintiff].  According to Mr. Riley, Plaintiff was being "blackballed" from the industry."  (Compl. 46) (emphasis added).

Even assuming that the co-conspirators in the market allocation scheme referenced by Mr. Riley include Mr. Knowlton, Mr. Corbin, Home City, and Reddy Ice, or any combination thereof, and that they agreed not to hire Plaintiff, Plaintiff has failed to alleged facts showing that Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, or Mr. Riley intentionally interfered with Plaintiff's reasonable expectation of employment in the packaged ice industry.   By agreeing not to hire Plaintiff, the particular Defendant may have defeated any reasonable expectation that Plaintiff had

41

of being hired by that Defendant.  A defendant, however, cannot be held liable for interfering with its own business relationship or expectancy with a plaintiff.  The defendant must be a "third party" to the expectancy or business relationship.  *See, e.g.*, *Dziera v. Mich. Oil Co.*, 152 Mich. App. 281, 287 (citing *Seven D Ents., Ltd. v. Fonzi*, 438 F. Supp. 161 (E.D. Mich. 1977)).  Plaintiff has not alleged any facts demonstrating that any of the Defendants besides Arctic Ice interfered with an employment expectancy that Plaintiff allegedly had with a third party.  Further, the mere existence of a conspiracy among the Defendants not to hire Plaintiff does mean that any Defendant intentionally interfered with the business expectancy of any third party, including another one of the Defendants.  Because Plaintiff has not alleged facts showing that any of the Defendants besides Arctic Ice interfered with the business expectancy of any third party, Plaintiff's tortious interference claim against Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, and Mr. Riley must be dismissed.

Accordingly, the Court GRANTS Mr. Knowton, Mr. Corbin's, Home City's, Reddy Ice's, and Mr. Riley's Motions to Dismiss Plaintiff's claim of tortious interference with prospective economic advantage.  The Court, however, DENIES Arctic Glacier's Motion to Dismiss Plaintiff's tortious interference claim.

## III.    CONCLUSION

For the reasons stated, the Court:

(1)    GRANTS Defendants Home City's, Reddy Ice's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C. § 1962(c) (Count I);

(2)    DENIES Defendants Arctic Glacier's and Mr. Knowlton's Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C. 1962(c) (Count I);

(3)    DISMISSES Plaintiff's RICO claim under 18 U.S.C. § 1962(d) (Count II);

42

(4)    DISMISSES Plaintiff's Sherman antitrust claim (Count III);

(5)    DISMISSES Plaintiff's Michigan antitrust claim under Mich Comp. Laws § 445.772 (Count IV);

(6)    DENIES Defendant Arctic Glacier's Motion to Dismiss Plaintiff's tortious interference with prospective economic advantage claim (Count V);

(7)    GRANTS Defendants Home City's, Reddy Ice's, Mr. Knowlton's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's tortious interference with prospective economic advantage claim (Count V);

**SO ORDERED**.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 29, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 29, 2009.


S/Denise Goodine
Case Manager


43