# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARTIN G. MCNULTY, | |
| Plaintiff, | Civil Action No. 2:08-cv-13178 |
| v. | Judge Paul D. Borman |
| | Magistrate Judge Steven D. Pepe |
| REDDY ICE HOLDINGS, INC., REDDY ICECORPORATION, ARCTIC GLACIER INCOME FUND, ARCTIC GLACIER, INC., ARCTIC GLACIER INTERNATIONAL, INC., HOME CITY ICE COMPANY, INC., KEITH CORBIN, CHARLES KNOWLTON, JOSEPH RILEY | AMENDED COMPLAINT |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## AMENDED COMPLAINT

1.    This is an action to recover from an unlawful conspiracy and enterprise among competing manufacturers and distributors of packaged ice to (a) terminate Mr. McNulty from Arctic Glacier for refusing to participate in an unlawful market allocation scheme and (b) conspire to boycott Mr. McNulty from the packaged ice industry. This Complaint is brought for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), violations of the Sherman Act, 15 U.S.C. § 1, violations of the Michigan Antitrust Reform Act, M.C.L.A. § 445.772, and violations of common law tortious interference with business relations and tortious interference with prospective economic advantage.

1

### The Parties

2.      Plaintiff Martin G. McNulty is, and was at all relevant times, a resident and citizen of Michigan, residing at various times in the counties of Wayne, Livingston, and Oakland.

3.      Defendant Arctic Glacier Income Fund ("Arctic Fund") is a Canadian company with its principal place of business in Winnipeg, Manitoba. Arctic Fund conducts business in both the United States and Canada. *See* 2007 Annual Report at 37, 53.

4.      Defendant Arctic Glacier, Inc. ("Arctic Inc.") is a Canadian corporation with its principal place of business in Winnipeg, Manitoba. Arctic Inc. is a wholly-owned subsidiary of Arctic Fund, and is the parent of Arctic Glacier International Inc.

5.      Defendant Arctic Glacier International Inc. ("Arctic International") is a Delaware corporation with its principal place of business located in West St. Paul, Minnesota. Arctic International is a wholly-owned subsidiary of Arctic Inc., which in turn is a wholly-owned subsidiary of Arctic Fund.

6.      Defendants Arctic Inc. and Arctic International are operating companies that manufacture and distribute packaged ice. Defendants Arctic Fund, Arctic Inc., and Arctic International will be collectively referred to throughout this Complaint as "Arctic Glacier."

7.      Arctic Glacier is the second largest manufacturer of packaged ice sold in the United States, servicing customer locations in 16 states in the northeast, central, and western United States, with U.S. packaged ice sales of almost $200 million per year. In connection with an ongoing criminal investigation of the market allocation scheme detailed in this Complaint, Arctic Glacier and its employees have produced a large volume of documents and other evidence

in response to Department of Justice Subpoenas issued on or around March 5, 2008, and in response to civil investigative demands from state attorneys general on March 28, 2008 and June 11, 2008.

8.    Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Home City manufactures, distributes, and sells packaged ice principally in the upper-Midwest. Home City is the third largest manufacturer and distributor of packaged ice in the United States and is the largest private manufacturer and distributor. Home City manufactures 4,400 tons of ice per day in 28 manufacturing plants and 36 distribution centers, and records sales of approximately $50 million per year. In connection with the market allocation scheme detailed in this Complaint, Home City has pleaded guilty to "participat[ing] in a conspiracy among packaged ice producers, the primary purpose of which was to allocate customers and territories of packaged ice."

9.    Defendants Reddy Ice Holdings, Inc. and Reddy Ice Corporation are corporations organized under the laws of the State of Delaware with principal places of business in Dallas, Texas. Reddy Ice Corporation is a wholly-owned subsidiary of Defendant Reddy Ice Holdings, Inc. Hereafter Reddy Ice Holdings, Inc. and Reddy Ice Corporation will be referred to collectively as "Reddy Ice."

10.    Reddy Ice is the largest manufacturer and distributor of packaged ice in the United States, serving approximately 82,000 customer locations in 31 states and the District of Columbia under the Reddy Ice brand name. For the year ended December 31, 2007, Reddy Ice sold approximately 1.9 million tons of ice. Reddy Ice's products are primarily sold throughout the southern United States. In connection with an ongoing criminal investigation of a market

allocation scheme detailed in this Complaint, Reddy Ice produced a large volume of documents when the federal government executed a search warrant at its offices on March 5, 2008, in response to an August 28, 2008 subpoena, and in response to civil investigative demands from state attorneys general on March 25, 2008 and September 11, 2008. An internal company investigation found that Reddy Ice's Executive Vice President of Sales and Marketing, Ben Key, "likely violated company policies and is associated with matters that are under investigation."

11.    Defendant Keith E. Corbin resides in Hendersonville, Tennessee and was employed by Arctic Glacier as Vice President of Sales.

