# Exhibit 3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JOHN CHAMBERLAIN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>REDDY ICE HOLDINGS, INC., WILLIAM P. BRICK, STEVEN J. JANUSEK, JIMMY C. WEAVER, and RAYMOND D. BOOTH,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CIVIL ACTION NO. 08-13451 (PDB)**

**CLASS ACTION**

**CONSOLIDATED CLASS ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS .......................... 1

II.     JURISDICTION AND VENUE ................................................................................ 7

III.    PARTIES .............................................................................................................. 8

IV.     SUBSTANTIVE ALLEGATIONS .......................................................................... 9

    A.  Background .......................................................................................................... 9

    B.  Reddy Ice's Illegal Scheme to Corner the Market for Packaged Ice ............... 12

    C.  Materially False and Misleading Statements Issued During the Class Period ....... 21

        1.   The IPO Offering Documents .................................................................. 21

        2.   Reddy Ice's Third Quarter 2005 Results ................................................. 24

        3.   Reddy Ice's Fourth Quarter and Full Year 2005 Results ........................ 27

        4.   The Company's First Quarter 2006 Results ............................................ 31

        5.   The Secondary Offering Documents ....................................................... 33

        6.   Reddy Ice's Second Quarter 2006 Results .............................................. 34

        7.   Reddy Ice's Third Quarter 2006 Results ................................................. 36

        8.   Reddy Ice's Fourth Quarter and Full Year 2006 Results ....................... 37

        9.   Reddy Ice's First Quarter 2007 Results .................................................. 38

        10.  Reddy Ice's Second Quarter 2007 Operating Results ............................. 41

        11.  Reddy Ice's Third Quarter 2007 Operating Results ................................ 42

        12.  Reddy Ice's Fourth Quarter of 2007 Management Changes, Acquisition
             Strategy and Operating Results ............................................................... 44

    D.  The Truth Begins to Emerge ............................................................................. 45

        13.  Reddy Ice Discloses Fourth Quarter and Full Year 2007 Results ......... 45

        14.  Reddy Ice's First Quarter 2008 Operating Results ................................. 47

        15.  One of Reddy Ice's Co-Conspirators Pleads Guilty to Price Fixing ........ 50

        16.  The Class Period Closes as the Truth is More Fully Disclosed .............. 54

    E.  Undisclosed Adverse Facts ............................................................................... 56

    F.  Additional Loss Causation Allegations .............................................................. 57

    G.  Additional Scienter Allegations ......................................................................... 59

|   | 1. | The Individual Defendants Benefitted from the Illegal Market Allocation Through Insider Sales | 60 |
|   | 2. | The Anti-Competitive Market Allocation Boosted the Individual Defendants' Compensation | 63 |
|   | 3. | The Individual Defendants Had Actual Knowledge of Reddy Ice's Illegal Anticompetitive Agreements | 64 |
|   | H. | Applicability of Presumption of Reliance: Fraud On The Market Doctrine | 67 |
|   | I. | No Safe Harbor | 68 |
|   | J. | Plaintiffs' Class Action Allegations | 69 |
| V. | | COUNT I | 70 |
| VI. | | COUNT II | 74 |
| VII. | | PRAYER FOR RELIEF | 75 |
| VIII. | | JURY TRIAL DEMANDED | 76 |

Lead Plaintiffs, Lawrence Diamond and Southeastern Pennsylvania Transportation Authority ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon investigation conducted by Plaintiffs' counsel. This investigation included, among other things, a review of Defendants' public documents, conference calls, announcements and United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Reddy Ice Holdings, Inc. ("Reddy Ice" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, as well as a review of Complaints and other pleadings filed in civil actions pending in the Eastern District of Michigan captioned: *In re Packaged Ice Antitrust Litigation*, Case No. 08-MD-01952-PDB; *Martin G. McNulty v. Reddy Ice Holdings, Inc., et al.*, Case No. 08-13178; and *Bynarry Ltd. (d/b/a McGeary's), et al. v. Reddy Ice Holdings, Inc., et al.*, Case No. 08-cv-13000-PDB-SDP. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.     This is a class action on behalf of purchasers of Reddy Ice's publicly-traded securities between August 10, 2005 and September 15, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Company's shares are listed on the New York Stock Exchange (the "NYSE").

2.     Reddy Ice is the nation's largest packaged ice manufacturer. The Company manufactures, distributes and sells packaged ice under the Reddy Ice brand name in the United States to supermarkets, convenience stores and retail outlets and has locations in 31 states and the District of Columbia.

1

3.      In August 2005, Reddy Ice offered its common stock to investors in an initial public offering (the "IPO") of 11.7 million shares at $18.50 per share, raising over $190 million. Nine months later, in a follow-on Secondary Public Offering in May 2006 (the "Secondary Offering"), Reddy Ice and its controlling shareholders sold an additional 4.59 million shares of the Company's common stock to investors at $21.55 per share, generating $98.9 million in proceeds that were paid to the controlling shareholders, including Defendants in this action.

4.      Subsequent to its IPO and Secondary Offering, Reddy Ice grew its business and repeatedly emphasized an aggressive acquisition plan; a loyal customer base generated through quality, service and price; and a large geographic footprint that allowed the Company a competitive edge in its primary markets. Reddy Ice further emphasized its strict adherence to a code of ethics, which expressly prohibited antitrust violations and was signed by the Company's executive officers.

5.      During the Class Period, beginning with the Company's IPO, Reddy Ice and the other Defendants issued to the public numerous materially false and misleading statements regarding Reddy Ice's business operations and competitive positioning in the packaged ice market. While claiming to be a dominant player in the U.S. that was minimally impacted by competition in primary geographic territories, Reddy Ice and the other Defendants knowingly and recklessly omitted material information regarding unlawful deceptive agreements that the Company entered into in violation of U.S. antitrust laws.

6.      Unbeknownst to investors, prior to and continuing during the Class Period, Reddy Ice was embroiled in an unlawful anti-competitive conspiracy involving its two largest competitors, Arctic Glacier Inc., based in Winnipeg, Canada ("Arctic Glacier"), and Home City Ice Co., based in Cincinnati Ohio ("Home City"). Reddy Ice, Arctic Glacier and Home City

2

formed a cartel to suppress and eliminate competition by allocating the U.S. market for packaged ice and entering into secret agreements not to compete among themselves in certain geographic markets.

7.      With the benefit of the unlawful conspiracy and without disclosing attendant risks to shareholders, Defendants grew Reddy Ice's business and revenues and artificially increased the Company's stock price as high as $31.18 per share during the Class Period.

8.      While the stock was trading at record-high prices, in July 2007, Reddy Ice announced a merger agreement with affiliates of GSO Capital Partners, L.P. ("GSO"), a hedge fund through which the Company was to be taken private in a transactions that paid shareholders $31.25 per share, which was a premium of approximately 9.6% over the Company's closing share price of $28.52 on June 29, 2007.  The transaction was expected to close in the fourth quarter of 2007, and upon consummation of the merger, the Individual Defendants stood to reap a total of $6.375 million for their Reddy Ice holdings, including restricted stock, which vested immediately if the merger was closed.

9.      In early January 2008, Reddy Ice announced that the proposed GSO merger was intended to be modified, and subsequently announced on January 31, 2008, that the merger had altogether been abandoned by GSO and its affiliates, and the Company's stock fell to $22.43 per share.

10.     Weeks later, on March 5, 2008, the FBI executed a search warrant and raided Reddy Ice's Dallas, Texas corporate office.  The next day, on March 6, 2008, Reddy Ice issued a press release announcing that "federal officials executed a search warrant at the Company's corporate office in Dallas on March 5, 2008."  The Company's press release stated merely that "The Company is cooperating with the authorities."  On March 7, the Company issued a second

release, clarifying the first release, shocking investors by disclosing that it was under federal investigation for antitrust violations, revealing: "The execution of the search warrant was directed by the Antitrust Division of the United States Department of Justice (the "DOJ") in connection with an investigation of the packaged ice industry."

11.    On March 7, 2008, following this news, the Company's stock price fell on unusually-heavy trading volume from approximately $23.57 per share to $15.38, for a one-day market capitalization loss of $180 million.

12.    When the Company's unlawful activities were first exposed, Reddy Ice repeatedly denied any improprieties, even though there was a torrent of news and disclosures concerning Reddy Ice's scheme with Arctic Glacier and Home City, and scores of lawsuits by Reddy Ice's customers under the antitrust laws.

13.    On August 7, 2008, the *Wall Street Journal* published an article that described an interview with Martin McNulty, a former vice president of sales at a subsidiary of Arctic Glacier. Among other things, Mr. McNulty disclosed that packaged ice industry executives had been caught by FBI wiretaps discussing the alleged unlawful conspiracy. Further, Mr. McNulty said that he provided prosecutors with evidence of an agreement by the ice companies to divide up customers and stay out of each other's sales regions. On this news, the Company's shares fell an additional $2.40 per share, or 17.92 percent, to close on August 7, 2008 at $10.99 per share, again on unusually heavy trading volume.

14.    Finally, on September 15, 2008, Reddy Ice announced that it had suspended Ben D. Key, the Company's Executive Vice President, Sales and Marketing. As admitted in the Company's press release, a Special Committee of the Company's Board of Directors, which was formed immediately after the DOJ served its subpoena on the Company, found that Mr. Key had

4

violated Company policies in connection with the antitrust violations under investigation by the DOJ. Key had been a member of Reddy Ice's executive management team and attended trade association meetings relating to the packaged ice industry through which he and other packaged ice industry executives unlawfully conspired to allocate packaged ice markets between and among Reddy Ice, Home City and Arctic Glacier prior to and during the Class Period.

15.     As confirmed in interviews of confidential witnesses who are Reddy Ice's former employees, Home City and Arctic Glacier service geographic markets that are adjacent to markets serviced by Reddy Ice, but Reddy Ice has unlawfully agreed not to compete with these other packaged ice companies in certain markets. Generally, Reddy Ice agreed not to compete with Arctic Glacier in the State of California. Similarly, in an illegal *quid-pro-quo* arrangement, Arctic Glacier secretly agreed not to compete with Reddy Ice in the State of Arizona.

