UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN MCNULTY,

                Plaintiff,                              Case No. 08-cv-13178

v.                                               Paul D. Borman
                                               United States District Judge

ARCTIC GLACIER, INC.,                     R. Steven Whalen
*et al.*,                                         United States Magistrate
                                             Judge

                      Defendants.
_____/

OPINION AND ORDER
(1) GRANTING ARCTIC GLACIER AND CHARLES KNOWLTON'S
MOTION TO DISMISS (ECF NO. 256),
(2) DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT (ECF NO. 250),
(3) DENYING AS MOOT (a) PLAINTIFF'S MOTION TO SEVER BANKRUPT
DEFENDANTS (ECF NO. 249) and (b) PLAINTIFF'S MOTION TO EXCLUDE
TESTIMONY OF MONITOR (ECF NO. 276)

This action involves Plaintiff's claims that he was terminated from his employment for his refusal to participate in an alleged unlawful market allocation conspiracy among the three major packaged ice distributors named as Defendants in this action and his related claim that he was boycotted from employment in the packaged ice industry for acting as an informant for the government in its investigation into anti-competitive collusion in the packaged ice industry. Claims against the packaged ice distributors ultimately led to several guilty pleas, a multi-district antitrust action (MDL 1952, E.D. Mich. 2008) and to the bankruptcy of two of the three alleged co-conspirators, Arctic Glacier and Reddy Ice. Plaintiff now seeks to continue and expand the claims asserted in this action, including his claims against Arctic Glacier, one of the bankrupt Defendants

1

and Charles Knowlton, one of its former employees.

Before the Court are (1) the motion of the bankrupt Defendant Arctic Glacier and its former employee Charles Knowlton to dismiss based upon the ongoing bankruptcy proceedings, (2) Plaintiff's motion to amend the Complaint to reassert claims that were dismissed by this Court in 2009, (3) Plaintiff's motion to sever the bankrupt Defendant Arctic Glacier from the remaining non-bankrupt Defendants, and (4) Plaintiff's motion to preclude testimony in this case from the monitor overseeing Arctic Glacier's Canadian bankruptcy proceedings.  The Court held a hearing on December 3, 2015.  For the reasons that follow, the Court GRANTS Defendants Arctic Glacier and Knowlton's motion to dismiss, DENIES Plaintiff's motion to amend, and DENIES AS MOOT the Plaintiff's motions to sever and to exclude testimony of the monitor.

## I.    BACKGROUND

### A.    Plaintiff's Complaint and This Court's Previous Partial Dismissal Orders

Plaintiff Martin McNulty ("Plaintiff" or "McNulty") filed this action on July 23, 2008, alleging that Defendants Arctic Glacier Income Fund, Arctic Glacier, Inc., Arctic Glacier International Inc. ("Arctic Glacier"), Reddy Ice Holdings, Inc. and Reddy Ice Corporation ("Reddy Ice"), Home City Ice Company ("Home City"), Keith Corbin, Charles Knowlton and Joseph Riley were involved in an unlawful conspiracy and enterprise to (1) terminate Plaintiff from Arctic Glacier for refusing to participate in an unlawful market allocation scheme and (2) to boycott Plaintiff from employment in the packaged ice industry.

This Court has summarized Plaintiff's claims in a previous Order as follows:

> Plaintiff, a former packaged ice salesperson, was an employee of Arctic Glacier International, Inc., the wholly-owned subsidiary of Arctic Glacier, Inc., which is the wholly-owned subsidiary of Arctic Glacier Income Fund. These three companies are collectively referred to as "Arctic Glacier." Plaintiff alleges that while he was

2

employed by Arctic Glacier, he discovered that Arctic Glacier was involved in a market allocation scheme with Home City Ice Company ("Home City"). Upon questioning Keith Corbin, a former vice president of sales for Arctic Glacier, about the market allocation scheme between Arctic Glacier and Home City, Mr. Corbin allegedly informed him that Arctic Glacier had the same market allocation arrangement with Reddy Ice Holdings, Inc. and Reddy Ice Corporation (collectively, "Reddy Ice"). Plaintiff alleges that he refused to participate in the market allocation scheme and that as a result, Arctic Glacier terminated him.

Shortly following his termination from Arctic Glacier, Plaintiff signed an agreement with Arctic Glacier, titled "FULL AND FINAL RECEIPT, RELEASE, DISCHARGE AND NON–COMPETITION AGREEMENT" ("Release"). In addition to containing a six month non-compete clause, the Release provides that in consideration of a severance payment, Plaintiff agreed not to sue Arctic Glacier or its employees with respect to any claims that he has prior to or as of the time that he signed the Release. During the pendency of the non-compete period, Plaintiff informed the federal government of alleged collusion among his former employer, Arctic Glacier, and Home City and Reddy Ice, and began working with federal authorities on the matter, including the Federal Bureau of Investigation ("FBI") and the Department of Justice.

After the non-compete period expired, Plaintiff alleges that he actively began looking for employment with manufacturers and distributors of packaged ice; his only promising lead was from Tropic Ice Company ("Tropic Ice"), which was later acquired by Arctic Glacier. Joseph Riley, the President of Tropic Ice agreed to meet with Plaintiff to discuss his application for employment. During the meeting, Mr. Riley informed Plaintiff, who allegedly was wearing a recording device provided to him by the FBI, that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire Plaintiff—specifically, that Plaintiff was being "blackballed" from the industry. Mr. Riley also informed Plaintiff that Tropic Ice had also been conspiring with Arctic Glacier to allocate markets. Despite this, Plaintiff alleges that Mr. Riley told him that he would call him to discuss Plaintiff's potential employment with Tropic Ice. After Mr. Riley never called Plaintiff, Plaintiff called him and was told that Tropic Ice had agreed with Arctic Glacier that it would not hire Plaintiff.

 On July 23, 2008, Plaintiff filed the instant suit against Reddy Ice, Arctic Glacier, Home City, Mr. Corbin, Mr. Knowlton, and Mr. Riley (collectively "Defendants"), alleging, inter alia, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO").

*McNulty v. Reddy Ice*, No. 08-13178, 2009 WL 2168231, at *1-2 (E.D. Mich. July 17, 2009).

3

In response to an initial round of motions to dismiss Plaintiff's original Complaint, Plaintiff filed an Amended Complaint on December 2, 2008. (ECF No. 43, Amended Complaint.) Plaintiff's Amended Complaint alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); the Sherman Act, 15 U.S.C. § 1; the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.772; and common law tortious interference with prospective business advantage. Defendants responded to Plaintiff's Amended Complaint with renewed motions to dismiss. (ECF Nos. 54-59.) On May 29, 2009, this Court issued an initial Opinion and Order Granting in Part and Denying Part Defendants' Motions to Dismiss. *McNulty v. Reddy Ice Holdings,* No. 08-13178, 2009 WL 1508381, at *1 (E.D. Mich. May 29, 2009). The Court dismissed Plaintiff's Sherman Act and state law antitrust claims, concluding that Plaintiff had failed to allege antitrust injury sufficient to confer standing to maintain his antitrust claims:

> Of the various requirements for establishing antitrust standing, the one primarily at issue here is antitrust injury, "which is a 'necessary, but not always sufficient,' condition of antitrust standing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Antitrust injury is an "injury the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark,* 128 F.3d 398, 402 (6th Cir. 1997) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)."The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* This requirement "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

> *            *            *

> Plaintiff's Amended Complaint clearly states that the relevant market is the market for packaged ice sales representatives. Instead of alleging an anticompetitive effect on that market, however, Plaintiff—under the heading "The Anticompetitive Effects of the Defendants' Termination and Boycott of [Plaintiff]"—merely alleges that the group boycott injured him personally. His Complaint does not mention any injury to the packaged ice sales market as a result of the alleged group boycott against him. Precedent from this Circuit clearly instructs that an antitrust plaintiff must allege not

4

only an injury to himself but also an injury to the relevant market. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (affirming dismissal of a complaint on antitrust injury grounds that alleged a similar "group boycott" of an employee); *see also Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000). Because Plaintiff has not alleged an anticompetitive effect on the market for packaged ice sales representatives, his antitrust claim must fail.

2009 WL 1508381, at *18, 21. The Court also dismissed Plaintiff's RICO claim against Home City, Reddy Ice, Corbin and Riley and dismissed Plaintiff's tortious interference claim against all Defendants except Arctic Glacier. *Id*. at *24.

On July 17, 2009, in response to Plaintiff's motion for reconsideration, this Court issued an Order reversing in part its May 29, 2009 Order, reinstating Plaintiff's RICO claim against certain Defendants based upon the Supreme Court's intervening decision in *Boyle v. United States*, 556 U.S. 938 (2009), which eased somewhat the threshold standard for pleading a RICO enterprise. *McNulty v. Reddy Ice Holdings*, No. 08-13178, 2009 WL 2168231 (E.D. Mich. July 17, 2009). On reconsideration in light of *Boyle*, the Court reinstated Plaintiff's RICO claim against Home City, Reddy Ice and Joseph Riley. *Id*. at *5. Taken together, the Court's rulings thus allowed for the following claims to proceed:

> (1) RICO claims under § 1692(c) against Arctic Glacier, Home City, Reddy Ice, Charles Knowlton and Joseph Riley based upon an alleged pattern of racketeering activity limited to the predicate acts of witness tampering and witness retaliation squarely directed at Plaintiff ("As alleged, and as limited by the Release, the RICO enterprise consisting of Arctic Glacier, Home City, Reddy Ice and Mr. Riley was to boycott Plaintiff from employment in the packaged ice industry in order to [dissuade] Plaintiff from cooperating with government officials and to punish Plaintiff for actually doing so." 2009 WL 2168231, at *5);[1] and

---

[1] In its May 29, 2009 Order, the Court dismissed all claims against Corbin and Corbin remains dismissed from this case. 2009 WL 1508381, at *6. Therefore, the Court need not and will not address in this Opinion any of Plaintiff's arguments regarding the continued viability, or amendment, of claims in this Court against Corbin. In any event, any past, present or future claims against Corbin that would relate to Plaintiff's claims in this action have been released, discharged

(2) Tortious interference with prospective economic advantage against Arctic Glacier only ("Plaintiff has not alleged any facts demonstrating that any of the Defendants besides Arctic Ice interfered with an employment expectancy that Plaintiff allegedly had with a third party." 2009 WL 1508381, at *24).

Following the Court's rulings on the Defendants' motions to dismiss, the parties engaged in discovery, appealing to the Court in several instances to resolve discovery disputes throughout 2009-2011. During this same time, the Department of Justice ("DOJ") conducted a criminal investigation into the packaged ice industry, which resulted in several guilty pleas from some of the Defendants in this action. In January, 2012, this Court ordered that Plaintiff be given access to certain recordings that the DOJ had obtained in the course of its investigation, several of which were recordings that were made by the Plaintiff in his role as a cooperating government witness. (ECF No. 127, Order Granting Plaintiff's Motion for Equal Access to Recordings and Transcripts.)