12.    Defendant Charles Knowlton resides in Port Huron, Michigan. Mr. Knowlton owned Party Time Ice Company, which was acquired by Arctic Glacier in late 2004. Mr. Knowlton then was employed by Arctic Glacier as Director, Franchise Operations.

13.    Defendant Joseph Riley resides in Traverse City, Michigan. Mr. Riley owned Tropic Ice Company, which was acquired by Arctic Glacier.

### Jurisdiction and Venue

14.    The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 (RICO). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in this action arise under section 1 of the Sherman Act (15 U.S.C. § 1) and sections 4 and 16 of the Clayton Act (15 U.S.C. § 15(a)); and further pursuant to 28 U.S.C. § 1331 (federal question), because certain claims in this action arise under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; and pursuant to 28 U.S.C. § 1332 (diversity

jurisdiction), because diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, 18 U.S.C. § 1965(a), and 15 U.S.C. §§ 15, 22, and 26, as one or more of the Defendants can be found in, reside in, and/or transact substantial business in this District, Mr. McNulty resides in this District, and a significant portion of the affected interstate trade and commerce described below has been carried out in this district.

### Facts

*Mr. McNulty's Rapid Rise in the Packaged Ice Industry*

16.     Mr. McNulty is a packaged ice salesman. He spent fourteen years learning the ins and outs of the industry, perfecting an analytical approach to selling packaged ice that consistently delivered new business and new accounts, and developing valuable contacts at some of the largest corporate accounts in the industry. He rose rapidly through the ranks, and was on a trajectory towards becoming a top executive at one the largest packaged ice manufacturers in the country before his ability to work in the industry was prematurely and unlawfully curtailed by the Defendants.

17.     Mr. McNulty began his career in the ice industry in 1991, when he accepted a position as a sales representative for Great Lakes Ice Company in Warren, Michigan. Great Lakes Ice was a relatively small competitor in the packaged ice industry with annual sales of approximately $2 million and served primarily the Detroit, Michigan and surrounding area. While at Great Lakes Ice, Mr. McNulty was quickly recognized as a high performing salesman.

5

He was promoted to sales manager about six months after he started at Great Lakes, and then promoted again to Vice President of Sales in 1994.

18.     As a result of his business acumen, Mr. McNulty was able to secure corporate accounts for Great Lakes Ice that were larger than the relatively small company had historically serviced.  For instance, after traveling to Bentonville, Arkansas several times to present to Sam's Club, Mr. McNulty was the first salesman in the industry to convince Sam's Club to sell packaged ice in the Midwest, including in Michigan.  Sam's had not previously sold packaged ice in its Midwest stores.  Because Great Lakes Ice had limited production and distribution capacity, the Sam's Club business that Great Lakes was able to service was limited to roughly six Sam's Club stores.

19.     Great Lakes Ice was acquired by a larger competitor -- Party Time Ice -- in 1994. Party Time Ice ("Party Time") had more production and distribution capacity than Great Lakes Ice, and annual sales of approximately $20 million.  Party Time's additional capacity, coupled with Mr. McNulty's acumen, enabled Mr. McNulty to secure new corporate accounts in broader geographies than Great Lakes Ice had been able to service.

20.     For instance, after presenting to executives from The Kroger Company (which is headquartered in Cincinnati, Ohio), Mr. McNulty secured for Party Time the Kroger account for the Detroit metro-area.  Mr. McNulty also secured the Sky Chef account, a large account that provides ice to airlines at the Detroit airport.

21.     In addition, as he had previously done with Sam's Club, Mr. McNulty convinced large retailers to sell packaged ice that had not previously done so.  For instance, Mr. McNulty

6

convinced CVS Corporation – which is headquartered in Woonsocket, Rhode Island – to sell packaged ice in its Midwest stores.

22.     Party Time's larger capacity also enabled Mr. McNulty to secure additional business from existing accounts.  For instance, while at Great Lakes Ice and then at Party Time, Mr. McNulty serviced Spartan Stores, Inc., a retailer in Grand Rapids, Michigan that had stores throughout Michigan and in Ohio.   By virtue of Party Time's additional production and distribution capacity relative to Great Lakes Ice, Mr. McNulty was able to better develop business in Spartan Stores' outlets located in Ohio – an opportunity Great Lakes Ice did not afford because of Great Lakes' limited capacity.

23.     Mr. McNulty's sales success at Party Time was broadly recognized.  In 1996, he was promoted from sales manager to Vice President of Sales.  In 1997, he was offered an equity stake in the company, which Mr. McNulty declined so that he could retain flexibility to work for another ice manufacturer or distributor, such as a company with more capacity than Party Time. In or around 2002, on behalf of Party Time, Mr. McNulty won an award from Wal-Mart, Inc. for the largest annual percentage increase in off-season sales of packaged ice.  In 2004, and as discussed further below, Mr. McNulty was told by Party Time's president – Charles Knowlton – that "everyone knows that you are the best corporate salesman in the ice industry."  At the time, Mr. McNulty was only 41 years old.