16.     Both Home City and Arctic Glacier have been criminally charged in connection with the criminal price-fixing conspiracy. In addition, Home City and Arctic Glacier have pleaded guilty to violating the U.S. antitrust laws by conspiring with other packaged ice firms to suppress and eliminate competition by agreeing with other packaged ice manufacturers to allocate customers and territories in the market place, and specifically in Michigan. According to its plea agreement, Arctic Glacier had a total of $50.7 million in sales of packaged ice that were affected by its conspiracy.

17.     In addition to the criminal probes, which have spawned criminal charges against and guilty pleas from its largest competitors, Reddy Ice has been sued by its largest customers for antitrust violations, including, for example, Wal-Mart, which accounted for approximately 11% of Reddy Ice's revenues in 2006. Numerous allegations also have been made in the direct and indirect purchaser antitrust actions consolidated in the action captioned, *In re Packaged Ice*

*Antitrust Litigation*, Case No. 08-MD-01952-PDB, which further demonstrate that Reddy Ice engaged in illegal anticompetitive conduct prior to and during the Class Period and deliberately and recklessly concealed from investors that the unlawful agreements were instrumental in generating the Company's inflated Class Period earnings and stock price.

18.     Reddy Ice also has disclosed that the Attorneys General of 19 states, including Michigan, Arizona and Florida, are investigating agreements in restraint of trade and/or price-fixing with respect to the pricing or market allocation of packaged ice.  These suits expose Reddy Ice to extensive costs related to antitrust investigations and lawsuits, and even more dangerously to debilitating civil liability because the federal antitrust laws provide for treble damages.

19.     In fact, on September 15, 2008, contemporaneously with announcing the forced leave of absence for Ben Key in connection with violations of Company policy and the DOJ's criminal antitrust probe, Reddy Ice announced that its was suspending its dividend because of "weaker than expected operating results and costs related to the ongoing antitrust investigations and related litigation."  On news of Key's implication in the criminal activities under investigation by the DOJ and the related adverse impact on Reddy Ice's financial condition, the Company's shares fell an additional $1.09 per share, or 13.9 percent, to close on September 15, 2008 at $6.75 per share, and further falling 34.8 percent the next day on September 16, 2008 to close at $4.40 per share, on extremely heavy trading volume.  Reddy Ice's shares have not recovered and currently trade in the $4.00 range.

20.     Throughout the Class Period, Defendants knowingly and recklessly failed to disclose material adverse facts about Reddy Ice's financial well-being, business relationships, risks and prospects.  Specifically, Defendants failed to disclose or indicate that Reddy Ice:

(1) had engaged, and continued to engage, in illicit business practices with its competitors in the packaged ice industry and had unlawfully joined with its competitors in the packaged ice industry in colluding and agreeing to allocate territories and customers in the United States' packaged ice market;

(2) had agreed with its competitors in the industry to fix, raise, maintain and stabilize prices for packaged ice in the United States market and that Reddy Ice's revenues and earnings had been artificially increased through the use of such illicit business practices, and as a result, the Company's financial statements were false and misleading at all relevant times;

(3) had engaged in illicit business practices that exposed the Company to risks of criminal and civil liability and penalties that threatened its existence and continuing business practices;

(4) had falsely certified that it had adequate internal and financial controls and operated under and ensured strict compliance with a code of ethics that expressly prohibited agreements that violated the U.S. antitrust laws; and

(5) had repeatedly issued statements about the Company's competitive position, financial well-being and future business prospects that were lacking in any reasonable basis when made.

21.     The ongoing illegal conduct was orchestrated at the highest levels of Reddy Ice, and the revelation of this conduct has caused investors tremendous losses.  As a direct result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class Members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

22.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  This action is related to the conduct underlying those cases in the action entitled *In re: Packaged Ice Antitrust Litigation*, MDL No. 1952, which was centralized in this Judicial District by Judicial Panel on Multidistrict Litigation on June 2, 2008.  As the Panel noted, "[t]his district offers a relatively geographically central district with favorable caseload conditions. More pending actions and potential tag-along actions have been filed in the Eastern District of Michigan than in any other district. Additionally, the grand jury investigating the packaged ice industry is based in this district."

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    **PARTIES**

26.     Lead Plaintiff, Lawrence Diamond as set forth in his certification, incorporated by reference herein, purchased Reddy Ice's securities at artificially-inflated prices during the Class Period and has been damaged thereby.

27.     Lead Plaintiff, Southeastern Pennsylvania Transportation Authority ("SEPTA") as set forth in its certification, incorporated by reference herein, purchased Reddy Ice's securities at artificially-inflated prices during the Class Period and has been damaged thereby.

28.     Defendant Reddy Ice Holdings, Inc. is a Delaware corporation with its principal executive offices located at 8750 North Central Expressway, Suite 1800, Dallas, Texas.

29.     Defendant William P. Brick ("Brick") was, at relevant times, the Company's President, Chief Executive Officer ("CEO"), and Executive Chairman of the Board of Directors.

8

30.     Defendant Steven J. Janusek ("Janusek") was, at relevant times, the Company's Chief Financial Officer ("CFO") and an Executive Vice President.

31.     Defendant Jimmy C. Weaver ("Weaver") was, at relevant times, the Company's President and CEO from May 17, 2007 until December 2007.

32.     Defendant Raymond D. Booth ("Booth") was, at relevant times, the Company's Chief Operating Officer ("COO") until January 2008.

33.     Defendants Brick, Janusek, Weaver, and Booth are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Reddy Ice's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and investors, i.e., the market.  Each individual defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

34.     Reddy Ice is the largest manufacturer and distributor of packaged ice in the United States.  With its headquarters in Dallas, Texas and numerous regional manufacturing and

distribution centers, Reddy Ice services approximately 82,000 customer locations in 31 states and the District of Columbia. The Company's principal product is ice packaged in bags ranging from 7 pounds to 50 pounds, which, according to the Company, it sells under the Reddy Ice brand name to a diversified customer base, including supermarkets, mass merchants and convenience stores.

35.     Reddy Ice sells approximately 1.9 tons of ice per year. There are no economically-reasonable substitutes for packaged ice, and consumers have little, if any, preference for specific brands of packaged ice. Also, the market demand for packaged ice is inelastic as price increases will not produce any material offsetting reduction in quantity sold, and therefore, increases in price are remunerative to suppliers such as Reddy Ice.

36.     Reddy Ice became a public company in August 2005, two years after going private in an acquisition through a private equity unit of Bear Stearns & Company. In August 2005, Reddy Ice's private equity owners and executive managers initiated an IPO, through which they took the Company public once again and changed the Company's name from Packaged Ice Inc. to its present name.

37.     Reddy Ice sold its common stock for $18.50 per share and raised $190 million in the IPO, with sales of 11,730,000 shares of common stock, of which 6,911,765 shares were offered by Reddy Ice and 4,818,235 were offered by controlling shareholders of Reddy Ice and affiliates of underwriters of the IPO. The selling controlling shareholders - which included defendants Weaver, Janusek and Booth - received $56.5 million in proceeds. Subsequent to the IPO Reddy Ice's common stock traded on the NYSE under the "FRZ" ticker symbol.

38.     On May 26, 2006, Reddy Ice's controlling shareholders sold an additional 4.59 million shares to public shareholders in a Secondary Public Offering (the "Secondary Offering")

at a price of $21.55 per share.  Through the Secondary Offering, the controlling shareholders received over $98.9 million, and the Individual Defendants collectively received over $2.78 million.

39.     In mid-2007, Reddy Ice was put up for sale, once again, when hedge fund GSO entered into a merger agreement with the Company on July 2, 2007.  The deal called for GSO to take the Company private and pay Reddy Ice's shareholders $31.25 per share, a price which was a 9.6% premium over the Company's closing price on June 29, 2007 and which shareholders approved on October 12, 2007.  On January 31, 2008, however, the deal collapsed, and Reddy Ice's stock fell below pre-merger-talk levels to $22.43 per share.

40.     Reddy Ice's core business is focused principally in the "Sun Belt" region in the Southern and Southeastern United States, although the Company has a national presence with manufacturing facilities and distribution centers strategically located throughout the U.S. as set forth in the chart attached hereto as Exhibit "A."  Since its IPO, Reddy Ice reported revenues in 2005, 2006 and 2007, of $317 million, $346 million, and $339 million, respectively.  Net income grew from $(12.16 million) in 2005 to $14.66 million in 2006 and $10.3 million in 2007, as Defendants professed a growth strategy, focused on acquiring companies within Reddy Ice's current geographic markets.

41.     Annually, the wholesale packaged ice industry generates $1.8 billion in sales in the U.S.  Because the packaged ice industry has high start-up costs, and customers typically are induced into long-term contracts by suppliers, there are substantial barriers that preclude new suppliers' entry into the production and distribution of packaged ice.  In fact, Reddy Ice is one of very few packaged ice companies operating in the U.S. and holds the dominant market position.  Its main competitors are the Canadian corporation Arctic Glacier and Home City.

### B.    Reddy Ice's Illegal Scheme to Corner the Market for Packaged Ice

42.    During and prior to the Class Period, Reddy Ice embarked on a scheme to dominate the packaged ice market and control price competition.  As Reddy Ice and Arctic Glacier acquired numerous independent producers, the industry experienced widespread consolidation.  Reddy Ice engaged in an unlawful scheme to wipe-out competition and control the prices for packaged ice products.  By illegally dividing up commercial territories in the U.S. between and among themselves and allocating territories and customers among themselves so as to avoid competition with each other, Reddy Ice, Arctic Glacier and Home City engaged in collusive activity to raise, fix and maintain the price of packaged ice.  In furtherance of its illegal anticompetitive scheme, Reddy Ice aggressively abused its dominance to acquire numerous independent producers within its exclusive geographic markets.

43.    Pursuant to unlawful agreements with Arctic Glacier and Home City, Reddy Ice dominated packaged ice sales in the Sun Belt region, ranging from Arizona to Florida, as well in certain states in the mid-Atlantic region.  Similarly, pursuant to unlawful agreements with Reddy Ice and Home City, Arctic Glacier dominated packaged ice sales in Canada, certain Northeastern states and in the Central U.S. region and California, while Home City was unlawfully allocated exclusivity in territories consisting primarily of Illinois, Indiana and Ohio.  Arctic Glacier and Home City have each pleaded guilty to criminal charges stemming from certain unlawful agreements reached between them to allocate customers of packaged ice to be sold in southeastern Michigan and the Detroit, Michigan metropolitan area.