On February 24, 2012, Arctic Glacier filed a Notice of Bankruptcy Filing (ECF No. 233). On April 13, 2012, Reddy Ice filed its Notice of Bankruptcy Filing (ECF No. 234).

Significantly, Plaintiff took no action in this case between February, 2012 and April, 2015, when Plaintiff filed a Stipulated Dismissal of Defendant Reddy Ice (ECF No. 248) and contemporaneously filed the motions to sever and for leave to amend his complaint that are presently before the Court.

**B.      Plaintiff's Claim Filing in Arctic Glacier's Bankruptcy Proceedings**

Arctic Glacier commenced its bankruptcy proceedings on February 24, 2012 under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), before the Canadian Court in Winnipeg, Canada, File No. CI 12-01 76323 (the "Canadian Proceeding").

---

and enjoined for the reasons discussed *infra* in Section IIB.

The United States Bankruptcy Court for the District of Delaware, Chief United States Bankruptcy Judge Kevin Gross (the "U.S. Bankruptcy Court"), recognized the Canadian Proceeding as the "foreign main proceeding." (ECF No. 256, Defs.' Mot. to Dismiss Ex. B, Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief ¶ 8.) In its Recognition Order, the U.S. Bankruptcy Court enjoined "all entities" other than the Foreign Representative from "the commencement or continuation . . . of a judicial . . . proceeding . . . in any way related to, or that would interfere with, the administration of the Debtors' estates in the Canadian Proceeding . . . ." *Id.* ¶ 9(b).

Arctic Glacier's insolvency proceedings have culminated in a plan of reorganization that has been approved by both the Canadian and U.S. Bankruptcy Courts. First, by Order dated September 5, 2014, the Canadian Court, Madam Justice Spivak, approved and sanctioned a Consolidated Plan of Compromise and Arrangement of the Debtors, as amended and restated on August 26, 2014 and January 21, 2015 (the "CCAA Plan"). (Defs.' Mot. Ex. C, the "Sanction Order"). Second, by Order dated September 16, 2014, the United States Bankruptcy Court in Delaware recognized and gave full force and effect in the United States to the Canadian Sanction Order. (Defs.' Mot. Ex. D, United States Recognition Order.) The CCAA Plan became effective on January 22, 2015, the "Plan Implementation Date."[2] Both of these Orders were issued pursuant to Motions by Alvarez & Marsal

---

[2] As discussed *infra* in Section IIA, this Court addresses Defendants' motion to dismiss as in the nature of a jurisdictional challenge and thus has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts. Even if this Court were to review the motion under Fed. R. Civ. P. 12(b)(6), as Defendants suggest, or under Fed. R. Civ. P. 12(c), as Plaintiff suggests, the Court would take judicial notice of the documents issued in the Canadian and U.S. Bankruptcy Proceedings, on which both parties necessarily rely in setting forth their arguments. "In determining whether the affirmative defense of discharge in bankruptcy applies, it is appropriate to look not only to the face of the complaint, but also to public documents related to [the] bankruptcy proceedings, of which judicial notice is hereby

Canada Inc., in its capacity as the court-appointed monitor and authorized foreign representative for the Arctic Glacier insolvency proceedings (the "Monitor"), that were served on Plaintiff's counsel in August, 2014. Plaintiff's counsel Daniel Low was served with the Notice of Motion for Plan Sanction Order on August 26, 2014. (ECF No. 256, Ex. E; Ex. G, at 7, PgID 6344.) Mr. Low's longtime co-counsel in this action, Andrew Paterson, was served with the Notice of Motion for an Order Recognizing and Enforcing Order of Canadian Court Sanctioning and Approving CCAA Plan (ECF No. 256, Ex. F PgID 6254, ECF No. 257, Amended Exhibit H, at 9, PgID 6451.) Mr. Low also was served with a copy of the Monitor's Fifteenth Report, which explained the CCAA Plan, including a provision, ¶ 9.1, releasing certain third party claims. (ECF No. 256, Ex. N at 13, PgID 6431.)

The CCAA Plan, a copy of which was attached to both the Plan Sanction and Recognition Motions that were served on Plaintiff's counsel, provides that claims against Arctic Glacier and its present and former employees who filed or could have filed an indemnity claim against an Arctic Glacier party are forever released:

> On the Plan Implementation Date and in accordance with the sequential steps and transactions set out in Section 8.3 of the Consolidated CCAA Plan, the Arctic Glacier Parties, the Monitor, Alvarez and Marsal Canada Inc. and its affiliates, the CPS, the Trustees, the Directors and the Officers, each and every present and former employee who filed or could have filed an indemnity claim or a DO&T Indemnity Claim against the Arctic Glacier Parties, each and every affiliate, subsidiary, member (including members of any committee or governance council), auditor, financial advisor, legal counsel and agent thereof and any Person claiming to liable

taken." *Compliant Rx Solutions, Inc. v. XO Commun.*, No. 05-cv-676, 2006 WL 999971, at *2 (E.D. Pa. April 13, 2006). Documents from those proceedings are publicly available on the Canadian Monitor's website, which contains direct links to documents filed in both the Canadian and United States Bankruptcy Proceedings. http://www.alvarezandmarsal.com/arctic-glacier-income-fund-arctic-glacier-inc-and-subsidiaries .

derivatively through any or all of the foregoing Persons (the "Releasees") shall be released and discharged from any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any person may be entitled to assert . . . whether known or unknown . . . existing or hereinafter arising . . . that are in any way related to, or arising out of or in connection with the claims, the Arctic Glacier Parties' business and affairs . . . the Consolidated CCAA Plan, the CCAA Proceedings, any Claim that has been barred or extinguished pursuant to the Claims Procedure Order or the Claims Officer Order (excepting only Releasees in respect of Unresolved Claims, unless and until such Unresolved Claims become Proven Claims in accordance with the Claims Procedure Order and the Claims Officer Order), and all claims arising out of such actions or omissions shall be forever waived and released . . . .

CCAA Plan ¶ 9.1. Paragraph 27 of the Sanction Order provides that "any and all Persons . . . are hereby stayed from commencing, taking, applying for or issuing or continuing any and all steps or proceedings . . . against any Releasee in respect of all Claims . . . ." ECF No. 256, Ex. C, Sanction Order ¶ 27. Paragraph 29 of the Sanction Order likewise provides that "all Persons shall be permanently and forever barred, estopped, stayed and enjoined . . . from . . . commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Releasees . . . ." *Id*. ¶ 29. The U.S. Bankruptcy Court, in its September 16, 2014 Order Recognizing and Enforcing Order of Canadian Court Sanctioning and Approving CCAA Plan, reiterates the exact terms of ¶ 9.1 of the CCAA Plan, including the language that defines "Releasees" to include "each and every present and former employee who filed or could have filed an indemnity claim." ECF No. 256, Ex. D, U.S. Recognition Order ¶ 5. The U.S. Recognition Order then adopts the same injunction set forth in ¶ 29 of the Sanction Order, permanently and forever barring all persons from commencing or continuing in any

manner any action or suit against the ¶ 9.1 Releasees. *Id*. ¶ 6. Finally, the U.S. Recognition Order expressly "retain[s] jurisdiction with respect to all matters relating to the interpretation or implementation of this Order." *Id*. ¶¶ 12.

With respect to Claims that were timely filed in the Canadian proceedings, the U.S. Bankruptcy Court has recognized and given full force and effect to the Claims Procedure Order and the Claims Officer Order that govern the processing of such Claims. (ECF No. 270, Defs.' Reply, Ex. A, Claims Procedure Order; Ex. B, Claims Officer Order; Ex. C, Claims Procedure Recognition Order; Ex. D, Claims Officer Recognition Order.) The Delaware U.S. Bankruptcy Court expressly "retain[s] jurisdiction with respect to all matters relating to the interpretation or implementation" of its Recognition Orders. *Id*. Exs. C, D ¶¶ 5, 7 respectively.

Significantly, Plaintiff McNulty filed a Schedule "C" Claim against Arctic Glacier in the Canadian Proceedings on October 12, 2012. (ECF No. 269, Pl.'s Resp. to Mot. to Dismiss, Ex. 3.) McNulty's Schedule C Claim seeks damages of $13.61 million ($4.17 million in lost lifetime earnings subject to mandatory statutory trebling, plus statutory attorneys' fees and expenses). *Id*. As supporting documentation for his Claim, McNulty attached his December 2008 Amended Complaint in this action. *Id*. McNulty is actively pursuing that Claim, which has been designated as an "Unresolved Claim" under the Canadian Claims Procedure, and the Monitor has established a reserve of $14.1 for the McNulty Claim. Pursuant to the CCAA, an "Unresolved Claim" is defined as "an Affected Claim, in an amount specified in the corresponding Proof of Claim, that has not been finally determined as a Proven Claim . . . ." *Id*. (ECF No. 269, Pl.'s Resp. Ex. 2, CCAA Plan ¶ 1.1.) An "Affected Claim" is defined under the CCAA as "any Claim or DO&T Claim that is not an Excluded Claim." *Id*. The CCAA further defines a "Claim" to mean "any right or claim of any

10

Person . . . that may be asserted in whole or in part against an Arctic Glacier Party." *Id*.  As defined in Footnote 1 on McNulty's Claim Form, "Arctic Glacier Parties" includes a list of corporate entities.  (ECF No. 269, Pl.'s Resp. Ex. 3.)   The list of "Arctic Glacier Parties" does not include a reference to individual directors, officers, trustees or employees of Arctic Glacier.   In fact, a *separate* claim form was required for claims against directors, officers or trustees of an Arctic Glacier entity and McNulty *did not* file a "DO&T Claim," defined in the CCAA as "any right or claim of any Person that might have been asserted or made in whole or in part against one or more Directors, Officers or Trustees" of Arctic Glacier," against either Corbin or Knowlton.   DO&T Claims were to be filed on a Schedule "D" Claim Form for claims against Directors, Officers or Trustees of the Arctic Glacier Parties.   (ECF No. 270, Ex. A, Claims Procedure Order, Schedule "D", PgID 8456.)   McNulty thus has an "Unresolved Claim" against Arctic Glacier, but has not filed a "DO&T Claim," and therefore has filed no separate Claim at all, against any officers or directors or trustees.[3]

---

[3] As discussed *infra*, McNulty claims that his Unresolved Schedule C Claim against Arctic Glacier also includes his claims against Corbin and Knowlton.  This is a matter for the Canadian Bankruptcy Court, and following that the Delaware United States Bankruptcy Court, to determine, not this Court.  Also, as discussed *infra*, regardless of whether McNulty has an Unresolved Claim against Arctic Glacier and McNulty, they are Releasees under the Plain and the claims against them in this action are forever discharged, released and enjoined.  In any event, McNulty's position, one that he has vigorously asserted in the Canadian Bankruptcy proceedings and has reiterated here in this Court, that he in fact already has an "Unresolved Claim" against Corbin and Knowlton in the Canadian proceeding by virtue of filing his Schedule C Claim against Arctic Glacier, would absolutely preclude any attempt to also pursue those same claims against Knowlton in this Court.  The CCAA Plan is clear that all "Unresolved Claims" are to be "finally determined" according to the Claims Order Procedure, CCAA Plan ¶ 7.3, which most certainly does not allow for any involvement of or review by this Court.  McNulty's litigation position in the Canadian proceedings, as reiterated in this Court, that he has perfected an Unresolved Claim against Arctic Glacier and Knowlton in the bankruptcy proceedings further establishes that he cannot pursue those claims here.  This, standing alone, is sufficient basis to grant Defendants' motion to dismiss.  *See infra* discussion at IIB2.