24.     While Mr. McNulty was very effective in establishing and servicing new, large corporate accounts, his ability to broadly expand the business these accounts delivered to Party Time was constrained by Party Time's limited production and distribution capacity relative to the three primary competitors in the industry:  Arctic Glacier, Home City, and Reddy Ice.

7

25. In October 2004, it was announced that Party Time was being purchased by Arctic Glacier, a much larger competitor with hundreds of millions of dollars in annual sales and with a substantially larger production and distribution capacity than Party Time. While a bit apprehensive about signing on with a new employer with which he was unfamiliar, Mr. McNulty was excited about the professional opportunities Arctic Glacier's increased capacity offered. Based on his experience in going from Great Lakes Ice to Party Time, Mr. McNulty believed that Arctic Glacier's additional capacity would enable him to secure new corporate accounts while simultaneously expanding the geographic coverage of his existing corporate accounts, including Sam's Club, Wal-Mart, Kroger, CVS, and others.

26. Arctic Glacier seemed equally as interested in Mr. McNulty. For instance, in late October 2004, Arctic Glacier offered Mr. McNulty a five year contract, conditioned on Mr. McNulty's agreeing not to work for a competitor of Arctic Glacier for five years. Arctic Glacier also offered Mr. McNulty (and some other employees) an "earn out" of two year's salary if he did not resign for a certain period of time after Arctic Glacier acquired Party Time, contingent on Arctic Glacier meeting certain financial goals.

27. Mr. McNulty accepted Arctic Glacier's "earn out" offer, but did not accept the organization's five year contract offer. Before entering a long-term commitment to work only for Arctic Glacier, Mr. McNulty first wanted to ensure that Arctic Glacier's culture and environment were satisfying. If not, Mr. McNulty would take his acumen, experience, contacts, and accounts – all of which were valuable in a commodity-based industry like packaged ice – to a competitor. He therefore declined Arctic Glacier's five-year offer, at least until he became more comfortable with the organization. In declining Arctic Glacier's five-year offer, Mr.

McNulty reasoned that the offer would always be available to him after he joined and became more comfortable with the organization.

28.     After Mr. McNulty declined Arctic Glacier's five-year contract offer, Keith Corbin – Arctic Glacier's Vice President of Sales – contacted Mr. McNulty to ensure that he planned to stay with Arctic Glacier following the Party Time acquisition. Mr. Corbin was going to be Mr. McNulty's supervisor at Arctic Glacier. Mr. Corbin called Mr. McNulty roughly four times in a single night in late October 2004 to discuss Mr. McNulty's plans. During the course of these calls, Mr. Corbin said he knew of Mr. McNulty's successes and capabilities. Mr. Corbin, who was roughly 70 years old at the time, also said that he was going to retire in the near future, and committed that Mr. McNulty would succeed him as Vice President of Sales at Arctic Glacier so long as Mr. McNulty stayed with the company.

*Mr. McNulty's Termination from Arctic Glacier*

29.     While at Party Time, Mr. McNulty had heard rumors and second-hand accounts about possible cooperation between Party Time and Home City as early as 1997, including customer allocation and bid-rigging. For example, he was told that Party Time declined to service certain stores because they were currently being serviced by Home City Ice, and that Party Time and Home City Ice agreed in advance which company would submit a lower bid to potential customers, such as Spartan Stores, SkyChef Catering, and government entities. On information and belief, all Defendants were involved in bid-rigging, and some of the bids submitted by Defendants included a false certification that the bid was not collusive. On information and belief, Defendants use interstate mails and wires to submit bids, to invoice

customers, and to receive payments from customers. Mr. McNulty had never been directly privy to information about explicit or widespread collusion. That all changed in late 2004.

30. One day in late 2004, Steve Knowlton called Mr. McNulty on behalf of his father, Defendant Charles Knowlton, to discuss a Party Time account. According to Steve Knowlton, Charles Knowlton had received a phone call from an executive at Defendant Home City (Party Time's competitor). The executive – who, on information and belief, was Tom Sedler, Jr. – informed Charles Knowlton that a Party Time customer in Livonia, Michigan was unhappy with Party Time's prices and services and had approached Home City about supplying ice. Home City declined to supply ice to the customer, and encouraged Party Time to take steps to satisfy the customer's needs so the customer would not search for a competing ice supplier. When Mr. McNulty asked why a competitor would call Party Time about a customer, Steve Knowlton told Mr. McNulty that Home City and Party Time had agreed not to compete for customers in specific geographies, and, on behalf of Charles Knowlton, Steve Knowlton asked Mr. McNulty to save the account for Party TIme. Mr. McNulty told Mr. Knowlton that he would not take over an account that Home City was effectively delivering to Party Time.