44.    The conspiracy to allocate markets, territories and customers and to fix prices is described in detail in a complaint filed against Reddy Ice, Arctic Glacier and Home City in this District (Case No. 08-13178) by Martin G. McNulty, a former Arctic Glacier employee who alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961

12

et seq. ("RICO"), violations of the Sherman Act, 15 U.S.C. § 1, violations of the Michigan Antitrust Reform Act, violations of common law tortious interference with business relations and tortious interference with prospective economic advantage.

45.    According to Mr. McNulty, who worked for Arctic Glacier's predecessor and Arctic Glacier from 1994 through January 2005, and reported directly to Keith Corbin ("Corbin"), Arctic Glacier's Vice President of Sales, Reddy Ice, Arctic Glacier and Home City unlawfully allocated markets between themselves for the exclusive sales of packaged ice. In his complaint, Mr. McNulty describes in detail conversations with Corbin in which McNulty was informed that Arctic Glacier's conspiracy with Reddy Ice extended throughout the United States, and according to Corbin, Arctic Glacier had "backed away" from buying an ice company in Nevada so that Arctic Glacier and Reddy Ice would not be in direct competition. McNulty's complaint alleges that Corbin explained to McNulty that Arctic Glacier's agreement not to enter the South and Southwest (a geography dominated by Reddy Ice) enabled Reddy Ice to "get their prices up," and Reddy Ice's agreement to stay out of the Midwest and Canada enabled Arctic Glacier to do the same.

46.    The unlawful allocation of markets to eliminate competition, both prior to and during the Class Period, was generally known among employees at Reddy Ice according to former employees. For example, Confidential Witness 1 ("CW1") is a former Reddy Ice employee who held the position of National Purchasing and Contracts Manager for Reddy Ice from mid-1997 through late-2004. CW1 was based out of the Company's Dallas, Texas headquarters. During CW1's tenure at Reddy Ice, CW1 became aware of the unlawful market allocation agreement between Reddy Ice and Arctic Glacier. According to CW1, the Agreement was entered into during CW1's employment at Reddy Ice. CW1 further stated that it was

discussed in the presence of CW1 and other employees at Reddy Ice's Dallas headquarters that Reddy Ice had agreed to not compete against Arctic Glacier in California, and that Arctic Glacier in exchange had for the exclusive right to service California had agreed to "stay out" of Arizona.

47.     Confidential Witness Number 2 ("CW2") is a former Reddy Ice employee that held several different positions at Reddy Ice during the Class Period and specifically from January 2006 through March 2008, including: (i) Internal Auditor, (ii) Area Controller, and (iii) Utilities Specialist.  Through these positions at Reddy Ice, CW2 was privy to highly-sensitive financial information related to the Company's financial performance and business practices, such as compiling the financials for all of the manufacturing plants in CW2's assigned territory, including revenues, expenses and EBITDA, and comparing budgeted amounts to actual amounts. CW2 was based out of the Company's Dallas headquarters, and travelled regularly to numerous plants owned by the Company to conduct internal audits.

48.     During the execution of CW2's duties, CW2 learned of an unlawful agreement between Reddy Ice and Arctic Glacier to allocate territories and markets for packaged ice for exclusive distribution and sales of packaged ice.  CW2 stated that this collusive agreement was often discussed in CW2's presence among Reddy Ice employees at the corporate office and at the various plants that CW2 visited while conducting audits.  In addition, CW2 was personally told of the unlawful agreement by defendant Weaver.

49.     According to CW2, defendant Brick had a connection at Arctic Glacier and had used this connection to approach the CEO of Arctic Glacier.  As told to CW2 by other Reddy Ice employees with whom CW2 came into contact during the course of internal audits, defendant Brick entered into the on-going unlawful agreement with Arctic Glacier to allocate territories and markets for packaged ice whereby Reddy Ice agreed to stay out of California and Arctic Glacier

14

agreed to stay out of Arizona. CW2 understood, based upon conversations with other Reddy Ice employees, that the unlawful agreement was entered into prior to the start of CW2's employment at Reddy Ice and at around the same time that Reddy Ice sold most of its California ice plants and Arctic Glacier shut down its Arizona plants.

50.    With respect to the structure of the unlawful allocation agreement, several Reddy Ice employees explained to CW2 that Reddy Ice agreed to sell its California manufacturing operations (except for a facility in Brawley, California that was near the border of Arizona) to a consortium of companies located in California. It was further explained to CW2 that, at the time of the Agreement, Arctic Glacier did not externally appear to have a connection with the consortium of companies, but it was understood that Arctic Glacier would subsequently acquire this consortium of companies to have access to all of the packaged ice manufacturing facities that had been acquired from Reddy Ice.

51.    During CW2's employment at Reddy Ice, CW2 attended an annual plant managers' meeting held at a Dallas hotel during February 2006 or 2007. CW2 stated that during this annual meeting, defendant Weaver mentioned the unlawful agreement with Arctic Glacier in a presentation to CW2 and several other management attendees, including defendant Janusek. CW2 further stated that the attendees (including the various plant managers) all expressed knowledge and an understanding of the terms of the on-going unlawful agreement during the meeting.

52.    Additionally, it was also regularly discussed amongst various Reddy Ice employees that Home City was a party to the unlawful agreement, according to CW2. CW2 stated that Reddy Ice employees mentioned that Home City was represented at the meeting during which defendant Brick and Arctic Glacier's Chief Executive Officer met to divvy up the

15

California and Arizona markets. With respect to Home City, CW2 was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had agreed to stay out of certain Mid-West states where Home City had a presence. During the course of CW2's employment, CW2 also gained first-hand knowledge that defendants Weaver and Janusek knew of the unlawful allocation agreement with Home City.

53.    Further according to CW2, although it appeared to the public that Arctic Glacier did not have a connection to the "consortium" at the time that Reddy Ice sold its manufacturing operations, defendant Brick knew that the consortium of companies that acquired Reddy Ice's manufacturing and distribution facilities in California was in fact a straw man set up by agreement between Reddy Ice and Arctic Glacier through which Arctic Glacier would subsequently acquire the packaged ice facilities in California. CW2 stated that Reddy Ice wanted to keep the details of Arctic Glacier's involvement "less obvious" since Reddy Ice was a public company.

54.    Another former employee of Reddy Ice, Confidential Witness Number 3 ("CW3") confirmed information about the on-going unlawful allocation agreements between and among Reddy Ice, Home City and Arctic Glacier. CW3 is a former Reddy Ice Internal Audit Manager who was employed at Reddy Ice's Dallas, Texas headquarters immediately prior to and during the Class Period from June 2005 through July 2008. CW3 was responsible for overseeing Reddy Ice's internal audits and Sarbanes-Oxley testing, and for reporting highly-sensitive information about the Company's financial performance to Reddy Ice's Audit Committee.

55.    CW3 stated that when Reddy Ice decided to pull out of the California packaged ice market, Reddy Ice's manufacturing facilities (except for an ice plant in Brawley, California) were purchased by a "California consortium" in 2003 or 2004. CW3 further stated that this

knowledge regarding the "infamous" California deal was gained through CW3's conduct of internal audit duties attendant to CW3's internal audit responsibilities. According to CW3, Reddy Ice and the consortium of companies entered into a "written covenant not to compete" whereby Reddy Ice agreed to purchase from the consortium a manufacturing plant built in Arizona.

56.      Additionally, according to CW3, defendants Janusek and Brick, Nancy Green, Reddy Ice's Vice President of Compliance, and Ben Key, Reddy Ice's Vice President of Sales and Marketing, attended a meeting with Arctic Glacier executives during 2006. CW3 was told by other Reddy Ice employees that the purpose of this meeting was to discuss the execution of Arctic Glacier's agreement to purchase the consortium that previously purchased the majority of Reddy Ice's California manufacturing operations.

57.      The collusive agreement to allocate exclusive markets for packaged ice distribution and sale in California and Arizona between Arctic Glacier and Reddy Ice, respectively, was confirmed by a fourth Confidential Witness ("CW4"), who is a former Plant Manager for one of Reddy Ice's large manufacturing facilities in Arizona. CW4 was employed by Reddy Ice during the Class Period from mid-2007 through late-2008. CW4 stated that other Reddy Ice employees told CW4 that Reddy Ice and Arctic Glacier had "management meetings" and struck a deal whereby Arctic Glacier "stayed out of Arizona" while Reddy Ice agreed to leave California. CW4 stated that co-workers discussed with CW4 in detail the unlawful agreement and the fact that Reddy Ice's collusive deal with Arctic Glacier was entered into prior to CW4's employment with Reddy Ice.

58.      Reddy Ice's efforts to eliminate competition through illegal and aggressive means existed on both a regional and a local level. In addition to acquiring small, local competitors to

17

further enforce its exclusive market allocation, Reddy Ice used undisclosed aggressive measures to drive competitors out of business. According to CW2, CW2's co-worker, an assistant area controller with first-hand knowledge of this process, explained to CW2 in detail that if Reddy Ice was not interested in acquiring the local competitor for its customer base, Reddy Ice would simply temporarily reduce its prices dramatically and sustain losses until the smaller company went out of business. CW2's co-worker also explained to CW2 that Reddy Ice executed this plan in Arizona.

59.     With respect to acquisitions, CW2 learned through conversations with CW2's co-worker that Reddy Ice planned to lower prices temporarily to force two local competitors – Northern Ice and Arizona Pure Ice – out of business so that Reddy Ice could easily acquire the competitors. Through CW2's position as an area controller, CW2 learned that Reddy Ice spent a "lot of money" on the acquisitions which CW2 believed resulted in a loss for the Company. CW2 further stated that CW2 was unsure why Reddy Ice paid the sum that it did for these companies, because CW2's review of the transaction during the course of CW2's controller responsibilities indicated that the acquired companies did not have the assets to substantiate the purchase price. CW2 explained that defendants Brick and Weaver and other Reddy Ice executives negotiated these acquisitions.

60.     CW2 also had first-hand knowledge of Reddy Ice's plan to drive out the local competition in its otherwise exclusive territories under the illegal anticompetitive allocation agreement with Home City and Arctic Glacier. During the course of CW2's employment, CW2 learned that Reddy Ice was losing customers to North Star Ice in Lake Havasu, Arizona. CW2 suggested to CW2's supervisor – a Reddy Ice Area Vice President also located at the Company's Dallas headquarters – that Reddy Ice simply acquire the competitor. The Reddy Ice Vice

18

President said that Reddy Ice was not interested in acquiring North Star Ice, and that Reddy Ice was "going to teach [North Star Ice] a lesson," since Reddy Ice was a "big company" that can "eat little people." CW2 understood through conversation with the Reddy Ice Vice President that the plan to force Northstar out of business was to be executed during the summer of 2008. However, CW2 understood that the plan was not fully implemented due to the Department of Justice raid at Reddy Ice's headquarters in March 2008.