Under the CCAA, Unresolved Claims are to "be finally determined in accordance with the Claims Procedure Order and the Claims Officer Order."  CCAA Plan ¶ 7.3.  Paragraph 45 of the CCAA Plan provides that in the event that disputed claims are not resolved in a timely manner, the Monitor shall apply to the Canadian Bankruptcy Court for direction.  CCAA Plan ¶ 45.  On March 5, 2013, as directed under ¶ 45, the Monitor filed a motion in the Canadian Bankruptcy Court seeking the appointment of a claims officer to adjudicate disputed claims that could not be resolved consensually.  On March 7, 2013, the Canadian Bankruptcy Court, Madam Justice Spivak, issued the Monitor's requested Claims Officer Order appointing Jack Ground as the Claims Officer for disputed claims.  On May 7, 2013, the Delaware U.S. Bankruptcy Court recognized and gave full effect to the Claims Officer Order.  (Orders available on the Alvarez website, *see supra* n. 2.)

Thus, Plaintiff McNulty has been vigorously pursuing his Unresolved Claim in the Canadian bankruptcy proceedings, which initially was denied, but subsequently was referred to Claims Officer Jack Ground for final adjudication. In its Thirteenth Report, the Monitor observed the following regarding the McNulty Claim:

> [T]he Monitor received a Proof of Claim from Martin McNulty, a former employee of the Applicants, in the amount of $13.61 million (the "McNulty Claim").  The McNulty claim related to outstanding litigation against the Applicants, Reddy Ice, Home City and certain former employees of the Applicants, pending in the Michigan Court.  In the litigation and in the McNulty Claim, Mr. McNulty alleges that AGIF, AGI, and AGII engaged in an unlawful conspiracy and enterprise with certain individuals and competing distributors of packaged ice to boycott his employment in the packaged ice industry (the tortious interference with prospective economic advantage claim).  Mr. McNulty also alleges that the named Arctic Glacier Parties violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), by allegedly blackballing him from finding employment in the packaged ice industry in retaliation for his cooperation with the authorities in their investigations of the industry, as well as offering Mr. McNulty bribes to stop cooperating with the government (the RICO claim).

> As set out in paragraphs 3.14 and 3.15 of the Twelfth Report, in order to evaluate the McNulty Claim, the Monitor required access to certain information and materials subject to protective orders issued by the Michigan Court. On April 30, 2013, the Monitor's motion to intervene in the McNulty litigation was filed, along with a joint motion of the Monitor and the Applicants to modify the necessary protective orders. On June 4, 2013, the Michigan Court granted the relief requested, such that the Monitor (and its outside counsel), any Claims Officer, the CPS, and this Court, if necessary, were and are permitted to view the information subject to protective orders in the McNulty litigation.
>
> The Applicants subsequently provided to the Monitor and its counsel certain additional information that was previously subject to the protective orders. After consulting with the CPS on behalf of the Applicants, as required by the Claims Procedure Order, the Monitor issued a Notice of Disallowance with respect to the McNulty Claim on September 12, 2013. The Monitor disallowed the McNulty Claim in its entirety because the evidence available to the Monitor does not support Mr. McNulty's allegations.
>
> On September 19, 2013, in accordance with the Claims Procedure Order, Mr. McNulty filed a Dispute Notice with the Monitor. . . . In accordance with the Claims Procedure Order and the Claims Officer Order, the Monitor intends to explore whether a consensual resolution of the McNulty Claim can be achieved. Should a consensual resolution not be achievable in the near term, the Monitor intends to refer the dispute raised in Mr. McNulty's Notice of Dispute to a Claims Officer.

Thirteenth Report of the Monitor at 16-18 (Monitor's Reports available on the Alvarez website, *see supra* n. 2.)

The Monitor ultimately concluded that a consensual resolution could not be achieved "within a satisfactory time period or in a satisfactory manner" and, in "accordance with the Claims Officer Order, on November 22, 2013, [] referred the McNulty Claim to a Claims Officer, the Honourable Jack Ground, for adjudication." Fifteenth Report of the Monitor at 11.

McNulty objected to the reference of his Claim to Claims Officer Ground for adjudication and, on December 3, 2013, wrote to Claims Officer Ground asking him to decline hearing the Claim because McNulty believed that his Claim "should be resolved in the United States by an adjudicator familiar with the applicable U.S. law, among other reasons." Fifteenth Report of the Monitor at 11-

12.  The Monitor responded to McNulty's objection on December 6, 2013, explaining that while reference to Claims Officer Ground was proper, the Monitor would explore further efforts at consensual resolution.  *Id*. at 12.  The Monitor, counsel for the Monitor, counsel for McNulty and counsel for the Arctic Glacier Parties participated in conference calls to agree upon a case management procedure but, as no such procedure was agreed to, the Monitor wrote to Jack Ground to discuss a timetable and steps for adjudication of the McNulty Claim.  *Id*. at 12.

On September 12, 2014, McNulty filed a motion in the Canadian Bankruptcy Court seeking to strike the appointment of Jack Ground as a Claims Officer to adjudicate the McNulty Claim, claiming that the Claims Procedure Order had not been followed with regard to reference of his claim for adjudication and also raising a concern about bias of Jack Ground based upon his affiliation some 23-years prior with the law firm of the current Monitor's counsel.  *See* Eighteenth Report of the Monitor, 12-13, ¶¶ 4.29, 4.33.  Madam Justice Spivak denied McNulty's motion to strike Jack Ground, (1) finding incredible McNulty's claim of lack of notice of the Monitor's Motion to Appoint a Claims Officer, (2) concluding that the Claims Procedure Order did not require the Monitor to consult with a claimant before referring his claim to a Claims Officer and (3) finding no basis whatsoever for a finding that Jack Ground's 23-years prior affiliation with the Monitor's counsel's law firm would lead him to favour his former firm's client.  *See* Twenty-First Report of the Monitor at 5-7, Ex. E, November 26, 2014 Decision of The Queen's Bench, CI12-01-76323, at 5-8; Transcript of November 26, 2014 Decision, available on Alvarez website "Orders."  Madam Justice Spivak also rejected McNulty's argument that his Claim should be determined by a United States lawyer, noting that Officer Ground was quite capable of acquiring the relevant United States law with appropriate expert opinion and also observing that McNulty's claim, involving primarily

14

credibility assessments, factual findings and inferences from those facts, was not of the particularly complex type that would require a United States adjudicator. *Id.* at 9. Madam Spivak further observed that McNulty's Claim arose in the context of a CCAA proceeding, with a streamlined process for resolution that respected the rights of all interested parties and the timing of the distribution of the estate. *Id.* at 10. Madam Justice Spivak urged the parties to move the McNulty Claim forward by bringing the matter back before Claims Officer Ground as soon as possible. *Id.*

In February, 2015, in consultation with Claims Officer Ground, the parties agreed to participate in a Judicially Assisted Dispute Resolution mediation session ("JADR") with the assistance of a Judge of the Canadian Court in Winnipeg. Twenty-First Report of the Monitor at 7. The JADR session took place on April 29, 2015 but did not lead to a settlement. Twenty-Second Report of the Monitor ¶ 9.8.

On March 13, 2015, McNulty filed a motion for leave to amend his Claim in the Claim adjudication with Claims Officer Ground, seeking to add an antitrust claim. *Id.* Officer Ground received briefing from both parties and permitted McNulty to amend his Claim. May 27, 2015 Twenty-Second Report of the Monitor ¶ 9.9. *See also* ECF No. 267, Pl.'s Sealed Reply in Support of Mot. for Leave to Amend, Exs. M and N, briefing in CCAA proceeding and Decision of Officer Ground permitting amendment of McNulty Claim. As a result of the amendment to the McNulty Claim, the parties have been engaged in negotiations in the Claims adjudication process regarding the scope of discovery and have sought direction from Officer Ground. November 9, 2015 Twenty-Third Report of the Monitor ¶ 6.8.

Meanwhile, McNulty filed his motions to amend and to sever in this Court on April 13, 2015. "[T]he Monitor is of the view that McNulty's filing of the McNulty Michigan Motions violates the

Plan, the Sanction Order, and the U.S. Recognition Order."  Twenty-Third Report of the Monitor ¶ 6.10.  In the Monitor's view, both Corbin and Knowlton were beneficiaries of the Release set forth in ¶ 9.1 of the Plan because both Corbin and Knowlton were former employees who did or could have filed indemnification claims against the debtor. Twenty-First Report of the Monitor ¶ 4.4.  The Monitor explained that Corbin had filed an indemnification claim and that Knowlton, although he did not file an indemnification claim, could have done so and had been indemnified for his attorneys' fees.  *Id.*   The Monitor is of the view that continuation of the claim in this (Michigan) Court against Arctic Glacier is an impermissible collateral attack on the Plan, the Sanction Order and the U.S. Recognition Order, because the McNulty Claim against Arctic Glacier is being addressed through the Claims Procedure, with appeal rights to the Canadian Bankruptcy Court and ultimate jurisdiction regarding the implementation of the Claims Procedure Order lying with the Delaware U.S. Bankruptcy Court.  Twenty-First Report of the Monitor ¶¶ 4.1-4.  As discussed *infra*, this Court agrees.

## II.    DEFENDANTS' ARCTIC GLACIER AND KNOWLTON'S MOTION TO DISMISS

### A.    Standard of Review

Defendants Arctic Glacier and Knowlton move to dismiss McNulty's claims against them, but their motion failed to cite the Federal Rule of  Civil Procedure under which they move.  When asked at the hearing to clarify the rule under which they seek relief, counsel was unsure and asked for the opportunity to address the issue in a supplemental filing.  Post-hearing briefing did little to clarify the issue, with Defendants continuing to urge the Court to apply Rule 12(b)(6), despite the fact that every Defendant in this case has filed an answer to the Complaint.  *See* ECF No. 280.  "[A] post-answer Rule 12(b)(6) motion is untimely and the cases indicate that some other vehicle, such

16

as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the plaintiff's failure to state a claim for relief." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).