31. On other occasions, Mr. McNulty spoke directly with Charles Knowlton about the conspiracy, and told Mr. Knowlton that he could not participate in a conspiracy with Home City or any competitor and that – if staying at Party Time/Arctic Glacier required participating in the conspiracy – he would leave for another packaged ice company. Recognizing that Party Time had the ability to blackball Mr. McNulty from the industry, Charles Knowlton responded: "Marty, everyone knows that you are the best corporate salesman in the ice industry. Now, see what that will do for you." On at least one occasion, Charles Knowlton told Mr. McNulty that

10

Knowlton would perjure himself if necessary to maintain the secrecy of the conspiracy, and implied that Mr. McNulty should do the same.

32.     Shortly after Mr. Knowlton told Mr. McNulty of the agreement between Home City and Party Time, Mr. McNulty learned that Arctic Glacier was also colluding with Home City. Arctic Glacier was in the process of acquiring Party Time. Mr. McNulty, who was in Michigan, received an out-of-state phone call from Mr. Corbin. During the course of the call, to ensure that Arctic Glacier – Mr. McNulty's future employer – would not tolerate participation in an unlawful conspiracy, Mr. McNulty told Mr. Corbin about the apparent allocation agreement between Party Time and Home City. Mr. Corbin responded that Arctic Glacier had the same arrangement with Home City as Party Time, and stated something to the effect of: "Pretty much Michigan is ours." Mr. Corbin also told Mr. McNulty that, if Mr. McNulty left Party Time/Arctic Glacier, Mr. Corbin would ensure that Mr. McNulty would not be hired by a competing ice manufacturer.

33.     Arctic Glacier acquired Party Time in December 2004. Mr. McNulty accepted a position with Arctic Glacier, which entitled him to an "earn out" of two year's salary if the company met its financial targets in subsequent quarters.

34.     In January 2005, Mr. McNulty was traveling with Mr. Corbin (who was by then Mr. McNulty's supervisor) to Ohio to meet with one of Mr. McNulty's accounts, Speedway SuperAmerica LLC. Speedway was headquartered in Ohio and had stores in a number of different states, including Michigan. Prior to meeting with Speedway, Mr. Corbin instructed Mr. McNulty as to the geographic locations of the Speedway stores Arctic Glacier could service and

11

the locations that Arctic Glacier could not service because of its market allocation agreement with Home City.

35.    Mr. McNulty questioned Mr. Corbin about the details of the market allocation agreement between Arctic Glacier and Home City. Mr. Corbin explained that Arctic Glacier had agreed with both Home City and Reddy Ice to geographically divide the market for the sale and delivery of packaged ice. Mr. Corbin further explained that he had recently flown to Cincinnati to meet with Home City executives to discuss a dispute regarding which competitor would control customer stores located in a specific geography.

36.    Mr. Corbin also explained that Arctic Glacier's conspiracy with Reddy Ice extended throughout the United States. For instance, according to Mr. Corbin, Arctic Glacier had "backed away" from buying an ice company in Nevada so that Arctic Glacier and Reddy Ice would not be in direct competition. Mr. Corbin explained that Arctic Glacier's agreement not to enter the South and Southwest (a geography dominated by Reddy Ice) enabled Reddy Ice to "get their prices up," and Reddy Ice's agreement to stay out of the Midwest and Canada enabled Arctic Glacier to do the same. Mr. Corbin described Reddy Ice as "good competition."

37.    As to Mr. McNulty's Speedway account, Mr. Corbin did not want to disrupt Arctic Glacier's commitments to its competitors by allowing Mr. McNulty to compete aggressively for Speedway's business in a broad geographic area. Mr. McNulty was stunned. Mr. McNulty told Mr. Corbin that he believed any agreement between Arctic Glacier and a competitor to allocate geographies and customers was unlawful and that Mr. McNulty could not participate in any such agreement.

38.     Mr. McNulty's refusal to participate in the conspiracy was unacceptable to Arctic Glacier and its co-conspirators.  Less than a week after learning of his unwillingness to participate, Arctic Glacier fired Mr. McNulty, even though he was a top-performing salesman who was expected to succeed Mr. Corbin as Vice President of Sales.  In late January 2005, an Arctic Glacier human resources employee, Richard Scott, placed a phone call from his office in Texas to Mr. McNulty's home in Michigan to schedule a meeting to terminate Mr. McNulty. Mr. McNulty then called Mr. Corbin in Tennessee to ask Mr. Corbin why he himself had not called Mr. McNulty to explain the reasons Mr. McNulty was being terminated, to which Mr. Corbin falsely responded: "I don't know what's going on."