61.     On March 5, 2008, federal authorities executed a search warrant directed by the Antitrust Division of the DOJ and raided Reddy Ice's Dallas, Texas headquarters in connection with a criminal probe of antitrust violations in the U.S. packaged ice industry. Immediately thereafter, on March 6, 2008, Reddy Ice publicly disclosed in a series of press releases and news conferences that a search warrant had been executed by the DOJ at the Company's offices in connection with an antitrust investigation of the packaged ice industry, although Defendants denied any improprieties. In response to the DOJ's execution of the search warrant, Reddy Ice's Board of Directors formed a special committee of independent directors to conduct an internal investigation. Reddy Ice further disclosed in its Annual Report for fiscal 2007, which was filed on Form 10-K with the SEC, that employees, including members of management, had received grand jury subpoenas issued from the U.S. District Court for the Eastern District of Michigan, seeking information in connection with the DOJ's packaged ice industry antitrust investigation.

62.     On June 18, 2008, the U.S. District Court for the District of Ohio unsealed a guilty plea that had been executed by Home City on October 30, 2007, in which Home City, through its president and CEO, Thomas Sedler, as authorized by the board of directors, entered a guilty plea on behalf of Home City to criminal charges that Home City violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring with other packaged ice firms to allocate customers

and territories in the packaged ice market. Documents released to the public did not implicate Reddy Ice by express name in connection with the Home City conspiracy, but shortly after disclosure of the criminal charges and guilty plea, Reddy Ice disclosed that the Attorneys General for the States of Florida and Arizona had issued "civil investigative demands" for documents as part of a multi-state antitrust investigation of the packaged ice industry.

63.     Home City's guilty plea and the ongoing investigations into Reddy Ice and Arctic Glacier spawned over ninety civil antitrust law suits against Reddy Ice and its competitors alleging that these companies conspired with one another to allocate territory and fix or stabilize the price of packaged ice sold in the United States and Canada. Reddy Ice also has been sued by its largest customers for antitrust violations, including, for example, Wal-Mart, which accounted for approximately 10% of Reddy Ice's revenues in 2006.

64.     After months of reporting only that Reddy Ice was cooperating with federal authorities, and further reporting that senior management was not aware of any anticompetitive behavior at Reddy Ice, or other activities, which would violate the antitrust laws, Reddy Ice abruptly changed its position. On September 15, 2008, Reddy Ice publicly disclosed that it had suspended Ben D. Key, the Company's Executive Vice President of Sales and Marketing after the Special Committee's internal investigation revealed that Key had violated Company policies in connection with the antitrust violations under investigation by the DOJ. Key had been a member of Reddy Ice's executive management team and attended meetings of trade associations relating to the packaged ice industry known as the International Packaged Ice Association ("IPIA") and the Western Ice Association ("WIA"), which are headquartered in Tampa, Florida and Cary, North Carolina. Key was at relevant times an officer of IPIA and WIA. WIA, IPIA and its affiliates hosted annual and other periodic regional trade association meetings that Key

20

and executives from Home City and Arctic Glacier attended prior to and during the Class Period. These IPIA trade association meetings were improperly used as a forum for Key and other Reddy Ice representatives to meet and unlawfully collude with Home City and Arctic Glacier representatives regarding the packaged ice markets, customers and prices.

65. On or about October 13, 2009, Arctic Glacier pled guilty to criminal charges that Arctic Glacier violated Section 1 of the Sherman Act, 15 U.S.C. § 1, during the period January 1, 2001, and continuing at least through July 17, 2007. Arctic Glacier agreed to pay a $9 million fine and to cooperate with the DOJ in its investigation of other packaged ice manufacturers. Corbin (McNulty's supervisor at the time he worked for Arctic Glacier) and two other executives of Arctic Glacier also have pled guilty to criminal charges that they violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Corbin's guilty plea states that during the period beginning at least in March 2005 and continuing through July 17, 2007, he knowingly violated the antitrust laws by participating in a conspiracy to suppress and eliminate competition by agreeing with other packaged ice manufacturers to allocate customers in Michigan.

**C.     Materially False and Misleading Statements Issued During the Class Period**

**1.     The IPO Offering Documents**

66. In connection with its IPO, on August 10, 2005, Reddy Ice filed with the SEC a Prospectus announcing the pricing of its IPO shares of common stock at $18.50 per share. In the Prospectus, Reddy Ice touted that it was the "largest manufacturer and distributor of packaged ice in the United States [with] sales [that] are more than three times those of any other packaged ice supplier in the United States." Reddy Ice further stated in the Prospectus that "[n]o other manufacturer and distributor of packaged ice in the United States has the geographic presence, infrastructure or capacity necessary to meet the multi-state demands of customers in our markets." Accompanying these statements was a large colored map with designated states in

21

which Reddy Ice was the sole or dominant manufacturer and distributer of packaged ice, which is reproduced and attached hereto as Exhibit A.

67.    The Prospectus further represented that within Reddy Ice's markets it was "the sole supplier of packaged ice to the majority of our top twenty retail ice customers" and that its percentage of total revenues derived from and volume sold to national and regional convenience and grocery store chains had grown as each of these retail channels had consolidated. Reddy Ice reported that it had "benefited from supplying these national and regional retailers as many of these customers have grown at rates in excess of industry averages."

68.    The Prospectus contained detailed disclosures regarding Reddy Ice's competition, business strategy and risks relating to the Company's business.  Specifically, Reddy Ice's IPO Prospectus described its "Competitive Strengths" as follows:

> We believe our competitive strengths include:
>
> •*Stable and Predictable Cash Flow Generation* as a result of our recent acquisitions, limited working capital needs and modest capital expenditure requirements going forward.
>
> •*Unique Multi-State Presence and Infrastructure* that allows us to benefit from continued consolidation within our customer base and from increased reliance by national and regional customers on suppliers that serve multiple markets and helps insulate us from the variability of weather patterns in any individual region.
>
> •*Leading Market Position in Attractive Ice Markets,* including the Sun Belt and 13 of the 15 fastest growing metropolitan areas in the United States.
>
> •*Long Standing Relationships with High Quality Customers,* which we believe provide us with a significant competitive advantage over other suppliers in our markets.
>
> •*Multiple Distribution Service Offerings* that enable us to offer our customers the flexibility to meet their specific supply requirements in a reliable and cost-efficient manner.
>
> •*Strong, Incentivized Management Team with Proven Execution Capabilities* that has been responsible for successfully executing our strategy of increasing our profitability through operational improvements, including cost rationalization,

22

facility consolidation and working capital management, while strengthening customer relationships.

69.     The Prospectus further specifically disclosed the Company's "Business Strategy" as follows:

Our business strategy is to strengthen our competitive position, increase revenues and drive profitability by:

• *Enhancing Revenue Growth* from our existing customers, new products and outsourcing by large retailers.

• *Selectively Pursuing Acquisitions* that enhance the density of our distribution routes, provide capacity rationalization opportunities, increase our market penetration in existing markets or expand our presence in contiguous markets.

• *Continuing Efficiency Improvements* to continue to improve our operating margins.

70.     Reddy Ice disclosed the following risks and challenges in its IPO Prospectus:

*We Have Many Competitors* in each of our geographic markets and could lose market share or customers to them or could be forced to reduce our prices to retain or attract business. New competitors may also enter our markets, including ice producers from outside our current sales area.

Our failure to successfully compete in our markets, retain existing customers and obtain new customers could limit our prospects and cause us to lose market share.

Our businesses are highly competitive. We have many competitors in each of our geographic markets offering similar products and services. Competition in our businesses is based primarily on service, quality and price. We could lose market share if we fail to successfully compete against our competitors in any of these areas, if our existing competitors expand their capacity....

71.     As a result of the foregoing statements, the Company's shares traded at inflated prices, enabling the Company and the Individual Defendants to raise $246.5 million in the IPO.

72.     The IPO Prospectus was materially false and misleading and omitted material information necessary to make statements therein not misleading as Defendants knowingly and recklessly failed to disclose that Reddy Ice:

(1) had engaged, and continued to engage, in illicit business practices with its competitors in the packaged ice industry and had unlawfully joined with its competitors in the packaged ice industry in colluding and agreeing to allocate territories and customers in the United States' packaged ice market;

(2) had agreed with its competitors in the industry to fix, raise, maintain and stabilize prices for packaged ice in the United States market and that Reddy Ice's revenues and earnings had been artificially increased through the use of such illicit business practices, and as a result, the Company's financial statements were false and misleading at all relevant times;

(3) had engaged in illicit business practices that exposed the Company to risks of criminal and civil liability and penalties that threatened its existence and continuing business practices;

(4) had falsely certified that it had adequate internal and financial controls and operated under and ensured strict compliance with a code of ethics that expressly prohibited agreements that violated the U.S. antitrust laws; and

(5) had repeatedly issued statements about the Company's competitive position, financial well-being and future business prospects that were lacking in any reasonable basis when made.

## 2.    Reddy Ice's Third Quarter 2005 Results

73.    On November 1, 2005, the Company issued its first earnings release as a public company entitled "Reddy Ice Reports Third Quarter and Nine Months 2005 Results." Therein, the Company, in relevant part, stated:

> Reddy Ice Holdings, Inc. (NYSE: FRZ), today reported financial results for the third quarter and nine months ended September 30, 2005.
>
> ***Revenues for the third quarter of 2005 were $126.6 million, compared to $106.5 million in the same quarter of 2004.*** The Company's net loss available to common stockholders was $3.1 million in the third quarter of 2005, compared to net income available to common stockholders of $13.2 million in the third quarter of 2004. ***Net loss per diluted share was $0.17 in the third quarter of 2005 compared to earnings per diluted share of $0.92 in the third quarter of 2004.*** Adjusted EBITDA, defined as earnings before interest, taxes, depreciation and amortization, and the effects of certain other items, was $45.2 million in the third quarter of 2005, compared to $39.3 million in the third quarter of 2004. Available Cash generated in the third quarter of 2005 was $39.0 million. [emphasis added.]