Plaintiff, citing the inapplicability of Rule 12(b)(6), argues that the Court should treat the motion as one for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). *See* ECF No. 281. Fed. R. Civ. P. 12(h)(2) permits a motion under 12(c) for certain 12(b) defenses, including failure of the complaint to state a claim. Fed. R. Civ. P. 12(h). "In this context, Rule 12(c) is merely serving as an auxiliary device that enables a party to assert certain procedural defenses after the close of the pleadings." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2005). "Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same de novo standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)). "[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same . . . ." *Lindsay v. Yates*, 498 F.3d 434, 437 n. 5 (6th Cir. 2007). When reviewing a motion to dismiss under Rule 12(b)(6) or 12(c), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or

suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

Plaintiff argues that because the motion is one for judgment on the pleadings, the Court must limit its consideration of documents and evidence outside the pleadings. "As a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under Fed. R. Civ. P. 56." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). However, in ruling on a motion to dismiss, the Court may consider in addition to the Complaint, the following, without converting the motion to one for summary judgment: (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims (2) matters of which a court may take judicial notice (3) documents that are a matter of public record and (4) letters that constitute decisions of a government agency. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See also Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings); *Jackson v, City of Columbus*, 177 F.3d 507, 745 (6th Cir. 1999), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2000). *See also Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long

as they are referred to in the Complaint and are central to the claims contained therein."); *Klais*, 108 F.3d at 89. Plaintiff argues that documents from Arctic Glacier's bankruptcy proceedings relied upon by the Defendants in their motion are central to Defendants' defense, and not to Plaintiff's claims, and apparently objects to the Court's reliance on those documents in resolving the motion. Certain affirmative defenses, however, (including discharge in bankruptcy) can be resolved on a motion to dismiss if the facts establishing the defense are not in dispute. *Compliant Rx Solutions, Inc. v. XO Commun.*, No. 05-cv-676, 2006 WL 999971, at *2 (E.D. Pa. April 13, 2006). "[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense [] appears on its face." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357).

The Court concludes that the challenge presented in Defendants' motion, which in essence asks this Court to decline to continue exercising jurisdiction over McNulty's claims against them due to the Orders and proceedings in the Arctic Glacier bankruptcy, is jurisdictional in nature and does not fit readily within the analytical framework for a motion to dismiss for failure to state a claim. In fact, the substantive merits of Plaintiff's RICO and tortious interference claims are not at issue at all in Defendants' motion. In *Pratt v. Ventas, Inc.*, 365 F.3d 514 (6th Cir. 2004), the Sixth Circuit recognized that a similar collateral attack on an order of the Florida bankruptcy court, although addressed by the district court under Rule 12(b)(6), was in fact "jurisdictional in nature." *Id*. at 523.

A possible analytical model for such a jurisdictional inquiry is Fed. R. Civ. P. 12(b)(1), which provides the framework for analyzing an attack on the Court's subject matter jurisdiction. Challenges to subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "come in

two varieties: a facial attack or a factual attack." *Gentek Bldg. Prod., Inc. v. Sherwin–Williams Co*., 491 F.3d 320, 330 (6th Cir. 2007). Under a facial attack, all of the allegations in the complaint must be taken as true, much as with a Rule 12(b)(6) motion. *Gentek*, 491 F.3d at 330 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Under a factual attack, however, the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction. "Where the defendant brings a factual attack on the subject matter jurisdiction, no presumption of truth applies to the allegations contained in the pleadings, and the court may consider documentary evidence in conducting its review." *Id*. "If the district court must weigh conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist, it has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id*.

But Defendants' motion does not fit neatly into either of the types of 12(b)(1) challenges, as it does not directly challenge the facial sufficiency of Plaintiff's Complaint or the factual basis of the claims pleaded in the Complaint. In *In re Daewoo Motor Co. Ltd., Dealership Litig*., No. MDL-1510, 2005 WL 8005218, at *3-4, n. 11-12 (M.D. Fla. Jan. 6, 2005), the court was faced with a similar motion challenging a collateral attack on an order or ruling of a bankruptcy court under Fed. R. Civ. P. 12(b)(6). While recognizing the imperfect fit of a Rule 12(b)(1) analysis, the court nonetheless found the collateral attack sufficiently "analogous to a factual attack on the Court's subject matter jurisdiction" to warrant review under the 12(b)(1) factual attack standard:

> [B]ecause the Court finds that Plaintiffs' claims represent a collateral attack on the Korean bankruptcy proceedings . . . the issues surrounding the dismissal of Plaintiffs' claims are, in essence, jurisdiction related, and thus the Court's review and the burden on the parties vary from a Rule 12(b)(6) standard. By raising issues of comity, and seeking to have the case dismissed on that ground, Defendants recognize that this Court has jurisdiction over the subject matter, but ask that the Court, in its

20

> discretion, choose not to exercise that jurisdiction.  In short, Defendants ask the
> Court to abstain from deciding the case. . . Thus, because the Court finds that the
> issues are more closely related to a motion to dismiss on jurisdictional grounds than
> on Rule 12(b)(6) grounds, the Court finds it more appropriate to utilize a Rule
> 12(b)(1) approach.

2005 WL 8005218, at *3.  The court then noted, as is true in this Court as well, that under such a

review the Court is not limited in its review to the face of Plaintiffs' Complaint and may consider

any evidence for purposes of resolving disputes related to its jurisdiction.  *Id*. at *4.

　　This Court finds that it is being asked to decide whether it has the power to continue to

adjudicate McNulty's claims against Arctic Glacier and Knowlton in this Court when Orders of the

Canadian and U.S. Bankruptcy Courts have either released McNulty's claims against them or

rendered those claims subject to the exclusive jurisdiction of the Canadian and Delaware U.S.

Bankruptcy courts.  In deciding such an issue, the Court clearly has the authority to, and indeed

must, look outside the four corners of Plaintiff's Complaint in this action and beyond those matters

that are referred to or are central to Plaintiff's Complaint.  Because the Court considers its review

of Defendants' motion to be "jurisdictional in nature," *see Pratt*, 365 F.3d at 523, the Court is not

constrained in its review of evidentiary matters outside the pleadings.[4]  Indeed, Plaintiff concedes

as much when he relies solely on statements made by the Canadian Monitor in his Fifteenth Report

to support his argument that the claims in this action against Knowlton were not released in the

bankruptcy proceedings; Defendants of course rely on the Orders and Reports issued in those

---

[4]  In fact, even if this Court were to analyze the motion under Fed. R. Civ. P. 12(c), it would be
"appropriate to look not only to the face of the complaint, but also to public documents related to
[Arctic Glacier's] bankruptcy proceedings, of which judicial notice [can be] taken." *Compliant RX*,
2006 WL 999971, at *2.  Unlike the situation faced by the Court in *Compliant RX*, a review of the
public records related to the bankruptcy proceedings in this case conclusively resolves any claimed
factual disputes that have been raised by Plaintiff.

21

proceedings in their motion to dismiss.

**B.    McNulty's Claims Against Arctic Glacier and Knowlton Were Either Released In, or Are Subject to the Exclusive Jurisdiction of, the Canadian and Delaware United States Bankruptcy Courts and Are No Longer Properly Before This Court**

Under the plain language of the CCAA Plan, both Arctic Glacier and Knowlton are "Releasees," and the claims asserted against them in this action in this Court have been released, discharged, and enjoined by the Orders of the Canadian and Delaware United States Bankruptcy Courts. Those Orders, to which McNulty never objected in the bankruptcy proceedings, cannot be attacked collaterally in this Court.

Additionally, while the CCAA Plan allows for certain "Unresolved Claims," a term strictly defined in the CCAA Plan, to proceed against a Releasee through the Claims Procedures approved by the Canadian and United States Bankruptcy Courts, such claims must be "finally resolved" through the bankruptcy procedures for "Unresolved Claims." To the extent that McNulty has an "Unresolved Claim," if ultimately he is dissatisfied with the outcome of the Claims Procedure in the Canadian courts, he can appeal to the Delaware United States Bankruptcy Court, thereafter to the Delaware United States District Court and then to the United States Court of Appeals for the Third Circuit. McNulty cannot collaterally attack that outcome or the process that led to that outcome in this Court.

For these reasons, as explained more fully below, Arctic Glacier and Knowlton are entitled to dismissal of Plaintiff's claims against them in this Court.

1.      **Under the CCAA Plan, McNulty's claims in this Court against Arctic Glacier and Knowlton have been released, discharged and enjoined by Orders issued in the Arctic Glacier bankruptcy proceedings.**[5]

Under the terms of the CCAA Plan that has been approved by the Canadian and United States Bankruptcy Courts as discussed *supra*, as of January 22, 2015, the Plan Implementation date, "the Arctic Glacier Parties . . . [and] each and every present and former employee who filed or could have filed an indemnity claim or DO&T Indemnity Claim against the Arctic Glacier Parties . . . (the "Releasees") . . . [were] released and discharged from any and all . . . claims, actions, causes of action, counterclaims, suits . . . which any Person may be entitled to assert . . . whether known or unknown . . . existing or hereinafter arising, based in whole or in part on any omission, transaction, duty, responsibility . . . or other occurrence existing or taking place on or prior to the later of the Plan Implementation date and the date on which actions are taken to implement the Consolidated CCAA Plan that are in any way related to, or arising our of or in connection with the Claims , the Arctic Glacier Parties' business and affairs whenever or however conducted . . ." CCAA Plan ¶ 9.1. The United States Recognition Order expressly grants the releases provided in ¶ 9.1. Both the Sanction Order and the United States Recognition Order expressly enjoin any action against a Releasee, providing that: "All Persons shall be permanently and forever barred, stopped, stayed and enjoined  . . . in respect of any and all Releasees from: (I) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever . . . against the Releasees."   Sanction Order ¶ 29; United States Recognition

---

[5]  Although this Court need not address the continued of viability of claims in this Court against Corbin, who was dismissed from this action in 2009, the Court notes that Corbin, as a former employee who did seek indemnification from Arctic Glacier, also falls within the definition of a Releasee under the CCAA Plan.

Order ¶ 6.

Plaintiff does not dispute that his claims against Arctic Glacier and Knowlton in this Court arise out of Arctic Glacier's business affairs and thus are substantively within the types of claims that are released pursuant to ¶ 9.1, nor could he, given that his Schedule C Claim filed in the bankruptcy proceedings attaches his Complaint in this Court as documentary support for his claim. Thus McNulty's claims in this Court against Arctic Glacier are expressly released (a fact that McNulty does not appear to contest), as are his claims against Knowlton, a former employee of Arctic Glacier who could have filed a claim for indemnification in the Canadian proceedings, bringing him squarely within the express definition of a Releasee under ¶ 9.1. As the Monitor stated in his Twenty First Report, both Corbin and Knowlton were beneficiaries of the Release set forth in ¶ 9.1 of the Plan because both Corbin and Knowlton were former employees who did or could have filed indemnification claims against the debtor. Twenty-First Report of the Monitor ¶ 4.4. The Monitor explained that Corbin did file an indemnification claim and that Knowlton, although he did not file an indemnification claim, could have done so and in fact had been indemnified for his attorneys' fees. *Id.*

While it is unclear whether Knowlton was an officer or director, as to whom McNulty was required to file a DO&T Claim, it is irrelevant to this Court's determination that he is a "Releasee" under the plain language of § 9.1 of the CCAA Plan, which releases claims against "each and every present and former employee who filed or could have filed an Indemnity Claim . . . against the Arctic Glacier Parties." There is no evidence, or even a plausible suggestion, that Knowlton, Arctic Glacier's Director of Franchise Operations, could not have filed an indemnity claim against Arctic

Glacier.[6]  The plain language of ¶ 9.1 releases claims against Arctic Glacier and against any former employee "who filed or could have filed an indemnity claim," and thus releases McNulty's claims against Arctic Glacier and Knowlton.