39.     On January 27, 2005, Arctic Glacier then sent a letter from Canada to Mr. McNulty in Michigan confirming Mr. McNulty's termination, using the false justification that "[t]his decision was made as a result of the restructuring of the Corporate Marketing department."  Upon information and belief, Arctic Glacier had agreed with its co-conspirators in its market allocation scheme that Mr. McNulty should be terminated from Arctic Glacier.

40.     Having spent 14 years as a successful salesman and executive in the packaged ice industry – and with promising prospects to advance to the top of the industry going forward – Mr. McNulty was angry that his former employer was engaged in an unlawful scheme designed to defraud the very accounts that he had worked hard to develop, and that he was being terminated by "crooked men" simply for refusing to participate in the scheme.  Mr. McNulty decided to disclose the scheme to government authorities to prevent Defendants from continuing to defraud customers.  He told a former colleague from Party Time named Geoff Lewandowski (who had also been terminated by Arctic Glacier) about his plan.

41.     Shortly after confiding in Mr. Lewandowski, on March 28, 2005, Mr. McNulty received a phone call from a colleague of Mr. Knowlton's named Fiaz Simon, who was calling at the behest of Mr. Knowlton. Mr. Simon wanted to set up a meeting between himself, Mr. McNulty, and Mr. Knowlton to address terms upon which Arctic Glacier might rehire Mr. McNulty at a salary that "would make him happy." Mr. Simon stated that Arctic Glacier was willing to pay him an annual salary of more than twice his previous salary. The offer was conditioned on Mr. McNulty's participation in the conspiracy and his not cooperating with the government. Mr. McNulty refused the offer.

*The Packaged Ice Competitors' Conspiracy to Boycott Mr. McNulty from the Industry*

42.     Following his termination from Arctic Glacier, Mr. McNulty signed a severance agreement with Arctic Glacier that restricted his ability to work for a company in competition with Arctic Glacier for six months – a period that expired on July 28, 2005. During this six month "non-compete period," Mr. McNulty informed the federal government of collusion in the packaged ice industry and began working with both the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") to help the agencies establish the existence, scope, and effects of the collusion.

43.     Once the six month non-compete period expired, Mr. McNulty actively began searching for employment with manufacturers and distributors of packaged ice. Because of his acumen, experience, contacts, and accounts, Mr. McNulty was confident that he could secure a good job with competitive pay and benefits and room to advance.

44.     Mr. McNulty sent a letter, for example, to Home City on September 16, 2005. When Mr. McNulty called Home City's human resources department at its offices in Ohio

14

shortly thereafter, Home City provided false and fraudulent reasons for why it was not interested in speaking to Mr. McNulty about potential employment opportunities.

45.    Mr. McNulty also sent a letter to Joseph Riley, the president of the Tropic Ice Company. In response to the letter, Mr. Riley called and agreed to meet with Mr. McNulty to discuss Mr. McNulty's application for employment. Because the DOJ and FBI suspected that Tropic Ice was conspiring with Arctic Glacier and Home City, the agencies asked that Mr. McNulty tape record the meeting, which Mr. McNulty agreed to do.

46.    Wearing a recording device provided to him by the FBI, Mr. McNulty met with Mr. Riley on January 27, 2006 at a restaurant in Lansing, Michigan. During the course of this meeting, Mr. Riley told Mr. McNulty that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire Mr. McNulty. According to Mr. Riley, Mr. McNulty was being "blackballed" from the industry.

47.    Mr. Riley admitted that Tropic Ice had been conspiring with Arctic Glacier to allocate markets. Nonetheless, at the conclusion of this meeting, Mr. Riley told Mr. McNulty that he would call Mr. McNulty within several weeks to discuss Mr. McNulty's potential employment. Mr. Riley never called Mr. McNulty, and Mr. McNulty surmised that Tropic Ice must have also agreed to boycott Mr. McNulty

48.    After not hearing from Mr. Riley for roughly six weeks, and following a request from the government, Mr. McNulty called Mr. Riley. Again, Mr. McNulty recorded the conversation for the DOJ and FBI. During this call, Mr. Riley confirmed what Mr. McNulty had suspected: that Tropic Ice had agreed with Arctic Glacier that Tropic Ice would not hire Mr. McNulty.

49.     While he was looking for a job, Mr. McNulty also had several conversations with Mr. Lewandowski. Mr. Lewandowski was in contact with Charles Knowlton who had accepted a position at Arctic Glacier. Based on discussions he had with Mr. Knowlton, Mr. Lewandowski told Mr. McNulty that Arctic Glacier was withholding Mr. McNulty's two-year earn out (to which he was entitled) because Mr. McNulty was cooperating with government authorities. Mr. Lewandowski also said that Arctic Glacier would pay Mr. McNulty his earn out plus a large salary if Mr. McNulty would return to work at Arctic Glacier and cease cooperating with federal authorities. Further, pursuant to the Defendants' agreement to boycott Mr. McNulty, Mr. Lewandowski said that no ice company would hire Mr. McNulty until he stopped providing information to law enforcement officers. Upon information and belief, Mr. Lewandowski relayed information to Mr. McNulty about his earn out and employment opportunities at the behest of the Defendants.