74.     Reddy Ice also disclosed in that same press release that it completed two acquisitions during the third quarter and first nine months of 2005.  Defendant Brick referred to Reddy Ice's aggressive plan to expand through acquisitions, which he stated had been "limited by our IPO process," but that the "acquisitions closed in the third quarter are indicative of the opportunities that are available in the marketplace."

75.     Additionally, Reddy Ice's financial results were repeated in its third quarter 2005 Form 10-Q for the period ended September 30, 2005, which was filed with the SEC on November 4, 2005, and was signed by defendants Brick and Janusek.  The Company's Form 10-Q contained numerous risk factors and various "controls and procedures" related to Reddy Ice's business, as follows:

> ***Our businesses are highly competitive.*** We have many competitors in each of our geographic markets offering similar products and services. ***Competition in our businesses is based primarily on service, quality and price.*** We could lose market share if we fail to successfully compete against our competitors in any of these areas, if our existing competitors expand their capacity, if new entrants successfully penetrate our markets, if we fail to adequately serve our existing base of customers, or if our larger grocery or convenience store customers decide to manufacture their own ice rather than purchase our products.  [emphasis added.]

76.     Defendants Brick and Janusek also certified the Company's financial and operating results as reported in the third quarter 2005 Form 10-Q pursuant to the requirements of the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley"), which in relevant part, stated:

I, [William P. Brick/Steven J. Janusek], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Reddy Ice Holdings, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and

4.      for, the periods presented in this report; and The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)      All significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

*       *       *

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. §§ 1350(a) and (b)), [William P. Brick/Steven J. Janusek] hereby certifies that the Quarterly Report on Form 10-Q for the period ended September 30, 2005 of Reddy Ice Holdings, Inc. (the "Company") fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

26

77.     As a result of the foregoing statements and Defendants' fraudulent conduct, the Company's shares traded at inflated prices as Reddy Ice's revenue growth, competitiveness, pricing and demand for its products were the result of its participation in the illegal market allocation and price-fixing conspiracy.  On November 1, 2005, Reddy Ice's stock closed at $21.08 per share, which was $2.58 above its IPO offering price.  The foregoing statements from the third quarter Form 10-Q contained in ¶¶ 73-76 above regarding the Reddy Ice's competition and business strategy and the risks that the Company faced, and the controls and procedures implemented to manage these risks were additionally materially false and misleading for the reasons set forth in ¶ 72.

### 3.     Reddy Ice's Fourth Quarter and Full Year 2005 Results

78.     On February 23, 2006, the Company issued a press release entitled "Reddy Ice Reports Fourth Quarter and Full Year 2005 Results."  Therein, the Company stated that it had revenues for the fourth quarter of 2005 of $60.8 million, compared to $53.3 million in the same quarter of 2004, and that it had revenues in the full year 2005 of $319.8 million, compared to $285.7 million in 2004.  Reddy Ice also disclosed that it completed no acquisitions in the fourth quarter, but had completed two acquisitions in January 2006.  In the earnings release, defendant Brick stated that "typical market forces" led to Reddy Ice's financial results and that the "fourth quarter brought us many of the same opportunities and challenges that we encountered in the third quarter."

79.     The foregoing statements from the February 23, 2006 press release contained in ¶ 78 above regarding the Company's revenues were materially false and/or misleading for the reasons set forth in ¶ 72.

80.     On March 16, 2006, Reddy Ice filed its Annual Report for fiscal 2005 with the SEC on Form 10-K.  The Company's Form 10-K was signed by Defendants Brick, Janusek and

27

Weaver, and reaffirmed the Company's financial results previously announced on February 23,

2006. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially

similar to the certifications contained in ¶ 76, *supra*.

81.     The Company's 2005 Form 10-K contained numerous disclosures related to

Reddy Ice's business and the purportedly highly-competitive market for packaged ice products.

The Form 10-K states in relevant part:

Business Overview

Our business is characterized by consistent annual customer demand, attractive
margins and modest annual capital requirements. Based on past experience, retail
consumer demand for packaged ice is relatively unaffected by adverse economic
conditions due to its low cost and the lack of readily available substitutes. For the
year ended December 31, 2005, we had revenues and a net loss of $319.8 million
and $12.1 million, respectively.

                              *       *       *

We have built a strong and loyal customer base by providing a high level of
service and quality at *competitive prices* utilizing our extensive network of ice
manufacturing plants and distribution centers. …. Most of our major customers,
including nineteen of our top twenty retail ice customers, have purchased ice from
us and our predecessor companies for over a decade. *Within our markets, we are
the sole supplier of packaged ice to the majority of our top twenty retail ice
customers.* The percentage of our total revenues derived from and volume sold to
national and regional convenience and grocery store chains has grown over the
last several years as each of these retail channels has consolidated.  [emphasis
added.]

82.     In the 2005 Form 10-K, Reddy Ice also disclosed that its business strategy was to

"strengthen [its] competitive positions, increase revenues and drive profitability." Reddy Ice

also touted the fact that it was the "sole supplier" in its geographic regions, and that "for certain

customers for whom [Reddy Ice] was not the sole supplier," Reddy Ice had the "likely

opportunity" to "capture incremental volume."   Further, the Company also stated that it

attributed customer loyalty to Reddy Ice's "high level of service and quality products at

competitive prices," and that its typical customer relationships were "long term and turnover of major customers [was] infrequent."

83.    Reddy Ice's 2005 10-K also disclosed that the packaged ice industry was "highly fragmented and that the Company would "continue to pursue strategic acquisitions in existing or adjacent geographic markets that enhance the density of our distribution routes, provide capacity rationalization opportunities, increase our market penetration in existing markets or expand our presence in contiguous markets." With respect to the competition Reddy Ice faced, Reddy Ice's Form 10-K provided a lengthy disclosure regarding the "highly competitive and highly fragmented" packaged ice industry:

Competition

*The traditional packaged ice industry is highly competitive and highly fragmented.* In the United States, the traditional packaged ice industry is led by us and three smaller, regional, multi-facility suppliers. *Although these suppliers generally do not serve customers in our primary markets, we do compete with numerous smaller local and regional companies of varying sizes and competitive resources.* Most ice manufacturers have annual revenues of less than $1 million. In addition to our direct competition, numerous convenience and grocery retailers operate commercial ice plants for internal use or manufacture and bag ice at their store locations. *However, our ice products generally do not face competition within a particular store as almost all of our customers rely on a single supplier of packaged ice at each point of sale....*

*Competition in the packaged ice industry is based primarily on service, quality and price. To compete successfully, an ice manufacturer must be able to offer significant supply and distribution capacity on a seasonal basis while maintaining cost efficiency.* We are the largest company in the packaged ice industry, serving customers in 31 states and the District of Columbia. Our large geographic footprint, manufacturing capacity and distribution infrastructure, including traditional ice delivery, warehouse delivery and The Ice Factory, gives us the ability to service large retailers across multiple states and regions in a variety of ways. Because of these attributes, we are positioned to benefit from continued consolidation within our customer base and from increased reliance by national and regional customers on suppliers that serve multiple markets.

We have been providing ice products and delivery services to many of our large customers for more than a decade. Our customers depend on our consistent ability to ensure prompt and reliable delivery, particularly during peak seasonal months.

29

*The strength of our customer relationships is further reinforced by the fact that almost all of our customers rely on a single supplier of packaged ice at each point of sale. We believe that the strength of our customer relationships provides us with a significant competitive advantage over other suppliers in our markets.* [emphasis added.]

84.     Reddy Ice further disclosed that its inability to "successfully" compete in its markets, retain existing customers and obtain new customers "could limits [its] prospects and cause [Reddy Ice] to lose market share," and that competition in the packaged ice industry was based "primarily on service, quality and price."

85.     As a result of the foregoing statements and Defendants' fraudulent conduct, the Company's shares traded at inflated prices as Reddy Ice's revenue growth, competitiveness, pricing and demand for its products were the result of its participation in their undisclosed illegal market allocation and price-fixing conspiracy. On March 16, 2006, Reddy Ice's stock closed at $21.90 per share, which was $3.40 above its IPO offering price. The foregoing statements from the Company's 2005 Form 10-K were additionally materially false and misleading for the reasons set forth in ¶ 72.

86.     Additionally, attached as Exhibit 14.1 to the Company's 2005 10-K was the Company's Code of Business Conduct and Ethics (the "Ethics Code"). The Ethics Code "summarizes certain laws and the ethical policies that apply to [Reddy Ice's] employees, officers and directors." Defendant Brick states in the Forward to the Ethics Code that he has "personally taken the time to study [the Ethics Code] carefully." Further, defendant Brick, as was required of all Reddy Ice employees, signed a statement confirming that he read the Ethics Code carefully and understood his responsibilities under it.

87.     The Ethics Code, among other things, states that the Company's employees, officers and directors must adhere to the Company's stated policy with respect to compliance with all antitrust laws and conduct business fairly with its customers:

*Antitrust Laws*

Antitrust laws are designed to ensure a fair and competitive marketplace by prohibiting various types of anticompetitive behavior. ***Some of the most serious antitrust offenses occur between competitors, such as agreements to fix prices or to divide customers, territories or markets. Accordingly, it is important to avoid discussions with our competitors regarding pricing, terms and conditions, costs, marketing plans, customers and any other proprietary or confidential information.*** Foreign countries often have their own body of antitrust laws, so if we engage in international operations we may also be subject to antitrust laws of other foreign countries.

Unlawful agreements need not be written. They can be based on informal discussions or the mere exchange of information with a competitor. If you believe that a conversation with a competitor enters an inappropriate area, end the conversation at once. Membership in trade associations is permissible only if approved in advance by our compliance officer.

Whenever any question arises as to application of antitrust laws, you should consult with legal counsel, and any agreements with possible antitrust implications should be made only with the prior approval of legal counsel.

*      *      *

Fair Dealing

We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. ***You must conduct business honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud or other unfair business practice***.   [emphasis added.]

88.    Defendant Brick's statements regarding his and the Company's compliance with the Ethics Code were blatantly false.  Brick knew or was seriously reckless in not knowing that Reddy Ice's collusive agreements with Arctic Glacier and Home City breached Company policy, and the Ethics Code and U.S. antitrust laws.