McNulty received copies of the CCAA Plan and notice of the Motions for Canadian and United States approval of the CCAA Plan and had ample opportunity to object to the provisions of the CCAA Plan.  He did not do so and in fact he has fully embraced the processes set forth the CCAA Plan in pursuing his Unresolved Claim against Arctic Glacier (which he argues also is an Unresolved Claim against Knowlton, *see* discussion *infra*).  Plaintiff's counsel, although actively prosecuting McNulty's Unresolved Claim in the Bankruptcy proceedings throughout the period of time that the Sanction and Recognition Orders were being vetted and approved, never filed an objection to either.  In fact, Plaintiff's counsel reiterated multiple times at the December 3, 2015 hearing in this Court that as he interprets ¶ 9.1 of the CCAA Plan, his claims against Knowlton and Corbin are not barred by that Release Provision, and that based on that interpretation he did not object to the CCAA Plan.  Thus, even crediting McNulty's suggestion that he never received notice of the Recognition Motion (a claim that is not supported by the bankruptcy court records and affidavits of service), there is no plausible suggestion that he would have filed an objection based on his admitted understanding of ¶ 9.1 of the Plan.

---

[6] Plaintiff suggests that because Knowlton did not formally pursue an indemnification claim against Arctic Glacier, McNulty is free to proceed with his claims against him in this Court.  This argument ignores the explicit Release language of ¶ 9.1 of the CCAA, which covers former employees who did "or could have filed" an indemnification claim.  This plain language negates the suggestion that a former employee had to have successfully asserted such a claim.  Plaintiff also unconvincingly argues, as his counsel reiterated at the hearing in this Court on December 3, 2015, that his claims against Knowlton are not released under the provisions of ¶ 9.1 because McNulty has an "Unresolved Claim" against Knowlton.  *See infra* discussion at Section IIB2.

25

McNulty also suggests that the Delaware United States Bankruptcy Court did not have jurisdiction to approve a Plan provision that released claims against third party non-debtors, such as Mr. Knowlton, and therefore McNulty argues that the Release provision cannot operate to bar Plaintiff's claim against Mr. Knowlton in this Court. In *Pratt*, the Sixth Circuit held that it was error (although ultimately harmless) for the district court to fail to address as a threshold matter whether the Delaware bankruptcy court had jurisdiction to enter an order barring the plaintiffs' third party claims. 365 F.3d at 520-21. The Sixth Circuit noted that in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), the case on which defendants relied to support their argument for dismissal, the court examined whether the Florida bankruptcy had jurisdiction and concluded that the bankruptcy court did have jurisdiction to bar the third party claims because they were "related to" the bankruptcy proceedings. *Id*. at 520. Although the district court in *Pratt* had expressly declined to decide the issue of whether the bankruptcy court exceeded its jurisdiction by entering the injunction, the Sixth Circuit concluded that the error was harmless because plaintiffs had waived their right to object on that ground because they subsequently returned to the bankruptcy court for the very purpose of challenging that authority. *Id*.

In this case, the Delaware United States Bankruptcy Court did have jurisdiction to confirm the Plan's Release provision. The law is clear that a bankruptcy court has jurisdiction to release claims "between third parties which have an effect on the bankruptcy estate." *Celotex*, 514 U.S. at 307 n. 5. A potential claim for indemnification presents a sufficient potential to affect the bankruptcy estate to support the exercise of such jurisdiction. *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers (In Re Dow Corning Corp.)*, 86 F.3d 482, 494 (6th Cir. 1996). McNulty implies (with no supporting evidence) that Knowlton would be precluded under the

26

Release provision from seeking indemnification and therefore any claim asserted against him in this case would have no effect on the bankruptcy estate. But the Sixth Circuit has "held that a claim is 'related to' the bankruptcy proceeding 'if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.'" *In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*, 497 F. App'x 491, 498-99 (6th Cir. 2012) (quoting *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir. 1996)). "[McNulty's] arguments about whether such claims for contribution and indemnification would be 'allowable' as claims against the bankruptcy estate are not relevant because the 'conceivable impact' of a claim on a bankruptcy estate, rather than its allowability as a claim on the estate's assets, is the touchstone of 'related to' jurisdiction." *In re Nat'l Century*, 497 F. App'x at 499 (citing *In re Dow Corning*). As the Monitor's response to McNulty's pursuit of his claims against Knowlton in this Court makes clear, Mr. Knowlton has already been indemnified for certain attorney's fees and further pursuit of McNulty's claims against Knowlton in this Court may well impact "the handling and administration of the bankrupt estate." McNulty's efforts to pursue a collateral attack in this Court against Knowlton has at least a "conceivable impact" on the administration of the bankruptcy estate and other stakeholders, including those who may be entitled to a distribution of excess funds after final administration of the bankruptcy estate. ECF No. 269, Ex. 6, April 13, 2015 Letter to D. Low from S. Jones. This Court concludes that the Delaware United States Bankruptcy Court had jurisdiction to confirm the Plan Release provision that enjoins McNulty's claim against Knowlton, which is "related to" the bankruptcy proceedings.

Under the express Release language of ¶ 9.1, both Arctic Glacier and Knowlton are "Releasees" and Plaintiff's claims against them in this Court have been released, discharged and

enjoined.  Plaintiff cannot launch a collateral attack in this Court on the Release provision in ¶ 9.1

of the CCAA Plan, which was approved and adopted by Orders of the Canadian and United States

Bankruptcy Courts.  *See Pratt*, 365 F.3d at 519-20; *Sanders Confectionary Prods., Inc. v. Heller

Fin., Inc.*, 973 F.2d 474, 480-81 (6th Cir. 1992) (noting that allowing parties to "launch collateral

attacks on confirmed plans undermine[s] the necessary ability of the bankruptcy courts to settle all

of the claims against the debtor").   If Plaintiff desires to mount an untimely objection to the CCAA

Plan, any attempt to do so would be through the channels of the bankruptcy courts, not through a

collateral attack in this Court.  *Pratt*, 365 F.3d at 520.

> **2.     Any "Unresolved Claim" that McNulty has filed in the Canadian bankruptcy proceedings must, under the clear terms of the CCAA Plan, the Claims Procedure Order and the Claims Officer Order, be "finally resolved" through the Claims Procedures approved in those Orders.**

It is not disputed that Plaintiff has filed, and is actively pursuing, an "Unresolved Claim"

against Arctic Glacier in the Canadian bankruptcy proceedings. Indeed, the Monitor has reserved

$14.1 million for the McNulty Claim, which is the full amount of damages claimed by McNulty in

his Schedule C Claim.  ECF No. 264, Ex. 1, Proof of Claim.  McNulty's Unresolved Claim against

Arctic Glacier has been referred to a Canadian Claims Officer for determination and that Claims

Officer has recently permitted McNulty to expand his Unresolved Claim to include an antitrust

claim.[7]  Plaintiff takes the position, as explained in his briefing in this Court and at the December

---

[7] This Court, on the other hand, will deny McNulty's motion to amend his Complaint in this action to add an antitrust claim.  Unlike the Claims Officer in the Canadian bankruptcy proceeding, this Court must analyze McNulty's proposed amendment for futility, which entails an analysis of the law of the case doctrine as applied to this Court's 2009 Order.  The Court finds no plausible suggestion, even considering McNulty's claimed "new evidence," of a claim of antitrust injury that would cause this Court to reach a different conclusion with regard to McNulty's proposed reasserted antitrust claim than it reached in 2009.  *See infra* discussion at Section III.

3, 2015 hearing in this Court, that his claim against Knowlton is part and parcel of his claim against Arctic Glacier and is also therefore an "Unresolved Claim" as that term is defined in the CCAA Plan. *See* ECF No. 264, Pl.'s Reply to Motion to Sever 2-4.[8]  As such, McNulty argues, his claims against Knowlton are not released under ¶ 9.1 of the CCAA Plan, which excepts from its provisions "Releasees in respect of Unresolved Claims" and does not purport to discharge a Releasee from "any obligation created by or existing under the Consolidated CCAA Plan or any related document." CCAA Plan ¶ 9.1.

Defendants dispute that the Schedule C Claim filed by McNulty against Arctic Glacier also served to perfect an "Unresolved Claim" against Knowlton. *See* ECF No. 270, Defs.' Reply in Support of Motion to Dismiss 2-4.  But the Court need not resolve this dispute because, accepting without deciding Plaintiff's assertion that he does indeed have an "Unresolved Claim" against Knowlton by virtue of his Unresolved Claim against Arctic Glacier, then that claim is currently being adjudicated in the Canadian proceeding by a Canadian Claims Officer who was appointed pursuant to Orders that have been adopted by the Delaware United States Bankruptcy Court and as to which the United States Bankruptcy Court retains jurisdiction as to all matters relating to "interpretation and implementation." *See* CCAA Plan ¶ 7.3; ECF No. 270, Ex. C, Claims Procedure

---

[8] While Plaintiff objects to the Defendants' relying to any extent on documents from the bankruptcy proceedings, he apparently feels free to do so himself.  Plaintiff relies solely on the Monitor's 15th and 18th Reports to support his contention that his claims against Knowlton are "Unresolved Claims" under the CCAA Plan.  In those Reports, the Monitor summarizes McNulty's claims in this action and reports that McNulty pursues claims against Knowlton (and Corbin) in this proceeding in this Court. From these summary statements made in the Monitor's Report, McNulty concludes that the Monitor has "created an obligation under the plan," and acknowledged McNulty's Unresolved Claim against Knowlton (and Corbin) as well as against Arctic Glacier.  The Court need not resolve the issue of the scope of McNulty's Unresolved Claim for purposes of its ruling on Defendants' Motion to Dismiss.

Recognition Order; ECF No. 270, Ex. D, Claims Officer Recognition Order.  If McNulty is dissatisfied with the final resolution of his "Unresolved Claim," whatever its scope, his avenue of appeal is through the bankruptcy courts, not through a collateral attack in this Court.

Even if, as McNulty argues, he has an "Unresolved Claim" against Knowlton, this does not alter Knowlton's status as a "Releasee" under ¶ 9.1.  His claims against Knowlton (and Arctic Glacier) in this Court have been finally released, discharged and enjoined pursuant to ¶ 9.1 of the CCAA Plan and the injunctions set forth in the Sanction and United States Recognition Orders.  The "exception" for Releasees with "Unresolved Claims" set forth in ¶ 9.1  simply permits McNulty to proceed with an "Unresolved Claim" against Knowlton (if he has one) *in the Canadian bankruptcy proceedings*; and that Unresolved Claim, just like the Unresolved Claim against Arctic Glacier, will be "finally determined" through the Claims Procedure process that has been approved by Orders of the Canadian and Delaware United States Bankruptcy Courts.  An attack in this Court on that process, or on the outcome of that process, is an impermissible collateral attack on the Orders of the Canadian and Delaware United States Bankruptcy Courts.  *See Pratt*, 365 F.3d at 519-20; *Sanders*, 973 F.2d at 480-81 (noting that allowing parties to "launch collateral attacks on confirmed plans undermine[s] the necessary ability of the bankruptcy courts to settle all of the claims against the debtor").