50.     During conversations with Mr. Lewandowski and other distributors, Mr. McNulty was told that Mr. Knowlton and Mr. Corbin made interstate phone calls from Michigan and Tennessee to several Home City executives in Ohio – Tom Sedler, Tom Sedler, Jr., and Lou McGuire – in furtherance of the Defendants' market allocation scheme.

51.     Over two years after Mr. McNulty began providing information to authorities regarding the Defendants allocation scheme, Home City has entered into a plea agreement with the United States. In the plea agreement, Home City admitted that, from "at least as early as January 1, 2001 until July 17, 2007," Lou McGuire and other officers and employees of Home City "participated in a conspiracy among packaged ice producers, the primary purpose of which was to allocate customers and territories of packaged ice." Home City further admitted that,

"[i]n furtherance of the conspiratorial activity, [Home City] engaged in discussions and attended meetings with representatives of other packaged ice producers . . . to allocate customers and territories," including one or more meetings in Cincinnati, Ohio.

*The Anticompetitive Effects of the Defendants' Termination and Boycott of Mr. McNulty*

52.      The Defendants' termination and boycott of Mr. McNulty has had two anticompetitive effects.  First, the termination and boycott enabled the Defendants to continue their unlawful market allocation scheme.  Had Mr. McNulty worked for Arctic Glacier – or any other packaged ice competitor – beyond January 27, 2005, he would have disrupted the Defendants' unlawful market allocation scheme by competitively and aggressively seeking the business of corporate accounts, including the business of accounts that were outside the scope of Arctic Glacier's allocated territory.  For instance, opportunities would have existed to expand the geographic coverage of Sam's Club, Wal-Mart, CVS, Kroger, Speedway and other accounts. Opportunities also would have existed to service new accounts outside of Arctic Glacier's territory.  As a relatively young, ambitious sales executive with a track record of success, these are precisely the types of opportunities Mr. McNulty sought – and for which he would have been rewarded – as he progressed professionally in the packaged ice industry.

53.      Second, the Defendants' boycott deprived Mr. McNulty of employment opportunities in the only industry in which he had professional experience.  As a result, his actual and future earnings have been substantially limited.  For instance, following his termination from Arctic Glacier, Mr. McNulty was unemployed for roughly ten months and, after this period of unemployment, accepted a position with a lower salary and reduced benefits than what he was making – and would have made absent the boycott – in the packaged ice industry.  This, in turn,

17

has substantially limited Mr. McNulty's ability to provide for his wife (a stay-at-home Mom) and

his son, who suffers from asthma. Mr. McNulty struggled to make payments on his house and to

pay for health insurance. Creditors foreclosed on his house, forcing Mr. McNulty and his family

to move to a rental property. Mr. McNulty and his wife went without health insurance (even

while encountering health issues) and paid out of pocket for Mr. McNulty's son's insurance. Mr.

McNulty's credit scores were ravaged by his inability to make payments on his house, causing

the interest rates and payments on his credit cards and loans to soar.

54.    In this action, Mr. McNulty seeks recovery from the Defendants for all the effects and

harm that Mr. McNulty suffered as a result of the Defendants' unlawful termination and boycott.

**Relevant Markets**

55.    The United States market for the purchasing of packaged ice sales services is a

distinct and separate relevant market. The Defendants collectively have market power as purchasers

in this market. The Michigan market for the purchasing of packaged ice sales services is a submarket

of the United States for the purchase of these services. The Defendants collectively have market

power as purchasers within this submarket.

**Interstate Commerce**

56.    In at least two ways, the Defendants' fraudulent and anticompetitive activities

were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable

effect on interstate commerce. First, by terminating and boycotting Mr. McNulty, the Defendants

ensured that their unlawful market allocation scheme persisted. Had Mr. McNulty remained

employed in the industry beyond January 27, 2005, he would have competitively and aggressively

sold packaged ice in interstate commerce, including selling ice to corporate accounts located in

Arkansas (Sam's Club and Wal-Mart), Rhode Island (CVS), and Ohio (Kroger and Speedway). Mr.

18

McNulty also would have sold ice to Michigan-based accounts with stores in bordering states, such as Ohio. Mr. McNulty's termination was necessary to preclude such sales of ice in interstate commerce.

57.    Second, by boycotting Mr. McNulty from the packaged ice industry, the Defendants precluded Mr. McNulty from selling his own services in interstate commerce. For instance, while residing in Michigan, Mr. McNulty sought employment from Home City, which was located in Ohio. Because Home City and other Defendants had agreed not to hire him, Mr. McNulty was not able to sell his services in interstate commerce.