### 4.    The Company's First Quarter 2006 Results

89.    On April 27, 2006, Reddy Ice issued and filed with the SEC an earnings release for its quarter-ended March 31, 2006.  In the release, the Company reported that "[r]evenues for

31

the first quarter of 2006 were $44.8 million, compared to $39.2 million in the same quarter of 2005," and that its "net loss was $8.2 million in the first quarter of 2006, compared to a net loss of $10.2 million in the same period of 2005." Defendant Brick, who at the time served as Reddy Ice's Chairman and CEO, commented on the results, stating that the Company's increased revenues and volume had "exceeded our internal goals" and were attributable to "[f]avorable weather" and "the impact of ongoing operating initiatives." Reddy Ice affirmed its purported growth strategy through acquisitions and reported that in connection with the Company's acquisition plan, two transactions had been completed in first quarter 2006 and one in second quarter 2006, prior to the date of the release.

90.     On April 28, 2006, Reddy Ice filed its Form 10-Q for the First Quarter ended March 31, 2006 with the SEC. The Company's Form 10-Q repeated its financial results as reported in the earnings release the prior day, and Defendants Brick and Janusek signed the quarterly report. In the Form 10-Q, Reddy Ice stated that its revenues "increased $5.6 million from the three months ended March 31, 2005 to the three months ended March 31, 2006," and attributed the increase "primarily due to the effects of the higher average pricing, increases in ice volume sales due to warmer and drier average weather conditions in our markets and the continuing positive effects of package sizing initiatives, which consists primarily of converting a portion of our ice sales from seven to ten pound bags." The Company's 10-Q contained substantially similar Sarbanes-Oxley required certifications, and also repeated the purported risks to Reddy Ice's business due to the "highly competitive" packaged ice market contained in contained in the Company's Third Quarter 2005 Form 10-Q, ¶¶ 75-76 *supra*.

91.     As a result of the foregoing statements and Defendants' fraudulent conduct, the Company's shares traded at inflated prices as Reddy Ice's revenue growth, competitiveness,

pricing and demand for its products were the result of its participation in their undisclosed illegal market allocation and price-fixing conspiracy. On April 28, 2006, Reddy Ice's stock closed at $23.50 per share, which was $5.00 above its IPO offering price. The foregoing statements from the Company's 2005 Form 10-K were additionally materially false and misleading for the reasons set forth in ¶ 72.

### 5.    The Secondary Offering Documents

92.    On May 5, 2006, the Company issued a press release entitled "Reddy Ice Announces Secondary Common Stock Offering." Therein, the Company, in relevant part, stated:

> Reddy Ice Holdings, Inc. (NYSE:FRZ), announced today that it has filed a registration statement on Form S-1 with the Securities and Exchange Commission relating to a proposed secondary offering of 4,590,258 shares of its common stock, representing approximately 21.2 percent of Reddy Ice's common shares outstanding. Certain selling stockholders also expect to grant the underwriters an option to purchase an additional 688,539 shares of common stock to cover over-allotments, if any.
>
> ***All of the shares being offered will be sold by current Reddy Ice stockholders, including…members of our management.*** Reddy Ice will not receive any proceeds from this offering. [emphasis added.]

93.    In connection with Reddy Ice's Secondary Offering, the Company filed a Registration Statement and Prospectus with the SEC on May 5, 2006, as amended on May 24, 2006, which detailed the Company's financial results from the year ended December 31, 2003 through March 31, 2006. The Secondary Offering Registration Statement and Prospectus were signed by Defendants Brick, Weaver and Janusek.

94.    The Secondary Offering Registration Statement and Prospectus substantially repeated the disclosures regarding Reddy Ice's business prospects, strategy and risks as provided in the IPO Prospectus, which are quoted above in ¶¶ 66-70. In addition, Reddy Ice confirmed that prior to the consummation of the Company's IPO, Reddy Ice's board of directors adopted "a new code of business conduct and ethics applicable to our directors, officers and employees."

95.     The statements in the Company's Secondary Offering Prospectus were materially false and misleading and omitted material information necessary to make the statements therein not misleading for the reasons set forth in ¶ 72.

96.     As a result of the foregoing statements and material omissions, the Company's shares traded at inflated prices, commanded the Secondary Offering price of $21.55 and enabled Reddy Ice's controlling shareholders and certain executives to sell 4.59 million shares of the Company's common stock to investors for total gross proceeds of over $98.9 million.  The Individual Defendants were among the members of the Company's management that sold into the public offering, collectively selling 129,170 shares for gross proceeds of over $2.78 million.

### 6.     Reddy Ice's Second Quarter 2006 Results

97.     On July 27, 2006, the Company filed an earnings release and its Form 10-Q for Reddy Ice's second quarter of 2006.  In the earnings release and quarterly report, Reddy Ice stated that revenues for the second quarter of 2006 "were $113.6 million, compared to $93.1 million in the same quarter of 2005," and that "net income was $12.7 million in the second quarter of 2006, compared to net income of $5.4 million in the same quarter of 2005." Defendant Brick stated in the earnings release that the Company's "second quarter 2006 results significantly exceeded our expectations," and that the results "were due to a combination of favorable weather conditions in most of our markets and our ongoing operating initiatives." With the benefit of Defendants' illegal conduct to allocate markets and drive up prices for packaged ice, Reddy Ice increased its guidance for revenues and earnings for the fiscal year to "between $335 million and $345 million and net income to range from $18.1 million to $22.2 million."

98.     In the Form 10-Q for second quarter 2006, Reddy Ice also disclosed the company's results from operations, repeated substantially similar risk factors regarding the

34

"highly competitive" packaged ice market as contained in the Company's Form 10-Q for period ending September 30, 2005.  In addition, Reddy Ice stated that its $20.5 million increase in revenue during second quarter 2006 was "primarily" due to:

- increases in ice volume sales due to significantly warmer and drier average weather conditions in our markets (especially during the months of April and May 2006);

- the continuing positive effects of package sizing initiatives, which consists primarily of converting a portion of our ice sales from seven to ten pound bags;

- the effects of the higher average pricing; and

- the effects of acquisitions completed during the six months ended June 30, 2006.

99.     The Company's Form 10-Q for the second quarter 2006, which defendants Janusek and Brick signed, incorporated by reference the risk factors previously disclosed in the Company's 2005 Form 10-K contained at ¶¶ 81-84, *supra*.  As with each of the Company's previous filings with the SEC, the Company's Form 10-Qs for the second quarter of 2006 contained substantially similar Sarbanes-Oxley required certifications, signed by defendants Brick and Janusek, as reflected in ¶ 76 *supra*.

100.    The foregoing statements in the Company's second quarter 2006 earnings release and Form 10-Q were materially false and/or misleading for the reasons set forth in ¶ 72.

101.    As a result of the foregoing statements and material omissions, the Company's shares traded at inflated prices.  In the days following the Company's disclosures in its second quarter 2006 press release and quarterly report, Reddy Ice's stock price steadily increased from $21.07 to $23.15 per share as Defendants' illegal conduct and impact on its competitive position, sales and revenue artificially inflated the Company's stock price.

### 7.    Reddy Ice's Third Quarter 2006 Results

102.    On November 2, 2006, the Company filed its earnings release and quarterly report on Form 10-Q for Reddy Ice's third quarter of 2006. Reddy Ice reported that "[r]evenues for the third quarter of 2006 were $126.1 million, compared to $126.6 million in the same quarter of 2005," and that its "net income was $15.1 million in the third quarter of 2006, compared to a net loss of $3.1 million in the same quarter of 2005." Additionally, the Company reported that "[r]evenues in the first nine months of 2006 were $284.4 million, compared to $258.9 million in the same period of 2005," which defendant Brick stated exceeded the Company's original guidance.

103.    In the third quarter 2006 Form 10-Q, Reddy Ice reported that during the nine months ended September 30, 2006, the Company had purchased nine ice companies. Reddy Ice further disclosed risks arising from uncertainties that may impact the Company's financial results and performance, including risks relating to "competitive practices in the industry in which we compete." Defendants Brick and Janusek certified the Company's results and internal controls as required pursuant to Sarbanes-Oxley.

104.    The foregoing statements in the Company's third quarter 2006 earnings release and Form 10-Q were materially false and/or misleading for the reasons set forth in ¶ 72.

105.    As a result of the foregoing statements and material omissions, the Company's shares traded at inflated prices. In the days following the Company's disclosures in its third quarter 2006 press release and quarterly report, Reddy Ice's stock price steadily traded in the $23-$24 range per share as Defendants' illegal conduct and impact on its competitive position, sales and revenue artificially inflated the Company's stock price.

### 8. Reddy Ice's Fourth Quarter and Full Year 2006 Results

106.   On February 22, 2007, the Company issued a press release entitled "Reddy Ice Reports Fourth Quarter and Full Year 2006 Results." During 2006, Reddy Ice was able to increase its year-over-year revenues by more than 8% – totaling $346.0 million compared to $319.8 million in 2005. The Company further reported that "[r]evenues for the fourth quarter of 2006 were $61.6 million, compared to $60.8 million in the same quarter of 2005." Defendant Brick stated that "the results of our ice operations exceeded last year's fourth quarter as various operating initiatives continued to provide benefits that we are optimistic will continue into 2007." Further, defendant Brick expressed how effective the Company's acquisition strategy had been at driving out local competition:

> "These recent acquisitions are a continuation of our strategy of acquiring companies in markets that will bring us immediate benefits while improving our ability to service our customers," commented Mr. Brick. "We are continuously evaluating opportunities and expect additional acquisitions during the remainder of 2007."

107.   On March 14, 2007, Reddy Ice filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Defendants Brick, Janusek and Weaver, and reaffirmed the Company's financial results previously announced on February 22, 2007. The 2006 Form 10-K further emphasized the Company's acquisition strategy and stated:

> We will continue to consider strategic acquisitions in existing or adjacent geographic markets that enhance the density of our distribution routes, provide capacity rationalization opportunities, increase our market penetration in existing markets or expand our presence in contiguous markets. ***Any significant reduction in goodwill and other intangible assets would have an adverse effect on the value of our business.*** Our acquisitions have resulted in significant amounts of goodwill and other intangible assets. Goodwill, which relates to the excess of cost over the fair value of the net assets of the businesses acquired, and intangible assets totaled approximately $296.3 million at December 31, 2006, representing approximately 49% of our total assets. [emphasis in original.]