McNulty fails to acknowledge that the CCAA Plan, and the Claims Procedure Order and Claims Officer Order provide the exclusive process for resolution of "Unresolved Claims."  *See Pratt*, 356 F.3d at 519-20 (holding that collateral attack on plan confirmation order was barred by both collateral estoppel and res judicata).  If McNulty ultimately wishes to dispute the final resolution of his Unresolved Claim, his recourse, as noted *supra*, is to the Canadian Bankruptcy

Court, the U.S. Bankruptcy Court in Delaware, the United States District Court for the District of Delaware, and the United States Court of Appeals for the Third Circuit. *Pratt*, 365 F.3d at 518 (citing *Celotex*, 514 U.S. at 313). He has no recourse in this Court to mount or continue a collateral attack.

The Court concludes that ¶ 9.1 of the CCAA Plan clearly and unambiguously bars McNulty's claim in this Court against Arctic Glacier and Knowlton and that McNulty's "Unresolved Claim," which McNulty is vigorously pursuing in the Canadian Bankruptcy proceedings, is subject to final resolution under the Claims Procedure and Claims Officer Orders approved by the Delaware United States Bankruptcy Court. Those procedures vest exclusive jurisdiction over resolution of McNulty's Unresolved Claim in the Canadian and Delaware United States Bankruptcy Courts. The Court therefore GRANTS the motion to dismiss the claims against Arctic Glacier and Knowlton.

The Court also DENIES AS MOOT the motion to sever the trial of "the bankrupt Defendants," defined by McNulty as Arctic Glacier and Joseph Riley (who was dismissed from this action on April 22, 2015), and to proceed to trial against Home City, Keith Corbin and Charles Knowlton. ECF No. 249, Motion to Sever. The motion to sever is moot based upon the dismissal of Arctic Glacier and Knowlton and the acknowledged earlier dismissal from the case of Corbin, who in any event, like Knowlton, would be a Releasee under ¶ 9.1 of the CCAA. Home City remains the sole Defendant in the case, obviating the need for the Court to consider "separate trials."

## III.   PLAINTIFF'S MOTION FOR LEAVE TO AMEND

Plaintiff moves to amend the Complaint in this action, for a second time, pursuant to Federal Rule of Civil Procedure 15. (ECF No. 250, Sealed Mot. for Leave to Amend, Ex. A, Proposed Second Amended Complaint ("SAC")). Rule 15 provides that leave to amend "shall be freely given

when justice so requires." Fed. R. Civ. P. 15(a)(2). "When considering whether to grant leave to amend a complaint, the court considers "'[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, . . . and futility . . . .'" *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998) (quoting *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962).

"Amending would be futile if a proposed amendment would not survive a motion to dismiss." *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 355 (6th Cir. 2014). Undue delay considers whether plaintiff was in possession of the facts that underlie the proposed amendment but failed to act diligently or appears to be acting purposefully to put the defendant at a disadvantage in the discovery process. Prejudice generally will be found where the amendment will require the defendant, too late in the game, to prepare a new defense strategy and invest additional resources in defending against the claim.

Defendants respond that the law of the case doctrine precludes Plaintiff's proposed amendment, which seeks to reassert claims that were previously dismissed by this Court in its 2009 Orders. Indeed, Plaintiff concedes the validity of this characterization of his proposed amendments, stating that his "proposed complaint seeks to reinstate dismissed claims, not assert new or unexpected claims." ECF No. 268, Sealed Reply 7. The Court agrees that Plaintiff's proposed

32

amendments, which seek to reassert the identical antitrust and RICO conspiracy claims that this Court expressly dismissed in its 2009 Orders, must be analyzed under the law of the case doctrine. *See White v. Smiths Detection, Inc.*, No. 10-4078, 2013 WL 1845072, at *18-20 (D.N.J. April 30, 2013) (denying plaintiff's motion to file a second amended complaint to reassert claims previously dismissed, finding that plaintiff's new evidence did not justify an exception to the law of the case doctrine). If Plaintiff's proposed SAC could not survive a motion to dismiss based on law of the case, amendment would be futile and leave to amend denied. *See Bennie v. Munn*, No. 11-3089, 2012 WL 1574453, at *1-2 (D. Neb. May 3, 2012) (denying motion to amend as futile where plaintiff's attempt to cure defects in his previously dismissed claims by amendment would not survive a motion to dismiss under the law of the case).

"Under the doctrine of the law of the case, a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *McCready v. Mich. State Bar Standing Comm. On Character and Fitness,* 926 F. Supp. 618, 620 (W.D. Mich. 1995) (quoting *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1995)). "[T]he law of the case doctrine is discretionary 'when applied to a coordinate court or the same court's own decisions.'" *Bench Billboard Co. v. City of Covington, Ky.*, 547 F. App'x 695, 704 (6th Cir. 2013) (quoting *Bowles v. Russell*, 432 F.3d 668, 677 (6th Cir. 2005)). The doctrine precludes reconsideration of a previously decided issue unless one of three "exceptional circumstances" exists: (1) substantially different evidence is available; (2) a supervening contrary view of the law is announced; or (3) the earlier decision is clearly erroneous and would work a manifest injustice. *Id*. at 705-06. "[T]he exception based on the availability of new evidence 'applies only if the record actually contains new evidence and 'if the new evidence differs materially from the evidence of record when the issue was

33

first decided and if it provides less support for that decision.'" *Id*. at 706 (quoting *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich*. 418 F App's 430, 435 n. 4 (6th Cir. 2011) (quoting *Hamilton v. Leavy*, 322 F.3d 776, 778 (3d Cir. 2003)).   "[A] court's power to reach a result inconsistent with a prior decision reached in the same case is to be exercised very sparingly, and only under extraordinary circumstances." *In re Kenneth Allen Knight Tr.*, 303 F.3d 671, 677 (6th Cir. 2002) (citation and internal quotation marks omitted) (alteration added).

### A.   Plaintiff Claims That "New Evidence" Supports His Request for Leave to Amend.

McNulty argues that his "motion for leave to amend should be granted because it is based on new evidence that he . . . obtained during discovery, including information from tape recordings he received in March 2012, shortly after Arctic Glacier's bankruptcy filing." (ECF No. 250, Sealed Mot. 8, n. 6-14.)  Acknowledging that this Court previously dismissed his antitrust claim for failure to allege antitrust injury to the market of packaged ice sales representatives, Plaintiff claims that the proposed SAC "cures this deficiency by alleging a group boycott of a particular segment of employees, i.e. salespersons who would not participate in the market allocation conspiracy, causing a salesperson who refused to participate to be unable to obtain employment as packaged ice salespersons, causing injury in the market for packaged ice salespersons." Mot. 12-13.  He claims that these allegations are "adequate to state a group boycott claim." *Id*. at 13.  While such a formulaic recitation of those elements that the Court found lacking in Plaintiff's Complaint likely would not have saved McNulty's claim from dismissal in 2009, the issue in 2016 under a law of the case analysis is whether Plaintiff has unearthed new evidence that is so materially different from what was available at the time Plaintiff's claims were dismissed that the Court is presented with "an extraordinary circumstance" requiring the Court to revisit its 2009 dismissal.  *White*, 2013 WL

1845072, at * 19 ("If evidence is allegedly new, the court determines whether it constitutes an extraordinary circumstance warranting reconsideration of a previously-decided issue by comparing the new evidence to evidence pleaded previously in support of that same issue.") (citing *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003)).

Plaintiff argues that his "new" evidence plausibly suggests an agreement among the Defendants to boycott all packaged ice sales persons who refused to participate in their market allocation scheme, reducing competition in the market for packaged ice sales persons, *see* Mot. 5-6 and proposed SAC ¶ 49, and plausibly now suggests a RICO conspiracy, *see* Mot. 19.  Plaintiff claims that as a result of this "group boycott" of his services, he was unable to find employment for a number of months, was forced to take lower-paying jobs, lost his home to foreclosure and faces decreased expected career earnings.  Mot. 6.

Specifically, Plaintiff relies on the following "new evidence" in support of his request for leave to amend his complaint:

(1)    A telephone conversation between Mr. A[9] of Home City and Mr. B of Arctic Glacier, recorded by Mr. A in 2007 when he was cooperating with the government in its investigation of the Defendants' alleged participation in a market allocation conspiracy.  (Sealed Mot. Ex. E.)  Plaintiff asserts that he received evidence of this call in 2012 when he obtained the DOJ recordings. He asserts that this phone conversation supports the new allegations contained in paragraph 49 of his proposed second amended complaint, which provides:

---

[9] The parties' filings in connection with Plaintiff's motion to amend have been filed under seal.  The Court has confirmed with the Government that maintaining anonymity of the individuals involved in these recorded conversations satisfies the Government's concerns with confidentiality.  The Court will disclose the identities of the individuals in a separate sealed filing.

In September, 2007, Home City was looking to fill an opening for vice-president of sales because the previous VP of Sales, Mr. C, had passed away. Mr. A, of Home City, asked Mr. B to recommend someone for the position. Over the course of the conversation, Mr. A and Mr. B agreed that the candidate would need to be willing to participate in the market allocation conspiracy, and would need to be willing to "keep [] the peace . . . with other ice companies," just as Mr. C had previously done for Home City and Mr. B had done for Arctic Glacier. Like Arctic Glacier and other conspirators, Home City would not hire anyone who had not demonstrated a willingness to engage in the unlawful market allocation scheme. Mr. B noted that he, Mr. C and Reddy Ice had "worked close[ly]" on their market allocation conspiracy because "we don't need to make the retailers wealthy." Although Home City still had Mr. McNulty's application on file, and despite Mr. B's previous statement to Mr. McNulty that he would become the VP of Sales at Arctic Glacier, and would have been an ideal candidate for Home City, Home City did not contact Mr. McNulty about the position.

Sealed Mot. Ex. A, Proposed Second Amended Complaint ("SAC") ¶ 49.