### Causes of Action

*Count I: Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 (c)*

58.    Plaintiff repeats and realleges the allegations in Paragraphs 1- 57 above as if fully set forth herein.

59.    At all times relevant to this Complaint, the Defendants each constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

60.    Defendants and others not named as defendants herein, were associated in fact and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaging in and affecting interstate commerce. The RICO Enterprise is a continuing organization that consists of Defendants, their officers, agents, representatives, and other individuals who assisted in devising and implementing their schemes.

61.    At all times relevant to this Complaint, Defendants agreed to and did conduct and directly or indirectly participate in, or aided and abetted, the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), committing

multiple fraudulent and illegal racketeering acts, and for the unlawful purpose of intentionally defrauding Plaintiff, including: interstate mail fraud in violation of 18 U.S.C. § 1341 (all Defendants); interstate wire fraud in violation of 18 U.S.C. § 1343 (all Defendants); tampering with a witness or informant in violation of 18 U.S.C. § 1512(b)-(d) (all Defendants); retaliating against a witness or informant in violation of 18 U.S.C. § 1513(e)-(f) (all Defendants). These violations included, but are not limited to the acts discussed in the prior paragraphs of this Complaint. Defendants engaged in this pattern of racketeering activity for the unlawful purpose of and with the effect of defrauding Plaintiff and consumers.

62.    Throughout the relevant time period, the Defendants used interstate mails and wires to conduct their fraudulent scheme. On information and belief, in violation of 18 U.S.C. §§ 1341, 1343, all Defendants used interstate mails and wires to further their customer and territorial allocation scheme. For example, throughout the duration of the conspiracy, Defendants used interstate mails and wires to submit rigged bids to potential customers, and submitted fraudulently inflated monthly or other periodic invoices to customers, who submitted payments using interstate mails and wires.

63.    In violation of 18 U.S.C. § 1341, Defendant Arctic Glacier used interstate mail to terminate Mr. McNulty's employment, providing false and fraudulent reasons for his termination. In violation of 18 U.S.C. § 1343, Defendants Keith Corbin and Arctic Glacier used interstate wires to fraudulently corroborate the letter, suggesting to Mr. McNulty that they were unaware of the reasons for his termination or that the termination was for reasons other than his refusal to cooperate with the RICO enterprise's fraudulent scheme. Similarly, Home City used

20

interstate wires to provide false and fraudulent reasons for their unwillingness to even discuss potential employment opportunities with Mr. McNulty.

64.    As detailed more fully above, Defendants committed various acts of witness tampering and retaliation, the purpose and effect of which was to further their scheme to defraud Mr. McNulty in violation of 18 U.S.C. § 1512 and § 1513. Specifically, Defendants knowingly used or conspired to knowingly use threats to fire and blackball Mr. McNulty from employment opportunities, and attempts to corruptly persuade Mr. McNulty and others through offers of large sums of money in salaries and bonuses, with the intent to: hinder, delay, or prevent the communication to a federal law enforcement officer information relating to the commission of a Federal offense in violation of 18 U.S.C. § 1512. Defendants knowingly engaged or conspired to engage in conduct that damaged the tangible property and lawful employment or livelihood of Mr. McNulty, with the intent to retaliate against him for providing law enforcement officers with truthful information relating to the commission of a federal offense, in violation of 18 U.S.C. § 1513.

65.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in an amount to be proven at trial. For example, Plaintiff suffered from lost wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses as a result of being terminated and boycotted by Defendants. Moreover, Plaintiff was injured by the customer and territory allocation aspect of Defendants' RICO scheme insofar as it diminished the demand, value, and compensation for the services of packaged ice salesmen, who were competing for

fewer potential customers and had fewer potential employers available in Michigan and other geographic areas.

*Count II: Federal Racketeer Influenced and Corrupt Organizations Act Conspiracy,*
*18 U.S.C. § 1962(d)*

66.    Plaintiff repeats and realleges the allegations in Paragraphs 1 - 65 above.

67.    This count is brought against all Defendants. As set forth above, the Defendants unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c). Specifically, Defendants committed overt acts in furtherance of the conspiracy as described above.

68.    Defendants have intentionally conspired and agreed to directly and indirectly participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

69.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property in an amount to be proven at trial by reason of Defendants' violation of 18 U.S.C. § 1962(d). For example, Plaintiff suffered from lost wages, bonuses, and benefits, and incurred other incidental and consequential damages and expenses as a result of being terminated and boycotted by Defendants.

*Count III: Conspiracy to Restrain Trade in Violation of Sherman Act § 1*

70.    Plaintiff repeats and realleges the allegations in Paragraphs 1 - 69 above.

22

71.     Defendants have engaged in a *per se* unlawful conspiracy by agreeing that Mr. McNulty should be terminated from Arctic Glacier and then terminating Mr. McNulty from Arctic Glacier.