37

108.   The Company's 2006 Form 10-K stated that "[r]evenues increased $26.3 million from 2005 to 2006" and that the "increase was primarily due to an increase in volume sales, primarily in the second quarter of 2006 as a result of favorable weather conditions in most of our markets, and the effects of package sizing initiatives," and "higher average pricing and the effects of the acquisitions of ice companies (approximately $4.4 million)."   Reddy Ice also attributed its ability to generate cash from its operations due to, among other things, "competitive factors."   Additionally, the Company's 2006 10-K contained substantially similar disclosures related to the Company's business overview, business strategy, competitive strengths and risks related to Reddy Ice's business as set forth above in ¶¶ 81-84, *supra*.   The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications those reproduced in ¶ 76, *supra*.

109.   In the Form 10-K for fiscal 2006, Defendants reiterated Reddy Ice's stated Company policy of full compliance with all anti-trust laws and incorporated by reference Reddy Ice's Ethics Code of Conduct as set forth above in ¶ 87, *supra*, and further stated in the Form 10-K that the Ethics Code was available on the Company's website.

110.   The foregoing statements from the Company's Form 10-K for 2006 were materially false and misleading for the reasons set forth in ¶ 72.

### 9.   Reddy Ice's First Quarter 2007 Results

111.   On April 25, 2007, the Company issued and filed with the SEC an earnings release for Reddy Ice's first quarter of 2007.  The Company announced that "[r]evenues for first quarter of 2007 were $47.0 million, compared to $44.8 million in the same quarter of 2006." Defendant Brick, Reddy Ice's Chairman and CEO, attributed the $3.4 million or 8.1% increase in quarterly revenues to Reddy Ice's aggressive acquisition strategy, among other things.  Reddy Ice had already "closed" five acquisitions during 2007 at a total cost of approximately $11.5

million.  Defendant Brick stated that "Reddy Ice's "on-going operating initiatives and acquisitions resulted in modest increases in revenues and volumes compared to last year."

112.   On April 26, 2007, Reddy Ice filed with the SEC its form 10-Q for the first quarter ended March 31, 2007.  The Company's Form 10-Q repeated its financial results as reported in the earnings release the prior day, and defendants Brick and Janusek signed the quarterly report.   In the first quarter 2007 Form 10-Q, Reddy Ice stated that its "revenues increased $2.2 million from the three months ended March 31, 2006 to the three months ended March 31, 2007."  The Company attributed this 5% year-over-year increase "to the effects of the higher volume sales of ice related to acquisitions and the continuing positive effects of package sizing initiatives."  The Company incorporated by reference the risk factor disclosed in Reddy Ice's 2006 Form 10-K filed on March 14, 2007 – including the purported risks to Reddy Ice's business due to the "highly competitive" packaged ice industry - (¶¶ 107-109, *supra*), and contained substantially similar Sarbanes-Oxley required certifications, signed by defendants Brick and Janusek, as reproduced in ¶ 76 *supra*.

113.   As a result of the foregoing statements and Defendants' fraudulent conduct, the Company's shares traded at inflated prices as Reddy Ice's revenue growth, competitiveness, pricing and demand for its products were the result of its participation in an undisclosed anti-competitive market allocation and price fixing conspiracy.  On April 26, 2007, Reddy Ice's stock closed at $28.98 per share, which significantly was more than $10.00 above its IPO offering price.  The foregoing statements from the Company's April 26, 2007 Form 10-Q were materially false and misleading for the reasons set forth in ¶ 72.

114.   On July 24, 2007, Reddy Ice filed an Amended Annual Report with the SEC on Form 10-K/A for the purpose of amending the Sarbanes-Oxley certifications.  The Company

stated that the sole reason for the amended report was to "conform to the language set forth in Regulation S-K, Item 601(b)(31)." Despite certifying that the Company's reports filed with the SEC contained all material facts regarding Reddy Ice's financial results and operations, Defendants knew and deliberately concealed from investors the Company's unlawful anticompetitive practices and agreements and failed to disclose risks arising therefrom. The Company's 10-K/A was signed by Defendant Janusek and set forth revised Sarbanes-Oxley certifications, as follows:

I, [Jimmy C. Weaver/Steven J. Janusek], certify that:

1.      I have reviewed this annual report on Form 10-K/A of Reddy Ice Holdings, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; and

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)      All significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

*      *      *

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. ss.ss. 1350(a) and (b)), [Jimmy C. Weaver/Steven J. Janusek] hereby certifies that the Annual Report on Form 10-K/A for the period ended December 31, 2006 of Reddy Ice Holdings, Inc. (the "Company") fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

## 10.    Reddy Ice's Second Quarter 2007 Operating Results

115.    On July 26, 2007, Reddy Ice filed an earnings release and its Form 10-Q for the

second quarter of 2007.   In the quarterly report and earnings release, Reddy Ice stated that its

revenues "decreased $7.6 million from the three months ended June 30, 2006 to the three months

ended June 30, 2007, and attributed this decrease to weather and the Company's "non-ice

operations." Reddy Iced also disclosed that its year-over-year decrease was positively offset due

to Reddy Ice's continued aggressive acquisition plan, "higher average pricing, …and the

continuing positive effects of package sizing initiatives..."  Although Reddy Ice revised downward its 2007 guidance, in the earnings release defendant Weaver assured the market that Reddy Ice could compete in the highly-competitive packaged ice industry and stated: "we continue to believe that the fundamentals of the business are sound and that our ongoing operating initiatives, including our package sizing initiative, the consolidation of administrative functions and plant efficiency projects, are adding and will add value."

116.   The Company's Form 10-Q for the second quarter of 2007, which defendants Weaver and Janusek signed, incorporated by reference the risk factors previously disclosed in Reddy Ice's Annual Report on Form 10-K/A for the year ended December 31, 2006 reflected at ¶ 114, *supra*.  As with each of the Company's previous filings with the SEC, the Company's Form 10-Q for the second quarter of 2007 contained substantially similar Sarbanes-Oxley required certifications, signed by defendants Weaver and Janusek, as contained in the Company's Form 2006 10-K/A, ¶ 114, *supra*.

117.   As a result of the foregoing statements and Defendants' fraudulent conduct, the Company's shares traded at inflated prices as Reddy Ice's revenue growth, competitiveness, pricing and demand for its products were the result of its participation in their undisclosed anti-competitive market allocation and price fixing conspiracy.  On July 26, 2007, Reddy Ice's stock closed at $29.79 per share, which was $11.29 above its IPO offering price.  The foregoing statements from the Company's July 26, 2007 Form 10-Q were materially false and misleading for the reasons set forth in ¶ 72.

**11.   Reddy Ice's Third Quarter 2007 Operating Results**

118.   On October 25, 2007, the Company filed its third quarter 2007 earnings release with the SEC.  The Company's revenues for the third quarter of 2007 were "$125.7 million, compared to $123.3 million in the same quarter of 2006."  Reddy Ice's net income increased

$1.5 million to $16.6 million in the third quarter of 2007 versus $15.1 million in 2006."  In the

earnings release, defendant Weaver attributed this "modest" increase in Reddy Ice's revenues to

improving weather conditions as well as the Company's ability to effectively compete in the

purportedly highly-competitive packaged ice industry, stating:  "We continue to believe that the

fundamentals of the business remain solid and that we are well positioned to take advantage of

improving weather trends and our ongoing internal operating initiatives."

119.   On October 26, 2007, the Company filed its Form 10-Q for Reddy Ice's third

forth in ¶ 72.

### 15.    One of Reddy Ice's Co-Conspirators Pleads Guilty to Price Fixing

143.    On June 19, 2008, the Dallas Business Journal published an article entitled

"Home City Ice pleads guilty in alleged anti-competition scheme," which updated developments

with one of the Company's collusion partners.  The article, in relevant part, stated:

> *Home City Ice Co. pleaded guilty to conspiring with other packaged ice firms to*
> *allocate customers and territories, the U.S. Department of Justice said this*
> *week.*
>
> *The Cincinnati-based company is a co-defendant, along with Dallas-based*
> *Reddy Ice Holdings Inc., and Arctic Glacier Inc., based in Winnipeg, Canada,*
> *in a series of lawsuits claiming the companies conspired with one another to*
> *allocate territory and fix or stabilize the price of packaged ice sold in the United*
> *States and Canada.*
>
> *Home City's guilty plea, filed late last year and unsealed this week, is part of an*
> *ongoing investigation of the packaged-ice industry* by the Justice Department's
> Antitrust Division office in Cleveland, and FBI offices in Cincinnati, Toledo,
> Indianapolis and Ann Arbor, Mich.
>
> *Home City, in pleading guilty, agreed to cooperate with the investigation.*
>
> *The company was accused of agreeing with competitors in Detroit and*
> *southeastern Michigan to allocate customers and territories in those areas and*
> *to refrain from competing for customers in the allocated territories.*
>
> Home City faces a fine of $100 million that could be increased by a judge,
> according to an Associated Press report.  (emphasis added.)

144.    On August 7, 2008, The Wall Street Journal published an article entitled

*Federal prosecutors are investigating an alleged criminal price-fixing conspiracy in the $1.8 billion market for packaged ice, with the help of a former industry executive who told authorities the collusion was nationwide and forced up prices for consumers and businesses.*

*In a July 23 filing in federal court in Detroit, and in an interview with The Wall Street Journal, a former vice president of sales for Party Time Ice, Martin McNulty, disclosed new details of the ice probe and said some industry executives were caught by FBI wiretaps discussing the alleged conspiracy.*

*Mr. McNulty's identity and his central role in the criminal investigation haven't been previously reported.* Federal law-enforcement officials confirmed that information provided by Mr. McNulty triggered the investigation, which began in Detroit three years ago.

In June, prosecutors unsealed charges against Home City Ice Co., Cincinnati, alleging that the company conspired to suppress competition in the Detroit market from 2001 to 2007. The company, which pleaded guilty to the charges, makes

*initial allegations.*

*In an interview, Mr. McNulty said he lost his home after he was fired, and that he was later offered his job back, at twice his original salary, if he would agree to go along with the conspiracy. "The arrogance was breathtaking," he said.*

increasing exponentially from the prior quarter: "Included in the results for the second quarter of 2008 are $4.6 million of costs related to the ongoing antitrust investigations and related litigation." Gilbert M. Cassagne, Reddy Ice's newly-appointed CEO ("Cassagne") as of June 23, 2008, commented on the Company's results and the new pricing pressures Reddy Ice found itself combating – since it could no longer engage in the anti-competitive agreement: "Our results for the second quarter were below our expectations due to current economic trends, which resulted in significant volume shortfalls. We also continued to experience cost pressures, especially in regards to fuel."