(2)    Three audio recordings, also allegedly obtained in 2012 from the DOJ recordings, none of which is transcribed or provided to the Court in any form but are "available upon request." McNulty was a participant in each of these recorded conversations and references to these same conversations are found in McNulty's original Amended Complaint in this Court. *See, e.g.* ¶¶ 46-48. Notwithstanding the fact that McNulty obviously has known of these conversations since they occurred 2006, he asserts that these recordings support the new allegations in paragraphs 51-52, 54 and 56 of his Proposed SAC, which describe conversations with Mr. D of Tropic Ice that Mr. McNulty tape recorded in 2006 when he was wearing a wire and assisting with the FBI investigation into an alleged market allocation agreement among packaged ice distributors. The SAC alleges that in these conversations, Mr. D and McNulty discussed the possibility of McNulty working for Tropic Ice and that Mr. D found McNulty's resume "impressive" and that Mr. D was surprised that Arctic Glacier let McNulty go. Mr. D allegedly said that Reddy and Home City "don't compete" and that

36

there was a collusive relationship among Reddy, Home City and Arctic Glacier. Allegedly, Mr. D told Mr. McNulty that he was being "blackballed" from the packaged ice industry. Mr. D allegedly admitted that Tropic Ice had been conspiring with Arctic Glacier to allocate markets and that he, Mr. D, had entered into an agreement with Mr. E of Arctic Glacier not to compete on price. Mr. McNulty alleges that at the conclusion of the conversation, Mr. D said he would call McNulty about a job but that McNulty waited 6 weeks and Mr. D did not call. McNulty then wired up again and recorded another conversation in which Mr. D told McNulty that the "conspirators" were concerned about how their actions would appear to the FBI, which they knew was investigating the market allocation scheme.

        3)      A chain of emails from early July, 2005 between Mr. F of Arctic Glacier to Mr. G of Arctic Glacier. (Sealed Mot. Ex. G.) This email chain suggests that Chuck Knowlton of Arctic Glacier wanted to pay McNulty an additional $10,000 in severance pay. Keith McMahon of Arctic Glacier rejected the idea because "McNulty would have signed a waiver when he accepted" his severance package and to "subsequently change our end of the deal would compromise our position." Mr. F informed Chuck Knowlton that Arctic would not participate in the additional payment and Chuck indicated that he would "handle it independent of Arctic." McNulty alleges that he received this email chain in the course of discovery (over three years ago) and that it supports the allegations of ¶ 42 of the SAC that Arctic Glacier was worried that this $10,000 payment would appear to be a bribe to dissuade McNulty from cooperating with authorities. The Court notes that Plaintiff produced no evidence in support of his motion to amend indicating that any such additional payment ever occurred. McNulty did sign on to the severance agreement payment.

37

4)      An August 1, 2005 handwritten note that appears to be documenting a conversation between an Arctic Glacier employee (Chuck Knowlton) and Mr. C of Home City.  (Sealed Mot. Ex. H.)  The note suggests that Chuck Knowlton told Mr. C that the FBI investigation into price fixing in the packaged ice industry was "spurred by Marty McNulty," and that Mr. McNulty was "irate" about "the way he was treated during Chuck Knowlton's sale of the business."  The note states that Chuck told Mr. C that McNulty screamed at Chuck that he had "ruined the McNulty family."  It is unclear when McNulty received this evidence but it was sometime during the course of discovery (over three years ago).  McNulty submits that this evidence supports the allegations of ¶ 47 of the SAC that Chuck Knowlton told Home City that the antitrust investigation was "spurred by" Mr. McNulty and that Chuck Knowlton "told Home City not to hire Mr. McNulty."

5)      A September 30, 2005 retirement and severance agreement between Arctic Glacier and Mr. B and a March 7, 2005 Employment Verification Form for Mr. E application for employment with Arctic Glacier, whom Arctic Glacier subsequently hired.  (Sealed Mot. Exs. I and J.)  McNulty asserts that this "new evidence" supports the allegations of ¶ 56 of the SAC that when Mr. B retired, Arctic Glacier promoted Mr. H to his position and hired Mr. E, neither of whom was as qualified as McNulty.  McNulty asks the Court to infer from this evidence that Mr. H and Mr. E were hired or promoted because of their willingness to participate in the market allocation conspiracy.  SAC ¶ 57.  Mr. H was subsequently indicted for conspiring to allocate markets in Southeastern Michigan and pled guilty.  Mr. E was never indicted.

6)      Home City's Supplemental Responses to Plaintiff's Interrogatories, which explain that Mr. A and Mr. I of Home City recalled that Mr. C  told them that Chuck Knowlton (Arctic Glacier) discussed with Mr. C (Home City) a possible payment to McNulty.  McNulty asserts that

this evidence supports the allegation of ¶ 42 of the SAC that Chuck Knowlton discussed the $10,000 payment to Mr. McNulty with Mr. C and "they agreed on a plan of action."  McNulty received this supplemental response on September 13, 2011.

7)    Mr. D's Response to Plaintiff's Interrogatories, in which Mr. D explains that he met with McNulty in January, 2006 to discuss McNulty's possible employment at Party Time Ice and that by the time Mr. D got back to McNulty in April, 2006, McNulty replied that he had already obtained another job.  Mr. D also answered that he spoke with Mr. E of Arctic Glacier by phone and told Mr. E that McNulty was "a loose cannon."  McNulty asserts that this evidence supports the allegation of ¶ 53 of the SAC that Mr. E cautioned Mr. D against hiring Mr. McNulty because he was "a loose cannon."  From the fact that Mr. D did not immediately follow up with McNulty, McNulty "reasonably surmised that Tropic Ice must have also agreed to boycott Mr. McNulty." McNulty received this interrogatory response on September 30, 2009.

### B.    Plaintiff's "New Evidence" is Not New.

Plaintiff received the four "new" DOJ recordings in March, 2012: he has waited over three years to seek leave to amend based on those recordings.  Three of the recordings were recorded by McNulty himself.  As to those three recordings, the Court is in the dark as to whether they plausibly suggest any of the new allegations that Plaintiff claims they do because Plaintiff has provided neither the recordings nor a transcript of the recordings for the Court to review but it is clear that they also have been in Plaintiff's possession for over three years.  The discovery responses have been in Plaintiff's possession for at least four years.  At the hearing on this motion, Plaintiff expressly confirmed in response to direct questioning by the Court that his "new evidence" relates to matters that were discovered by him about three years ago or more.  Thus, it is undisputed that none of

Plaintiff's "new evidence" is new.

Plaintiff claims that he is not guilty of undue delay in this case because this matter has been stayed in this Court against the bankrupt defendants, Arctic Glacier and Reddy Ice. But, in the meantime, in the cases against the two bankrupt Defendants, he has been actively proceeding in the bankruptcy courts in Texas (Reddy Ice) and Manitoba/Delaware (Arctic Glacier). Plaintiff has been vigorously pursuing his claims against both bankrupt Defendants; actively litigating in the Canadian bankruptcy proceedings against Arctic Glacier, and resolving his claims against Reddy Ice in the now concluded Texas bankruptcy proceedings.

This case has not been stayed as to Home City, and Plaintiff has never proceeded on his claims against them for many years. Canadian Claims Officer Ground did not have occasion to address prejudice or delay as to Home City, because  Home City has never been part of the proceedings in Winnipeg. Home City has been waiting for four years for Plaintiff to take some action in this Court on the sole claim against them that survived this Court's 2009 dismissal order, i.e. a RICO claim under § 1962(c) – Plaintiff's antitrust and  RICO conspiracy claims that he now seeks to resurrect against Home City were dismissed in 2009.

Home City, finally, in April, 2015, asked the Court for permission to destroy documents that had been languishing because Plaintiff had taken no action in this matter in over four years. *See* ECF No. 244, Motion for Protective Order and Authority to Destroy Paper Documents. Only in response to this Home City filing did McNulty re-engage in this action by filing the motions that are presently before the Court. In waiting years to resurrect an antitrust claim and a RICO conspiracy claim that were expressly rejected by this Court six years ago, Plaintiff has created significant prejudice for Home City with no excuse for its delay. On the other hand, Plaintiff, who has been

actively litigating his claims against Arctic Glacier over many years,  has been granted leave to amend his claim in the Canadian Bankruptcy proceedings to assert the antitrust claim.

Significantly, Plaintiff takes the position that his Unresolved Claim in the Arctic Glacier Bankruptcy Proceeding is "the same" claim that is pending before this Court:  he seeks statutory and treble damages on his Unresolved Claim, for which the Canadian Monitor has reserved $14.1 million.  Thus, Plaintiff has actively litigated his Arctic Glacier claims in Canada and Delaware, and resolved his claims against Reddy Ice in Dallas while taking no action in this Court on claims dismissed by this Court many years ago.[10]

### C.   Plaintiff's "New Evidence" Does Not Present an "Extraordinary Circumstance" That Would Override Application of the Law of the Case Doctrine and Therefore the Motion for Leave to Amend is Denied.

As discussed *supra*, Plaintiff's claims against Arctic Glacier and Knowlton (and any attempted resurrected claim against Corbin) are barred, released and enjoined by Orders of the Canadian and United States Bankruptcy Courts.  Accordingly, leave to amend as to them is patently futile.  As to Home City, the only remaining Defendant in this action, Plaintiff's "new evidence" suggests nothing different than the evidence plausibly suggested in 2009, that McNulty allegedly was blackballed by the Defendants and injured as a result of his inability to gain employment.  Nothing in Plaintiff's "new evidence" would convince this Court to reconsider its 2009 rulings that Plaintiff failed to allege antitrust injury and failed to allege a RICO conspiracy.  The law of the case doctrine precludes relitigation of Plaintiff's antitrust and RICO conspiracy claims absent an

---

[10] As noted *supra*, this Court is not bound by Claims Officer Ground's decision to permit McNulty to amend his Unresolved Claim in the Canadian bankruptcy proceedings.  Claims Officer Ground had no occasion to consider the futility of that amendment in this Court based on the law of the case doctrine.

41

"extraordinary circumstance" that would permit the Court to reconsider its prior rulings. While "new evidence" may, in certain "extraordinary circumstances," require a court to revisit a previous ruling, it fails to do so where, as here, it does not support the proposed reasserted claim.

McNulty claims that he has cured the defects noted by this Court in its 2009 dismissal of his antitrust claim because he "has now alleged a boycott and injury to packaged ice salespersons who were unwilling to participate in the market allocation conspiracy." ECF No. 268, Sealed Reply 5. While McNulty's proposed SAC recites this allegation, the law of the case doctrine requires the Court to examine the "new evidence" behind those allegations to determine whether that "new evidence" supports the proposed allegations and creates an "extraordinary circumstance" requiring the Court to reconsider its 2009 ruling. Nothing in McNulty's "new evidence" supports an inference of an agreement among the Defendants to reduce competition in the market for sales persons in the packaged ice industry. Indeed, as the evidence suggested in 2009, the new evidence suggests at most a boycott of McNulty for his refusal to participate in the market allocation conspiracy and injury to him personally. Thus, like the First Amended Complaint before the Court in 2009, the proposed SAC does not allege antitrust injury as a result of an agreement to restrain trade in the employment market for packaged ice salespersons.

In his First Amended Complaint that was the subject of this Court's prior ruling that McNulty failed to allege antitrust injury, Plaintiff made the same conclusory relevant market allegations he offers now: that "the market for the purchasing of packaged ice sales services[]" was a "distinct and relevant market" that was affected by the boycott conspiracy because it "enabled the Defendants to continue their unlawful price-fixing [sic] scheme," and "deprived McNulty of employment in the only industry in which he had professional experience." (Am. Compl. ¶¶ 1, 52,

53, 55.)  Fatal to his antitrust claim, however, McNulty failed to allege an anticompetitive effect on the market for packaged ice sales representatives.  His "new evidence" does not support such an allegation now.