72.     Defendants have engaged in a *per se* unlawful conspiracy by agreeing to boycott Mr. McNulty from the packaged ice industry.

73.     Defendants' actions lack any legitimate business justification, and any purported business justifications are pretextual.

74.     Defendants' conduct has substantially and adversely affected interstate commerce.

75.     Defendants by and through their anticompetitive actions as outlined herein, have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

76.     As a direct and proximate result of Defendants' violations of the Sherman Act, Mr. McNulty has been harmed in an amount to be established at trial.

> Count IV:  Conspiracy to Restrain Trade in Violation of the
> Michigan Antitrust Reform Act, M.C.L.A. § 445.772

77.     Plaintiff repeats and realleges the allegations in Paragraphs 1 - 76 above.

78.     Defendants have engaged in a *per se* unlawful conspiracy by agreeing that Mr. McNulty should be terminated from Arctic Glacier and then terminating Mr. McNulty from Arctic Glacier.

79.     Defendants have engaged in a *per se* unlawful conspiracy by agreeing to boycott 1r. McNulty from the packaged ice industry.

80.     Defendants' actions lack any legitimate business justification, and any purported iness justifications are pretextual.

23

81.     Defendants' conduct has substantially and adversely affected commerce within the market for the purchase of packaged ice sales services and within the market for packaged ice.

82.     Defendants by and through their anticompetitive actions as outlined herein, have violated § 445.772 of the Michigan Antitrust Reform Act.

83.     As a direct and proximate result of Defendants' violations of the Michigan Antitrust Reform Act, Mr. McNulty has been harmed in an amount to be established at trial.

*Count V: Tortious Interference with Prospective Economic Advantage*

84.     Plaintiff repeats and realleges the allegations in Paragraphs 1 - 83 above.

85.     Mr. McNulty had the expectancy of a valid business relationship with manufacturers and distributors of packaged ice, given his acumen, experience, contacts, and accounts in the packaged ice industry.

86.     The Defendants knew of Mr. McNulty's expectancy of a valid business relationship with manufacturers and distributors of packaged ice.

87.     The Defendants intentionally interfered with Mr. McNulty's expectancy of a valid business relationship with manufacturers and distributors of packaged ice by agreeing to a *per se* unlawful boycott of Mr. McNulty from the industry (as specifically detailed in paragraphs 42 - 49, above), causing a termination of the expectancy.

88.     The Defendants agreed to boycott Mr. McNulty from the packaged ice industry with malice for the purpose of perpetuating the Defendants' *per se* unlawful market allocation scheme and interfering with Mr. McNulty's expectancy of a valid business relationship.

24

89.    Mr. McNulty was damaged by the Defendants' intentional interference with Mr.
McNulty's expectancy of a valid business relationship by an amount to be determined at trial.

## Jury Trial Demand

Pursuant to Fed. R. Civ. P. 38(b), Mr. McNulty demands a trial by jury of all claims
asserted in this Complaint so triable.

## Prayer for Relief

WHEREFORE, Mr. McNulty prays that the Court enter judgment against Defendants,
and in favor of Mr. McNulty as follows:

A.    Order Defendants to cease and desist from violating RICO, the Sherman Act, the
Michigan Antitrust Reform Act, and the common law principles of tortious interference, as
stated herein;

B.    Award Mr. McNulty the maximum amount of damages he sustained as a result of
Defendants' actions, as well as the maximum amount of civil penalties;

C.    Award Mr. McNulty all costs and expenses of this action, including Attorney's
fees; and

D.    Awarding Mr. McNulty all such relief as the Court deems just and proper.

Dated: December 2, 2008

/s/ Daniel L. Low
Daniel L. Low
Daniel A. Kotchen
Kotchen & Low LLP
2300 M St., NW, Suite 800
Washington, DC 20037
(202) 416-1848 (Tel.)
(202) 280-1128 (Fax)
dlow@kotchen.com
dkotchen@kotchen.com

Andrew A. Paterson
23880 Woodward Ave.
Pleasant Ridge, MI 48069-113
(248) 291-0550 x 275
aap43@hotmail.com

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2008, I electronically filed the foregoing Amended Complaint with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

- David H Bamberger
- Lisa A. Brown
- Anthony T. Chambers
- David A. Ettinger
- Melissa B. Hirst
- Howard B. Iwrey
- Scott L. Mandel
- James R Nelson
- John B. Pinney
- Paula W Render
- Peter R. Silverman

/s/ Daniel L. Low
KOTCHEN & LOW LLP
2300 M St., NW, Suite 800
Washington, DC 20037
(202) 841-7164
(202) 280-1128 (fax)
dlow@kotchen.com