146.     On this news, the Company's shares fell an additional $2.40 per share, or 17.92 percent, to close on August 7, 2008 at $10.99 per share, on unusually heavy trading volume.

147.     On August 8, 2008, Reddy Ice filed its Form 10-Q for the Company's second quarter of 2008. The Company's Form 10-Q repeated its financial results as reported in the earning release the prior day, and Cassagne and defendant Janusek signed the quarterly report. In the Form 10-Q, Reddy Ice state that its "[r]evenues decreased $0.9 million from the three

155.    On March 30, 2009, Arctic Glacier, one of Reddy Ice's co-conspirators in the Agreement, announced that it was suspending two high-ranking Arctic Glacier executives, Frank Larson, Arctic Glacier's Executive Vice President – Operations, and Gary Cooley, Vice President – Sales and Marketing of Arctic Glacier Inc.   Like Reddy Ice, Arctic Glacier suspended these two executives based upon an internal investigation that was precipitated by the on-going DOJ investigation.

**E.    Undisclosed Adverse Facts**

156.    The market for Reddy Ice's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to



securities during the Class Period, Plaintiffs and other members of the Class suffered significant

August 7 and September 15, 2008, however, Reddy Ice's stock price suffered material, statistically significant declines.

161.    On March 7, 2008, after it was disclosed that officials from the Antitrust Division of the United States Department of Justice had executed a search warrant at the Company's Dallas headquarters on March 5, 2008 in connection with an investigation of the packaged ice industry, the Company's stock price dropped 33.45%, $7.73 per share, on unusually high trading volume of nearly three million shares.

162.    On August 7, 2008 – following the publication of an article in the *Wall Street Journal*, entitled "Collusion inquiry Targets Ice Companies," which disclosed, inter alia, that the anti-competitive activities that the Department of Justice was investigating in the packaged ice industry were wide ranging and included the three companies that dominated that market, Reddy Ice being one of them – the Company's stock price plummeted again 17.92%, $2.40 per share, on unusually high volume of nearly one million shares.

163.    On September 15, 2008, the Company announced that it had suspended a key member of its management team – Ben D. Key, Executive Vice President, Sales and Marketing – after a Special Committee of the Board of Directors found evidence that Company policies prohibiting engaging in anti-competitive activities had been breached.  In a separate release that same day, the Company announced the indefinite suspension of its cash dividend due to "weaker than expected operating results and costs related to the ongoing antitrust investigations and related litigation".  This news caused the Company's stock price to fall 13.9%, or $1.09 per share on September 15, and an additional 34.8%, or $2.25 per share, on September 16, 2008.

164.    Individually and collectively, the drops on March 7, August 7, September 15 and September 16, 2008 removed the inflation from Reddy Ice's stock price, causing real economic

loss of at least $13.47 per share to investors who had purchased the Company's publicly traded securities during the Class Period.

165. The decline in Reddy Ice's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed

including the Individual Defendants.

### 1. The Individual Defendants Benefitted from the Illegal Market Allocation Through Insider Sales

168. At the beginning of the Class Period, on or about August 10, 2005, the Defendants took advantage of the artificially-inflated price of the Company's securities in connection with Reddy Ice's IPO. Reddy Ice controlling shareholders and insiders – including Defendants Janusek, Weaver and Booth – collectively sold 2,448,151 shares of the Company's stock to the public at a price of $18.50 per share, for gross proceeds of over $45 million.

a price of $21.55 per share, for total gross proceeds of over $98.9 million.   The Individual

Defendants were among the members of the controlling shareholders that sold into the

Secondary Offering, collectively selling 129,170 shares of the Company's stock for gross

proceeds of over $2.78 million.

170.    In addition to sales in connection with the IPO and Secondary Offerings, during

the Class Period, and while in possession of material non-public information and while the

Company's securities trading at artificially-inflated prices, Company insiders sold an additional

176,095 shares of the Company's stock for gross proceeds of $4,414,170.80, including over

$2.53 million in gross proceeds received by the Individual Defendants.   This trading by

Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| February 28, 2006 | Booth, Raymond D. | 4,916 | $20.20 | $99,303.20 |
| February 28, 2006 | Brick, William P. | 10,445 | $20.20 | $210,989 |
| February 28, 2006 | Dann, Thomas L. | 2,019 | $20.20 | $40,783.80 |
| February 28, 2006 | Davis, Graham D. | 4,038 | $20.20 | $81,567.60 |
| February 28, 2006 | Geloso, Joseph A. | 2,019 | $20.20 | $40,380 |
| February 28, 2006 | Janusek, Steven J. | 4,442 | $20.20 | $89,728.40 |
| February 28, 2006 | Key, Ben D. | 2,625 | $20.20 | $53,025 |
| February 28, 2006 | Steffek, Mark A | 1,033 | $20.20 | $20,866.60 |
| February 28, 2006 | Weaver, Jimmy C. | 10,306 | $20.20 | $208,181.20 |
| August 23, 2006 | Dann, Thomas L. | 2,500 | $23.32 - $23.35 | $58,000 |
| September 5, 2006 | Steffek, Mark A | 1,000 | $23.40 | $23,000 |
| September 6, 2006 | Brick, William P. | 4,100 | $23.55 | $97,000 |
| September 7, 2006 | Key, Ben D. | 750 | $23.21 | $17,000 |
| September 12, 2006 | Brick, William P. | 1,500 | $23.62 | $35,000 |
| September 13, 2006 | Weaver, Jimmy C. | 5,000 | $24.00 | $120,000 |

unvested Restricted Share Units ("RSU") in the event of a change in control such as the proposed GSO going-private merger transaction. According to the Company's 2007 Proxy Statement, (i) defendant Brick held 90,000 shares of unvested RSUs; (ii) defendant Janusek held 36,000 shares of RSUs; (iii) defendant Weaver held 60,000 shares of RSUs; and (iv) defendant Booth held 18,000 shares of RSUs.

175. During July 2007, with Reddy Ice's revenues and earnings artificially inflated as a result of the Company's illegal participation in the collusive market allocation agreement with Arctic Glacier and Home City, Defendants aggressively pursued a merger with GSO. Under the terms of the merger, each RSU outstanding under the Company's long-term incentive program would immediately vest and be converted into the right to receive the "Per Share Merger Consideration" of $31.25 in cash.

176. Upon the consummation of the merger with GSO, the Individual Defendants stood to receive $6.375 million, as follows:

| | Unvested RSUs | Total Per Share Merger Consideration |
|---|---|---|
| Brick: | 90,000 | $2,812,500 |
| Janusek: | 36,000 | $1,125,000 |
| Weaver: | 60,000 | $1,875,000 |
| Booth: | 18,000 | $562,500 |
| | | $6,375,000.00 |

### 3. The Individual Defendants Had Actual Knowledge of Reddy Ice's Illegal Anticompetitive Agreements

177. As confirmed by confidential witnesses, each of the Individual Defendants had actual knowledge that Reddy Ice had entered into illegal anticompetitive agreements with Home City and Arctic Glacier to allocate exclusive geographic territories among the packaged ice companies. Thus, these Individual Defendants knew or deliberately and recklessly disregarded

Ice to issue materially false and misleading statements and numerous public disclosures with

183.     Defendant Brick's and Janusek's signed Sarbanes-Oxley certifications attesting to the fact that the information contained in the various Class Period SEC filings fairly presented, in all material respects, the financial condition and results of operations of the Company, when in fact they knew that material risks regarding the Company's operations, sales and revenues were deliberately and recklessly omitted from SEC filings further supports their scienter

184.     Further probative of Reddy Ice's and the Individual Defendants' conscious knowledge of their materially false and misleading public statements and omissions during the Class Period arises from the immediate terminations and resignations of Weaver and Booth. Similarly, the termination of Ben Key, and the Company's public admission that Key was dismissed from the Company because of his implication in the illegal antitrust violations being investigated by the DOJ, further demonstrates Defendants' scienter.  Key's scienter, and the scienter of each of the Individual Defendants is attributable to Reddy Ice.

185.     Defendants were further motivated to engage in the conduct herein in order to successfully consummate the Company's IPO and complete its Secondary Offering on terms otherwise unobtainable **but for** Defendants' fraudulent conduct, including the use of false and misleading prospectuses for the IPO and Secondary Offering.

**H.     Applicability of Presumption of Reliance: Fraud On The Market Doctrine**

186.     At all relevant times, the market for Reddy Ice's securities was an efficient market for the following reasons, among others:



making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Reddy Ice in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Reddy Ice's publicly traded securities during the Class Period.

200. Each of Defendants William P. Brick, Steven J. Janusek, Jimmy C. Weaver, and



Had Plaintiffs, the other members of the Class and the marketplace known the truth regarding the anti-competitive conduct and sales practices, and the true condition of Reddy Ice's business operations and prospects, which were not disclosed by Defendants, they would not have purchased or otherwise acquired their Reddy Ice publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

205.     By virtue of the foregoing, all of the Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## VI.     COUNT II

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

207.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

208.     Defendants William P. Brick, Steven J. Janusek, Jimmy C. Weaver and Raymond D. Booth acted as controlling persons of Reddy Ice within the meaning of §20(a) of the Exchange Act as alleged herein.  Reddy Ice controlled all of its employees and each of the individual defendants.   By virtue of their high level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, defendants William P. Brick, Steven J. Janusek, Jimmy C. Weaver and

Raymond D. Booth had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. These defendants participated in conference calls with investors and/or were provided with or had

Farmington Hills, MI 48334
Telephone:  248/851-4111
248/851-0100 (fax)
mzausmer@zkact.com
kthwaites@zkact.com

*Liaison Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that November 2, 2009, I electronically filed the forgoing Consolidated Class Action Complaint with the Clerk of the Court using the ECF system which will send notification of such filing to:  David A. Ettinger, James R. Nelson, Raymond W. Henney, and Samuel B. Isaacson.

/s/ Gregory M. Castaldo
Gregory M. Castaldo
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
gcastaldo@btkmc.com

**EXHIBIT A**