The "new evidence" that McNulty asserts bears on this allegation, *i.e.* the telephone call between Mr. A and Mr. B regarding the hiring of a replacement for Mr. C, first is not new and second does not plausibly suggest an agreement to restrain trade that has had an anticompetitive effect on the market for packaged ice salesman.  The conversation was recorded two years after Arctic Glacier terminated McNulty.  Plaintiff alleges that in this conversation, Mr. A and Mr. B agreed that Mr. C's replacement would have to be willing to participate in the market allocation conspiracy, thus supporting his allegation that the Defendants conspired to reduce competition in the market for packaged ice salespeople.  Plaintiff suggests that this inference is further supported by the fact that Mr. B did not recommend McNulty for the position and Home City ultimately did not hire McNulty.  SAC ¶ 49.

It is perhaps unsurprising that Arctic Glacier's Mr. B did not think to recommend McNulty, a salesman whom Mr. B had known for only approximately one month before McNulty was terminated in January, 2005, for a job two years later as Home City's Vice President of Sales. *McNulty*, 2009 WL 1508381, at *3.  The 2007 telephone conversation between Mr. A and Mr. B does not plausibly suggest an agreement among the Defendants to reduce competition in the market for packaged ice salespersons.  Plaintiff takes snippets of the recorded conversation out of context to cobble together the implausible and unsupported inference that there was an agreement that targeted the entire packaged ice sales person market.  It was Mr. A, acting as a cooperating witness for the government, not Mr. B, who made the comment about "keeping the peace out there." To the

extent that Mr. B did adopt that sentiment by stating that he works closely with Reddy and Home City so as not to "make the retailers wealthy," nothing in this conversation suggests that this comment relates to an agreement to hire only salespeople willing to participate in a market allocation scheme as opposed to an agreement among competitors to stay out of each other's territories (the agreement that was the object of the government's investigation). McNulty's allegation that "Mr. A and Mr. B agreed that the candidate would need to be willing to participate in the market allocation conspiracy" is surely not stated in this conversation and is not even a plausible inference from this evidence. Nothing in this conversation suggests a conspiracy whose primary object was to restrain trade in the labor market for packaged ice salespersons.

In its 2009 Opinion, this Court noted that Plaintiff's claims were not governed by *Radovich v. National Football League*, 352 U.S. 445 (1982) and similar cases because Plaintiff had not "alleged an anticompetitive conspiracy directed at a respective employment market . . . ." 2009 WL 1508381, at *19. Nothing in Plaintiff's "new evidence" changes that conclusion. To cite Plaintiff's own "new evidence," the object of the conspiracy in this case was to "keep the peace with other ice companies," and "not make the retailers wealthy." There is no "new evidence" to suggest that the object of the conspiracy was directed to the packaged ice salesperson labor market. Absent an extraordinarily strong basis for finding in Plaintiff's new evidence the suggestion of an agreement whose primary purpose was to reduce competition in the market for packaged ice sales representatives, McNulty's antitrust claim stands exactly where it stood in 2009 – without a plausible allegation of antitrust injury in the labor market for packaged ice salespersons.[11]

---

[11] Plaintiff continues to cite the Ninth Circuit's decision *Ostrofe v. H.S. Crocker Co*., 740 F.2d 739, 742-43 (9th Cir. 1984) as support for his antitrust claim. As the Court noted in its 2009 Order dismissing McNulty's antitrust claim, *Ostrofe* was expressly limited to its facts by *Exhibitors'*

The essence of McNulty's proposed antitrust claim is that Defendants participated in a group boycott of his services to prevent him from obtaining employment in the packaged ice industry. He alleges that Defendants spoke of "blackballing" him from the industry and agreeing among themselves to refuse to hire him. (Am. Compl. ¶¶ 31, 32, 43-48, 49.) As this Court previously held in dismissing Plaintiff's antitrust claim in 2009, injury to a single individual is not proof of injury to competition. In determining whether to disregard the law of the case and to revisit its 2009 dismissals, this Court must look behind McNulty's new "allegations" to his "new evidence." While McNulty invokes additional formulaic language in his SAC to allege the existence of a conspiracy to reduce competition in the market for the services of packaged ice sales persons, and alleges "facts" that he suggests support his theory, his "new evidence" does not support the "facts" he alleges and does not plausibly suggest the existence of a conspiracy whose primary purpose was to reduce competition in the market for packaged ice salesmen. The Court finds in Plaintiff's "new evidence" no extraordinary circumstance that would require it to revisit its 2009 dismissal of

---

*Service, Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574, 579-80 (9th Cir. 1986) and *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372 (9th Cir. 1996). The Sixth Circuit has rejected the rationale of *Ostrofe* by expressly declining to follow *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423 (S.D.N.Y. 1986), a case that adopted the reasoning of the Ninth Circuit in *Ostrofe*. *See Fallis v. Pendleton Woolen Mills, Inc.*, 866 F.2d 209, 211 n. 4 (6th Cir. 1989), *abrogated on other grounds by Humphrey v. Bellaire Corp.*, 966 F.2d 1037 (6th Cir. 1997) (declining to follow *Donahue's* guidance and noting that: "[N]o useful policy is served by granting standing to a terminated employee for a product market violation that is known to others") (alteration in original). Here, not only do more direct victims of the market allocation conspiracy exist, *i.e.* retailers and consumers of packaged ice, but those victims have vigorously pursued and vindicated their rights in a massive multi-district litigation involving both direct and indirect purchasers. The reality is that "[McNulty's] injury did not result from a lack of competition in the labor market," and he is not "the appropriate antitrust enforcer" in this case. *In re Industrial Gas Antit. Litig.*, 681 F.2d 514, 517, 520 (7th Cir. 1982) (holding that whistleblower who was terminated for refusing to participate in a conspiracy to fix prices and allocate markets, and subsequently was blacklisted by the industry, could demonstrate neither antitrust injury nor antitrust standing).

Plaintiff's antitrust claim.  Accordingly, Plaintiff's motion to amend to reassert his antitrust claim is DENIED.

The RICO conspiracy claim was not revived in this Court's subsequent decision reinstating Plaintiff's RICO claim under § 1962(c) and Plaintiff never sought reconsideration of the Court's ruling on the RICO conspiracy claim.  2009 WL 2168231, at *5.  This Court concluded in 2009 that Plaintiff's RICO conspiracy claim failed against all Defendants because there was no allegation that Home City, Reddy Ice, or Riley ever agreed to any acts of witness tampering against Plaintiff and thus Plaintiff had failed to allege "that any of the other Defendants agreed with Arctic Glacier to commit two predicate acts."  2009 WL 1508381, at *16.

In support of his request to reassert his RICO conspiracy claim, Plaintiff relies on the "new evidence" in Exhibits G, J and K that he claims supports ¶¶ 41-42, 49 and 56 of the proposed SAC. Exhibit G is an email chain between Arctic Glacier employees regarding Knowlton's suggestion that McNulty be paid an additional $10,000.  Arctic Glacier responded that Knowlton would have to handle this on his own and that Arctic Glacier wanted no part of it unless they received legal advice. McNulty characterizes this Exhibit as evidence of a bribe from Knowlton to dissuade McNulty from cooperating.  This adds nothing to the allegations that the Court found insufficient in 2009, as it fails to plausibly suggest the involvement of Home City, Reddy Ice or Riley.  2009 WL 1508381, at *16. Exhibit J is Mr. E's employment application and has no bearing on the issue of witness tampering. Exhibit K are Home City's supplemental answers to interrogatories in which Home City responds that Mr. A and Mr. I recall that Mr. C told them that Chuck Knowlton discussed with Mr. C a possible payment to McNulty.  Mr. A and Mr. I did not recall when this conversation occurred or whether McNulty had made a demand for such a payment.  McNulty asserts that this "new

evidence" supports the allegation that Mr. Knowlton discussed with Mr. C a $10,000 payment to McNulty to dissuade him from cooperating and that Knowlton and Mr. C "agreed on a plan of action." Mr. McNulty concludes from this that "Home City, Arctic Glacier and Mr. Knowlton conspired to stop Mr. McNulty's cooperation with government investigators." SAC ¶ 42. As noted before, this additional payment never occurred. Further, this "new evidence" says nothing about the purported purpose of the $10,000 payment and certainly nothing supporting the allegation that a "plan of action" was agreed upon or suggesting what such a "plan of action" entailed. None of this "new evidence" supports the allegation that the Court found missing in 2009, when it concluded that Plaintiff failed to allege that Home City, Reddy Ice and Mr. Riley agreed to an act of witness tampering. This "new evidence," which is not "new," creates no "extraordinary circumstance" requiring this Court to reconsider its 2009 dismissal of Plaintiff's RICO conspiracy claim.

Additionally, McNulty offers no explanation for his failure to act on this "new evidence" when he discovered it over three years ago. If this "new evidence" was the "eureka" breakthrough McNulty ascribes to it now, he should have implored the Court then and there to grant him leave to amend to reassert these claims and expand the scope of discovery. Not only did he not do so, but he elected not to proceed with discovery against Home City at all. Home City has prepared to defend itself against the single RICO claim that survived this Court's 2009 partial dismissal of McNulty's claims. It is difficult to predict what Home City would have done differently over these past three years that McNulty has been sitting on his "new evidence" had it known that it might also have had to defend an antitrust claim and a RICO conspiracy claim. McNulty argues that there is no prejudice due to his delay because the parties were aware of these claims, which were asserted in his original amended complaint and dismissed. But that is precisely the point! The claims were

dismissed in 2009 and the parties had no reason to believe that they should stand ready to defend against them. Although prejudice need not be found where Plaintiff's amendments would be futile, it is certain that at the very least memories have faded and Home City would suffer significant prejudice if they were required to gear up such defenses now.  Moreover, as noted *supra*, McNulty does have a venue to assert his antitrust claim and he is actively litigating that claim in the Canadian bankruptcy proceedings.

The law of the case doctrine requires McNulty to do more than simply recite in 2016 what the Court found lacking in 2009.  He has failed to convince the Court that he has "new evidence" that is so materially different from what was available in 2009 that it presents an "extraordinary circumstance" of such magnitude that the Court must reconsider its 2009 ruling.  Accordingly, his motion for leave to amend to reassert the very same claims that this Court dismissed in 2009 is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Arctic Glacier and Knowlton's Motion to Dismiss (ECF No. 256), DENIES AS MOOT Plaintiff's Motion to Sever Bankrupt Defendants (ECF No. 249) and DENIES Plaintiff's (Sealed) Motion for Leave to Amend (ECF No. 250).[12]  Only Plaintiff's claim against Home City for a RICO violation continues in this Court. IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: February 8, 2016

---

[12]  The Court also DENIES AS MOOT Plaintiff's Motion to Exclude Testimony or Argument of Shauna Jones.  (ECF No. 276.) Ms. Jones attended the December 3, 2015 hearing on behalf of the Monitor but offered no evidence or argument.

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 8, 2016.

s/Deborah Tofil
Case Manager