UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN MCNULTY,

           Plaintiff,

v.

                                            Case No. 08-cv-13178

                                            Paul D. Borman
                                            United States District Judge

HOME CITY ICE CO.,

                                            R. Steven Whalen
           Defendant.                                United States Magistrate Judge

_____/

## OPINION AND ORDER GRANTING DEFENDANT HOME CITY ICE COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 284)

      This action involves Plaintiff Martin McNulty's claims that he was terminated from his employment for his refusal to participate in an alleged unlawful market allocation conspiracy among packaged ice distributors originally named as Defendants in this action and that he was boycotted from employment in the packaged ice industry and threatened for his cooperation with the government in its investigation into alleged collusion in the packaged ice industry. The sole remaining Defendant in the case, Home City Ice Company ("Home City"), now moves for summary judgment on the single claim that remains against it for a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). (ECF No. 284, Home City's Motion for Summary Judgment.) Plaintiff filed a Response (ECF No. 288) and Home City filed a Reply (ECF No. 291). The Court held a hearing on Home City's motion on July 15, 2016. For the reasons that follow, the Court GRANTS Home City's motion.

1

## I.    BACKGROUND

The history of this litigation is set forth in multiple prior orders of this Court.  *See, e.g., McNulty v. Reddy Ice Holdings, Inc., et al.*, No. 08-13178, 2016 WL 465490 (E.D. Mich. Feb. 8, 2016); *McNulty v. Reddy Ice Holdings, Inc., et al.*, No. 08-13178, 2011 WL 39131 (E.D. Mich. Jan. 6, 2011) (Whalen, M.J.); *McNulty v. Reddy Ice Holdings, Inc., et al.*, No. 08-13178, 2009 WL 1508381 (E.D. Mich. May 29, 2009), rev'd in part on reconsideration in *McNulty v. Reddy Ice Holdings, Inc., et al.,* 2009 WL 2168231 (E.D. Mich. July 17, 2009).  To reiterate the facts and proceedings most pertinent here, Plaintiff filed this action on July 23, 2008, alleging that Defendants Arctic Glacier Income Fund, Arctic Glacier, Inc., Arctic Glacier International Inc. ("Arctic Glacier"), Reddy Ice Holdings, Inc. and Reddy Ice Corporation ("Reddy Ice"), Home City, Keith Corbin, Charles Knowlton and Joseph Riley were involved in an unlawful conspiracy and enterprise to (1) terminate Plaintiff from Arctic Glacier for refusing to participate in an unlawful market allocation scheme and (2) boycott Plaintiff from employment in the packaged ice industry in retaliation for his cooperation with the government in an investigation into the alleged unlawful collusion.  Plaintiff asserted claims under RICO; the Sherman Act, 15 U.S.C. § 1; the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.772; and common law tortious interference with prospective business advantage.  Only the claim against Home City for violation of RICO's substantive provision, 18 U.S.C. § 1962(c), remains.

In an initial Opinion and Order Granting in Part and Denying Part Defendants' motions to dismiss, the Court dismissed Plaintiff's Sherman Act and state law antitrust claims, concluding that Plaintiff had failed to allege antitrust injury sufficient to confer standing to maintain his antitrust claims, dismissed Plaintiff's RICO claim against Home City, Reddy Ice, Messrs. Corbin and Riley,

and dismissed Plaintiff's tortious interference claim against all Defendants except Arctic Glacier. *McNulty*, 2009 WL 1508381, at *24. On July 17, 2009, in response to Plaintiff's motion for reconsideration, this Court issued an Order reversing in part its May 29, 2009 Order, reinstating only Plaintiff's RICO claim against certain Defendants based upon the Supreme Court's intervening decision in *Boyle v. United States*, 556 U.S. 938 (2009), which eased somewhat the threshold standard for pleading a RICO enterprise. *McNulty*, 2009 WL 2168231, at *3-4. On reconsideration in light of *Boyle*, the Court reinstated Plaintiff's RICO claim against Home City, Reddy Ice and Joseph Riley. *Id.* at *5.

Taken together, the Court's initial Opinion and Order and the ruling on reconsideration thus allowed for the following claims to proceed:

(1) RICO claims under § 1962(c) against Arctic Glacier, Home City, Reddy Ice, Charles Knowlton and Joseph Riley based upon an alleged pattern of racketeering activity limited to the predicate acts of witness tampering and witness retaliation squarely directed at Plaintiff ("As alleged, and as limited by the Release, the RICO enterprise consisting of Arctic Glacier, Home City, Reddy Ice and Mr. Riley was to boycott Plaintiff from employment in the packaged ice industry in order to [dissuade] Plaintiff from cooperating with government officials and to punish Plaintiff for actually doing so." 2009 WL 2168231, at *5);[1] and

(2) Tortious interference with prospective economic advantage against Arctic Glacier only ("Plaintiff has not alleged any facts demonstrating that any of the Defendants besides Arctic Ice interfered with an employment expectancy that Plaintiff allegedly had with a third party." 2009 WL 1508381, at *24).

In revising its opinion with regard to the enterprise, the Court expressly held that its May 29, 2009, holding with respect to the pattern of racketeering activity and proximate cause was

---

[1] In its May 29, 2009 Order, the Court dismissed all claims against Corbin. 2009 WL 1508381, at *6. Plaintiff stipulated to dismiss Reddy Ice on April 13, 2015 and the Court terminated Reddy Ice as a party on that same day. (ECF No. 248.) On April 21, 2015, Plaintiff stipulated to the dismissal of Joseph Riley (ECF No. 252) and the Court entered an Order of dismissal as to Riley on April 22, 2015 (ECF No. 253).

undisturbed:

> Including Home City, Reddy Ice, and Mr. Riley as part of the RICO enterprise does not alter the pattern of racketeering activity and proximate cause findings. As alleged, and as limited by the Release, the RICO enterprise consisting of Arctic Glacier, Home City, Reddy Ice, and Mr. Riley was to boycott Plaintiff from employment in the packaged ice industry in order to persuade Plaintiff from cooperating with government officials and to punish Plaintiff for actually doing so.

2009 WL 2168231, at *5.

Following the Court's rulings on the Defendants' motions to dismiss, the parties engaged in discovery, appealing to the Court in several instances to resolve discovery disputes throughout 2009-2011. Meanwhile, the Department of Justice ("DOJ") had conducted a criminal investigation into the packaged ice industry, which ultimately resulted in guilty pleas by some of the original Defendants in this action, including Home City, to collusive market allocation in Southeastern Michigan. In January, 2012, this Court ordered that Plaintiff be given access to certain recordings that the DOJ had obtained in the course of its investigation, several of which were recordings that were made by the Plaintiff in his role as a cooperating government witness. (ECF No. 127, Order Granting Plaintiff's Motion for Equal Access to Recordings and Transcripts.)

On February 24, 2012, Arctic Glacier filed a Notice of Bankruptcy Filing (ECF No. 233) and on April 13, 2012, Reddy Ice filed its Notice of Bankruptcy Filing (ECF No. 234). Following the April 13, 2012 Reddy Ice filing, Plaintiff took no formal action in this case until January, 2015, when Plaintiff responded to Home City's motion for a protective order, in which Home City sought to destroy documents that it had retained since the 2008 filing of this action, in light of the prolonged inactivity in the case. (ECF No. 244, Motion for Protective Order.) Only then, spurred into action

4

by Home City's motion, did Plaintiff re-engage in this action.[2]

Plaintiff objected to Home City's motion for a protective order (ECF No. 245). On April 13, 2015, McNulty filed a Stipulated Dismissal of Defendant Reddy Ice (ECF No. 248) and contemporaneously filed a motion to sever his claims against the non-bankrupt Defendants remaining in the action and to proceed against them and also sought leave to amend his 2008 complaint to reassert claims that this Court dismissed in its 2009 Opinion and Order. In an Opinion and Order resolving McNulty's motions to sever and to amend, issued on February 8, 2016, this Court held that: (1) McNulty's claims against Arctic Glacier and Charles Knowlton were either released in, or are subject to the exclusive jurisdiction of, the Canadian and Delaware Bankruptcy Courts and are no longer properly before this Court, leaving only McNulty's substantive RICO claim against Home City in this action; and (2) based upon the law of the case doctrine and McNulty's undue delay, he was not entitled to amend his Complaint to reassert his previously-dismissed antitrust and RICO conspiracy claims. 2016 WL 465490, at *16, 24.

Now before the Court is Home City's motion for summary judgment on the sole remaining RICO claim against it in this action. For the reasons that follow, the Court GRANTS the motion and DISMISSES this action against Home City, the only remaining Defendant in the case, WITH PREJUDICE.

---

[2] During this prolonged period of inactivity in this action, McNulty was, and continues to be, actively pursuing in the Arctic Glacier bankruptcy proceedings, among other claims, the identical claims he asserts in this Court against Home City. As discussed in this Court's February 8, 2016 Opinion and Order, approximately $14 million has been reserved for possible payment of Plaintiff's claims against Arctic Glacier in its Canadian bankruptcy proceedings. *See McNulty,* 2009 WL 465490, at *7, 15.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

"Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-

7

34. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). While all facts and factual inferences are drawn in favor of the nonmovant, *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." *Anderson*, 477 U.S. at 249–50. In *Anderson*, the Court explained:

> [T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.
>
> ***
>
> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a

8

verdict. . . .

477 U.S. at 254. The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis*, 226 F.3d at 511. Failure to establish a genuine issue of material fact as to an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). Although all favorable inferences reasonably supported by the record must be granted to the plaintiff, *Matsushita*, 475 U.S. at 587–88, once the defendant moves for summary judgment, it becomes plaintiff's burden to produce evidence on each essential element of his claims. *Celotex*, 477 U.S. at 322–23. And plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. Plaintiff cannot meet his or her "burden by relying on mere '[c]onclusory assertions, supported only by [her] own opinions.'" *Green v. Central Ohio Transit Authority*, __ F. App'x __, 2016 WL 2586840, at *3 (6th Cir. 2016) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008)) (alterations in original). Plaintiff "must show sufficient probative evidence, based 'on more than mere speculation, conjecture, or fantasy,' that would enable a jury to find in her favor." *Green*, 2016 WL 2586840, at *3 (quoting *Arendale*, 591 F.3d at 601).

Finally, all evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. See Fed.R.Evid. 801(c),

9

802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid.*; *see also North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997) ("[T]he testimony of Chaffee is inadmissible hearsay and therefore cannot defeat a motion for summary judgment."). It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e). *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 532 n. 5 (6th Cir. 2002); *see also Meals v. City of Memphis, Tenn.*, 493 F.3d 720, 728-29 (6th Cir. 2007); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) ("This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991), and *State Mutual Life Assurance Co. of America v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979))).

*CareSource*, 576 F.3d at 558-59.

Likewise, affidavits offered in support of and in opposition to a motion for summary judgment must be based on personal knowledge or set forth such facts as would be admissible into evidence:

A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact. *Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000) (disregarding many of the plaintiff's allegations because they were based upon hearsay rather than personal knowledge); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

*Sperle v. Mich. Dept. of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002).

## III.   ANALYSIS

Home City moves for summary judgment on McNulty's RICO claim, arguing that there is

10

insufficient evidence on which a reasonable juror could conclude that Home City engaged in two or more predicate acts that are necessary to establish liability under § 1962(c). Section 1962(c) of the RICO Act provides, in part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). The discrete elements of a claim under 18 U.S.C. § 1962(c) are now well established: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima v. Imrex*, 473 U.S. 479, 496 (1985). Section 1961(1)(B) of the RICO Act defines the requisite "racketeering activity" with reference to "predicate acts," that are defined in relevant part as: "any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . section 1512 (relating to tampering with a witness, victim, or an informant), [and] section 1513 (relating to retaliating against a witness, victim, or an informant)." 18 U.S.C. § 1961(1)(B). In addition, a "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

This Court has already held that only those predicate acts that form the basis for McNulty's witness tampering and witness retaliation claims may be considered for purposes of establishing liability on McNulty's RICO claim. 2009 WL 2168231, at *5.[3] The Witness Tampering statute, 18

---

[3] The Court has concluded that predicate acts committed in furtherance of the antitrust market allocation scheme are not sufficiently related to the alleged employment boycott scheme to serve as predicate acts in establishing liability for the purported boycott scheme. In a January 6, 2011 Opinion and Order, Magistrate Judge Whalen discussed in depth the lack of relatedness between the market allocation scheme and the alleged boycott of the Plaintiff. Citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) and *Vild v. Visconsi*, 956 F.2d 560 (6th Cir. 1992). Magistrate Judge Whalen concluded that the two schemes had distinct purposes, results, participants and

U.S.C. §§ 1512(b)-(d) provides in relevant part:

> (b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> (1) influence, delay or prevent the testimony of any person in an official proceeding;
>
> (2) cause or induce any person to—
>
> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>
> (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
>
> (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
>
> (D) be absent from an official proceeding to which such person has been summoned by legal process; or
>
> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both.
>
> (c) Whoever corruptly—

---

victims, noting this Court's 2009 rulings that the "purpose of the enterprise was to boycott Plaintiff from employment in the packaged ice industry," and "the pattern of racketeering here is limited to the alleged acts of witness tampering and witness retaliation" which "were squarely directed at Plaintiff." 2011 WL 39131, at *2-3 (citations omitted).

Magistrate Judge Whalen also noted that the Sixth Circuit had previously concluded, in rejecting McNulty's claim to crime victim rights status related to the government's criminal antitrust prosecution, that "McNulty's firing and blackballing from the industry, if proved, are ancillary to the actions involved in forming a conspiracy and restraining interstate commerce." *Id.* at *3 (citing *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010). In affirming Magistrate Judge Whalen's January 6, 2011 Opinion and Order, this Court added the observation that Plaintiff himself characterized his RICO lawsuit as "mainly related to witness tampering and retaliation, [involving] distinct legal and factual issues from the antitrust and securities cases." (ECF No. 212, Opinion and Order at 4.)

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from-

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

In addition, 18 U.S.C. § 1512(k) provides: "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

The Witness Retaliation statute, 18 U.S.C. § 1513(e)-(f), provides in pertinent part as follows:

(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.
(f) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

McNulty also claims that Home City committed an act of wire fraud in connection with the

13

alleged boycott scheme. The Wire Fraud statute, 18 U.S.C. § 1343, provides in relevant part: "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice," shall be subject to imprisonment. Wire fraud requires proof of three elements: "The first element of wire fraud, then, is that the defendant devised or willfully participated in a scheme to defraud. The second is that he used or caused to be used an interstate wire communication 'in furtherance of the scheme'; and the third, that he intended 'to deprive a victim of money or property.'" *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (quoting *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000). "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* (quoting *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)) (alteration in original).

A "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Thus, McNulty must prove that Home City committed at least two predicate acts to establish Home City's liability on the sole remaining claim under § 1962(c) based on an employment boycott – *not* the market allocation scheme. *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605-06 (E.D. Mich. 2015). In response to Home City's motion for summary judgment, McNulty states that "a jury could find that Home City committed at least five predicate acts" on the instant employment boycott scheme. (Resp. 11.) McNulty argues that its RICO claim against Home City presents genuine issues of material fact because a reasonable juror could conclude: (1) that Home City conspired with Arctic Glacier and other members of the RICO enterprise to retaliate

14

against McNulty as a witness by agreeing that McNulty should be terminated if he would not actively participate in the market allocation conspiracy and agree to cover up the conspiracy; (2) that after McNulty proceeded to contact government authorities, Home City conspired with other members of the RICO enterprise to tamper with McNulty as a witness; (3) that Home City retaliated against McNulty for his cooperation with the DOJ by declining to consider McNulty's online employment application in 2005, and falsely responding to his follow up phone call by indicating that there were no job openings; (4) that Home City again retaliated against McNulty in 2007 by failing to seek him out for employment when allegedly there was an opening for a Vice President of Sales following the death of Lou McGuire; and (5) that Home City conspired with other members of the RICO enterprise to offer a bribe to McNulty of at least $10,000 in 2005 if he agreed to stop cooperating in the federal antitrust investigation into the packaged ice industry.   The Court examines the summary judgment evidence McNulty offers in support of each of these contentions to determine whether the evidence creates a triable issue on at least two predicate acts against Home City.

A.   **McNulty provides insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City conspired with Arctic Glacier and other members of the RICO enterprise to retaliate against McNulty by agreeing to terminate him in an effort to frustrate his cooperation with authorities in violation of 18 U.S.C. § 1513(f).**

McNulty claims that Home City committed the predicate act of conspiring with Arctic Glacier, in violation of 18 U.S.C. § 1513(f), to retaliate against McNulty through termination of his employment with Arctic Glacier.[4]   To prove that Home City conspired with Arctic Glacier to

---

[4] This Court dismissed McNulty's § 1962(d) RICO conspiracy claim in its May 29, 2009 Opinion and Order and did not reinstate the conspiracy claim in its July 17, 2009 Reconsideration Opinion, which very specifically revived *only* McNulty's substantive RICO claim under § 1962(c).  However, because both the witness tampering and the witness retaliation statutes make a conspiracy to tamper or to retaliate a separate indictable offense under those statutes, *see* 18 U.S.C. § 1512(k) and 18

retaliate against McNulty by agreeing to a plan to terminate him in an effort to frustrate his cooperation with the government, McNulty must provide sufficient evidence on which a reasonable juror could conclude that Home City knew of and agreed to participate in the termination. "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Salinas v. United States*, 522 U.S. 52, 63 (1997). "Because the essence of the crime of conspiracy is agreement, the government must prove that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Patel*, 579 F. App'x 449, 461 (6th Cir. 2014) (citing *United States v. Shabani,* 513 U.S. 10, 15 (1994)). "'A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (quoting *Salinas*, 522 U.S. at 65).

Arctic Glacier hired McNulty in or around November, 2004 and terminated him a few months later on January 19, 2005. In order for Home City to be held liable as a participant in a scheme to terminate McNulty, there must be some evidence that Home City played some role in the alleged scheme prior to McNulty's termination on January 19, 2005. In support of the assertion that Home City committed the predicate act of conspiring with other members of the RICO enterprise to retaliate against McNulty by terminating him in order to frustrate his cooperation with authorities

---

U.S.C. § 1513(f), McNulty seeks to proceed on such "conspiracy" claims as discrete alleged predicate acts, but only under the witness tampering and witness retaliation statutes. Thus, in analyzing McNulty's claim of conspiracy to violate the witness tampering and retaliation statutes, *see* section IIIA, and sections IIIB and IIID, *infra*, the Court must determine whether the evidence proffered by McNulty is sufficient to permit a reasonable juror to conclude, based on a preponderance of the evidence, that Home City agreed to participate in an endeavor to tamper with or retaliate against McNulty for his cooperation with the government.

in revealing the market allocation conspiracy, McNulty relies on a statement allegedly made to him by Knowlton (of Arctic Glacier) threatening McNulty that if he did not cooperate in the market allocation conspiracy, Knowlton would arrange a group boycott of McNulty from employment at Home City or any other ice company in the area, stating that he (Knowlton) had relationships with Home City and others that would enable him (Knowlton) to boycott McNulty.  In support of this assertion, McNulty offers his own declaration (Pl.'s Ex. 15), his deposition testimony (Pl.'s Ex. 16), and a letter that he sent to Michigan Assistant Attorney General Michelle Rick, on March 21, 2005 setting forth these same allegations (Pl.'s Ex. 17).  McNulty further asserts that on November 10, 2004, Keith Corbin (Arctic Glacier) similarly threatened McNulty with termination and boycott if he did not cooperate.  In support of this assertion he relies again on his declaration, his own deposition testimony, his answers to interrogatories, his March 21, 2005 letter to Ms. Rick and on a January 25, 2005 calendar entry from his personal day planner stating: "Wed. Nov. 10th (2004) told that I'd be frozen out."  (Pl.'s Ex. 43.)

From this evidence, none of which involves conduct or statements attributed to Home City, McNulty argues that a reasonable juror could "infer" that Knowlton and Corbin would not have made these threats if Home City, a confessed co-conspirator in the market allocation scheme, had not agreed to participate in the retaliation scheme.  While McNulty is entitled to all of the favorable inferences from this evidence, he "must show sufficient probative evidence, based 'on more than mere speculation, conjecture, or fantasy,' that would enable a jury to find in [his] favor." *Green*, 2016 WL 2586840, at *3 (quoting *Arendale*, 591 F.3d at 601).  In opposition to Home City's motion for summary judgment, McNulty was required to "present more than a mere scintilla of the evidence" and to cite "to particular parts of materials in the record" that would permit a jury to

17

resolve the disputed fact in his favor. There is nothing in this evidence to suggest that there was any communication, let alone agreement, between Arctic Glacier and Home City prior to McNulty's termination by Arctic Glacier on January 19, 2005, on the issue of terminating McNulty in retaliation for his anticipated cooperation with the government in the criminal antitrust investigation. Evidence that relies solely on innuendo and requires pure speculation to adopt Plaintiff's version of the facts is insufficient to withstand a motion for summary judgment. Standing alone, this evidence, all of which relates to threats made by Knowlton and Corbin of Arctic Glacier about actions that they would take to "freeze out" McNulty, is insufficient to support the inference that Home City had agreed with Arctic Glacier to participate in the termination/retaliation scheme.

In further support of this alleged predicate act, McNulty asserts that at a meeting with Corbin on January 11, 2005, McNulty expressed to Corbin his unwillingness to participate in the market allocation scheme or the cover up and Corbin "reacted negatively." According to McNulty, it was after this meeting that McNulty decided to contact authorities about the "collusion." In support of this assertion, McNulty again relies on his own declaration, his deposition testimony and entries in his personal date book on January 13, 14, and 20, 2005. These date book entries reference the website for the Department of Justice, the "U. S. Office of Special Council [sic]" and the "Whistle Blower Act," and include an entry on January 20, 2005 that reads: "9-15-5 Keith Corbin (1) collusion - barring me from going to work w/a competitor, because they are in collusion w/ them, (2) price-fixing." (Pl.'s Mot. Ex. 25, 26, 27.)

McNulty states that he informed a former colleague of his, Geoff Lewandowski, of his intention to cooperate with the government and Lewandowski "shared this information with Arctic Glacier." McNulty states that in retaliation, and to discourage him from proceeding to contact

18

authorities, Corbin and other Arctic Glacier executives decided on or around January 19, 2005 to terminate him. In support of these assertions, McNulty relies on his declaration and on a chain of emails on January 19, 2005, between Arctic Glacier personnel, indicating that McNulty would be terminated on January 20, 2005 and offered a severance package in exchange for signing a release. (Pl.'s Exs. 44, 45.) Nothing in this evidence provides any factual basis for a jury to conclude, based on a preponderance of the evidence, that Home City was involved in any of this conduct regarding the termination of McNulty, other than the pure innuendo that Home City would necessarily have been on board with a conspiracy to terminate McNulty to discourage his cooperation with the government because Home City was part of the market allocation conspiracy. But the essence of a conspiracy is an agreement to participate in a collective venture directed to a common goal. *Patel*, 579 F. App'x at 461. This evidence is insufficient to permit a reasonable juror to conclude that Home City knew of and was part of a separate alleged scheme to terminate McNulty in retaliation for his cooperation with government.

McNulty next asserts that Arctic Glacier decided on January 19, 2005, to terminate McNulty and that "Corbin met with Home City the next day [January 20, 2005], and Home City approved Corbin's decision." Pl.'s Resp. 13. For support of this assertion, which does directly mention Home City, McNulty offers a largely illegible calendar page for the month of January 2005. (Pl.'s Ex. 46.) At the hearing on Home City's motion, Home City's counsel acknowledged that Home City produced this calendar page, but all parties agreed that apart from a small scribbled notation that appears to read "Keith Corbin," nothing else is legible for the entry on January 20, 2005, and nothing else is known about this exhibit. Lou McGuire passed away in 2007 and beyond Home City's concession that it produced this calendar page that mentioned Corbin's name, McNulty provides no

19

authentication or context for this document, that would support the inference he would ask a jury to make, i.e. that Corbin and McGuire met, discussed McNulty's termination and that Home City "approved" of Corbin's decision to terminate McNulty. Viewing the facts in the light most favorable to the Plaintiff, this calendar entry suggests that a calendar page produced by Home City contains a notation for January 20, 2005, regarding Keith Corbin. Even assuming the document could be further authenticated as coming from Lou McGuire's calendar (and Plaintiff makes no suggestion as to how this would occur), this document does not establish if there was a meeting, a phone call or neither or, if there was some communication, whether McNulty was discussed. There is absolutely no other evidence offered in support of the assertion either (1) that Corbin did meet or speak with Lou McGuire on January 20, 2005 or (2) even if a meeting or conversation did occur, that McNulty was discussed. There is certainly no evidence to suggest that Corbin shared with McGuire the details of a scheme to terminate McNulty (a decision that according to Plaintiff was in fact made by Arctic Glacier the day before the January 20, 2005 alleged meeting) for his cooperation with the government and/or that Home City "approved Corbin's decision." Lou McGuire died in 2007. Consequently, a jury is left to speculate whether a meeting or conversation occurred on January 20, 2005, and, if so, what was discussed. This is insufficient evidence on which a jury could reasonably conclude that indeed McGuire and Corbin met or spoke on January 20, 2005, and that the conversation included Corbin sharing the details of McNulty's termination in retaliation for his government cooperation and that Home City "approved" of the retaliatory termination. This evidence does not create a genuine issue of material fact that Home City was somehow complicit (after-the-fact) in Arctic Glacier's January 19, 2005 decision to terminate McNulty to discourage his cooperation with the government.

20

Although McNulty is entitled to all favorable inferences from the January 20, 2005 calendar entry, that evidence must create more than "a metaphysical doubt as to the material facts" and must be substantial enough to allow a reasonable jury to find in McNulty's favor by a preponderance of the evidence. The January 20, 2005 calendar entry, even granting McNulty all favorable inferences reasonably supported by the evidence that flow from that entry, simply cannot support the evidentiary weight that McNulty places on it.

In further support of his charge that Home City committed the predicate act of conspiracy to engage in "witness retaliation" at or around the time of McNulty's termination, McNulty relies on the fact that Arctic Glacier hired a news sales manager, Jim Forsberg to replace McNulty, who allegedly demonstrated a willingness "to participate in the conspiracy and to cover it up." In support of this assertion, McNulty relies on Corbin's deposition testimony, in which Corbin admits that he informed Forsberg about the conduct to which Arctic Glacier ultimately pled guilty, i.e. agreeing not to call on a Home City customer who complained about Home City's service, and that Forsberg did not object to that conduct. (Pl.'s Ex. 19, April 6, 2011 Deposition of Keith Corbin, 116:7-22, 118:17-24.) McNulty also relies on statements made to him by Riley that he (Riley) was surprised that Arctic Glacier had hired Forsberg because he was more of a "dispatch guy" than a "sales guy," and that he (Riley) on behalf of Tropic Ice had entered into a price-fixing agreement with Forsberg. Pl.'s Ex. 15, McNulty Decl. ¶ 15. McNulty also relies on an audio recording of a conversation that he recorded between himself and his former colleague, Geoff Lewandowski, in which Lewandowski expressed surprise that Arctic Glacier hired Forsberg because he was "not qualified."[5] (Pl.'s Ex. 6,

---

[5] McNulty offers no affidavit, declaration or other sworn statement from Lewandowski in support of his opposition to Home City's motion. He offers only the tape recorded conversations, which involve Lewandowski's personal opinions and representations of what others purportedly thought

Audio Recording PIL #41.) This evidence, viewed in the light most favorable to McNulty, suggests at most that Arctic Glacier replaced McNulty with an unqualified candidate who agreed to Keith Corbin's request that he not call on a competitor's customer. There is nothing in this evidence from which a reasonable juror could reasonably infer that Home City, not even mentioned in this evidence, conspired in Arctic Glacier's decision to terminate McNulty.

In response to Home City's motion for summary judgment, McNulty has produced insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City committed the predicate act of conspiring

_____

or said, which are out-of-court statements offered here to establish the truth of the assertion that Home City "agreed" to Arctic Glacier's alleged retaliatory termination of McNulty. It is axiomatic that hearsay statements that fit within no exception cannot be relied upon to defeat a motion for summary judgment. *CareSource*, 576 F.3d at 558. Although summary judgment evidence need not necessarily be presented in a *form* that will be admissible at trial, the proponent of such evidence must show that he can "make good on the promise" to make such evidence admissible at trial. *Id.* McNulty has failed to establish the admissibility of the statements made by Lewandowski in the tape recorded conversations. There is no evidence or even a suggestion that Lewandowski was a member of any conspiracy, and thus his statements cannot be excluded from the hearsay rule under Fed. R. Evid. 801(d)(2)(E). Indeed, the evidence suggests that Lewandowski was a former colleague and personal friend of McNulty's. At the hearing on Home City's motion, when asked to address the issue of the admissibility of Lewandowski's tape recorded statements, McNulty's counsel simply stated that Lewandowski, who notably had been recently terminated by Arctic Glacier at the time of the recordings, was nonetheless acting as an "agent" of Arctic Glacier when speaking with McNulty in the tape recorded conversations. While counsel for McNulty cited no rule or legal authority for this proposition, the Court assumes he was appealing to the exclusion from hearsay provided in Fed. R. Evid. 801(d)(2)(D), for statements made by a party's agent on a matter within the scope of the employment relationship. McNulty cites no evidence, law or analysis to support this suggestion of agency. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 775 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," are abandoned. *Indah v. S.E.C.*, 661 F.3d 914, 925 (6th Cir. 2011). Lewandowski's statements on the recorded conversations on which McNulty seeks to rely are hearsay, without an established exclusion or exception that would allow for their admissibility at trial, and may not be considered on summary judgment. *Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (quoting *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999)).

22

in Arctic Glacier's decision to terminate McNulty allegedly to retaliate against him to dissuade him from acting as a government witness.[6]

> **B.    McNulty has produced insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City conspired with Arctic Glacier and other members of the RICO enterprise to tamper with McNulty after learning that he had begun to cooperate with the government in violation of 18 U.S.C. § 1512(k).**

McNulty argues that a reasonable jury could conclude that, just after McNulty proceeded to contact government authorities, Home City committed the predicate act of conspiring with other members of the RICO enterprise to tamper with McNulty as a witness in violation of 18 U.S.C. § 1512(k). In support of this, McNulty relies on a letter that he sent to the State of Michigan Consumer Protection Division on March 21, 2005, detailing the alleged unlawful activities of Arctic Glacier and others. Pl.'s Ex. 17. In this letter, McNulty stated that he wished to file a formal complaint against Arctic Glacier and Party Time Ice Co. (McNulty's previous employer, owned by Chuck Knowlton, that was acquired by Arctic Glacier in January, 2005). McNulty details his early interactions with Keith Corbin regarding his potential salary as sales manager at Arctic Glacier, in which Corbin allegedly told McNulty that his salary expectations were too high. When McNulty suggested he would seek work for another ice company, Corbin allegedly told McNulty that he

---

[6] It is unclear whether McNulty's claim is that these allegations support a witness retaliation or a witness tampering claim. McNulty describes this first alleged predicate act as follows: "Home City conspired with Arctic Glacier and other members of the RICO conspiracy *to retaliate* against McNulty as a witness, agreeing that McNulty should be terminated if he would not actively participate in the market allocation conspiracy, including covering up the conspiracy." Pl.'s Resp. 11-12 (emphasis added). However, McNulty then drops a footnote arguing that "witness tampering does not require an ongoing investigation, and it does not require that the victim intended to cooperate with authorities." Pl.'s Resp. 12 n. 69. Whether couched as a retaliation or a tampering claim, the analysis of Home City's involvement remains the same with regard to events related to Arctic Glacier's January 19, 2005 decision to terminate McNulty.

would never be hired by Home City "due to their relationship with Arctic Glacier." 3/21/05 Letter at 1. McNulty also alleges in this letter that Corbin told him U.S. Ice would never hire him because they also had already agreed with Arctic Glacier to keep their prices up. *Id.* at 2. McNulty further explains in this letter that although he was aware that Arctic Glacier and Home City "colluded to fix prices," he was "rather stunned by Mr. Corbin's arrogant threats and blatant remarks regarding my potential opportunities to work for another ice company." *Id.*

McNulty claims that he told Geoff Lewandowski that he had sent the letter and that "right after that," on March 28, 2005, McNulty received a call from Fiaz Simon (a "business associate" of McNulty's) who said that he was calling on behalf of Knowlton of Arctic Glacier and that Knowlton wanted to meet with McNulty about either hiring him back to Arctic Glacier or offering McNulty a monetary incentive to make him happy. In support of these statements, McNulty relies on his own deposition, his Declaration, a letter he wrote to the DOJ and his responses to Interrogatories.[7] (ECF Nos. 16, 18, 29.) McNulty states that he told Fiaz Simon that he would meet with Knowlton but only with his (McNulty's) lawyer present. The meeting never took place.

From this evidence, McNulty asserts, a reasonable juror could conclude that, in light of the market allocation conspiracy between Arctic Glacier and Home City and Knowlton's alleged statement to McNulty that he (Knowlton) had a relationship with Home City that would allow him (Knowlton) to enforce a boycott, that this was an attempted bribe "made within the scope of the conspiracy." Again, Knowlton's (Arctic Glacier) statements about his alleged ability to control

---

[7] McNulty offers no declaration, affidavit or other sworn statement from Fiaz Simon. *See* Fed. R. Civ. P. 56(c)(4) and 28 U.S.C. § 1746. "Statements that are not sworn in one of these two ways are not competent summary judgment evidence." *Worthy v. Michigan Bell Telephone Co.*, 472 F. App'x 342, 343-44 (6th Cir. 2012). The same hearsay challenges that would apply to Lewandowski's statements also apply to statements attributed to Fiaz Simon. *See supra* footnote 5.

Home City's hiring practices do not demonstrate that Home City was aware of and intended to participate in an endeavor to tamper with McNulty's cooperation with the government. *See Salinas*, 522 U.S. at 65 (noting that the "partners in the criminal plan must agree to pursue the same criminal objective"). None of this evidence directly implicates Home City or even provides the basis for a reasonable inference of Home City's knowledge of or involvement in this alleged attempted "bribe." A juror would have to infer that Home City was aware that McNulty had a written a letter to the State of Michigan and was aware of Fiaz Simon's actions allegedly in response to that letter based upon (1) Home City's participation in the market allocation conspiracy and (2) statements made by Knowlton (Arctic Glacier) that he had the power to enforce a boycott. Not only is this inference based on inference, but it is hearsay based on hearsay with no noted exceptions set forth by McNulty.

McNulty has failed to produce sufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City knew about and agreed to Fiaz Simon's alleged attempt to arrange a meeting between Knowlton and McNulty to discuss an alleged "monetary incentive to make [McNulty] happy." This is insufficient evidence on which a reasonable juror could conclude that Home City committed the predicate act of conspiring with other members of the RICO enterprise to tamper with McNulty as a witness in violation of 18 U.S.C. § 1512(k).

    **C.**    **McNulty has produced insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City retaliated against McNulty by refusing to hire him in 2005 in retaliation for his cooperation with the DOJ or that such retaliation was the "but for" and proximate cause of McNulty's injury.**

McNulty argues that a jury could reasonably conclude that Home City committed the predicate act of witness retaliation based on the fact that Home City did not hire McNulty in 2005

when McNulty submitted an online application. McNulty states that he began cooperating with the DOJ in May, 2005 and that his non-compete with Arctic Glacier expired on July 27, 2005. McNulty states that days after his non-compete expired, Knowlton called Lou McGuire of Home City to "warn Home City" about McNulty, stating to McGuire that he (Knowlton) had learned from Lewandowski that McNulty was responsible for the FBI/DOJ investigation and that McNulty's wife had complained to him (Knowlton) that Knowlton had ruined the McNulty family. McNulty alleges that a few days later, Corbin called McGuire about McNulty and agreed to let McGuire know what Arctic Glacier learned as the investigation unfolded.

McNulty states that shortly thereafter, he applied to Home City for employment. McNulty responded in interrogatories that in early September, 2005, he submitted an online application to Home City via their website. (ECF No. 31, Pl.'s Interrog. Resp. No. 10.) McNulty states that he sent a follow up letter to Home City on September 16, 2005, and called their human resources department at some point thereafter, but was not hired despite other employer's opinions of him as having "an impressive resume" and Geoff Lewandowski's opinion that it would have cost Home City nothing to hire McNulty as a commission-based contractor. McNulty alleges that Lou McGuire of Home City told Knowlton about McNulty's employment application and assured Knowlton that Home City had not hired McNulty. McNulty claims that he was later told by Lewandowski and Riley that he (McNulty) was being blackballed by Home City.

In support of this claim, McNulty relies on an August 1, 2005, handwritten note presumably written by Lou McGuire (now deceased) stating that McGuire did receive a phone call from Knowlton that day informing McGuire that Geoff Lewandowski had been contacted by the FBI concerning price fixing in the ice industry and was going to meet with the FBI the following week.

(Pl.'s Resp. Ex. 34.)   The note further explains that Knowlton told McGuire that the FBI investigation was "spurred by Marty McNulty (Chuck's ex sales mgr also let go by Arctic)." *Id.* The note explains that Knowlton stated to McGuire that McNulty was irate about the way he was treated during Knowlton's sale of the Party Time business to Arctic and that McNulty's wife had called Knowlton and screamed at him for ruining the McNulty family. *Id.*

In further support of this claim, McNulty relies on an August 3, 2005 handwritten note presumably written by McGuire indicating that McGuire had spoken with Keith Corbin who informed McGuire that Arctic Glacier was aware of the phone call to Home City from Chuck Knowlton.   Pl.'s Resp. Ex. 35.   The note continues that the FBI is supposed to interview Lewandowski that week and that "they" (Arctic presumably) will let Home City know "what is going on in this." *Id.* In his April 6, 2011 deposition, Corbin confirmed that he did call McGuire, at Knowlton's direction, to tell him that they were being investigated by the FBI. Pl.'s Resp. Ex. 19, April 6, 2011 Deposition of Keith Corbin.   Corbin did not recall mentioning McNulty in that conversation and McGuire's notes also do not indicate that he and Corbin discussed McNulty - only that Lewandowski was meeting with the FBI.

Next, in answers to McNulty's first set of interrogatories on May 23, 2011, Knowlton responded that Knowlton recalled that "at some point Mr. McGuire told him that Mr. McNulty had applied and Home City did not hire him." Pl.'s Resp. Ex. 47, Knowlton's Answers to Interrog. p. 5. Knowlton further answered that to the best of his recollection, "Mr. McGuire had said this had happened a few months before their conversation." *Id.* This answer was in response to an interrogatory that asked Knowlton to identify and describe any communication between him and any other person relating to the employment or hiring of McNulty or relating to any employment

27

inquiries about McNulty's prospective employment. *Id.* McNulty's counsel conceded at oral argument that there is no evidence in the record to establish when this conversation occurred.

McNulty also supports this alleged predicate act with his assertion that Lewandowski and Riley told him that Home City was blackballing him. McNulty supports this assertion with his own deposition testimony in which he refers to his taped conversations with Riley (Pl.'s Ex. 3) and Lewandowski (Pl.'s Ex. 4). McNulty testified in his deposition that Riley (Tropic Ice) told him that Mr. Knowlton (Arctic Glacier) had told him (Riley) that he (McNulty) was being blackballed in the industry and no one would hire him in the ice industry. (Pl.'s Ex. 16, McNulty Dep. 103-04.) Mr. McNulty testified that it was Lewandowski who specifically mentioned, in the tape recording of their conversation on September 7, 2005, that Home City was blackballing him. McNulty Dep. 104-05. McNulty testified that Riley only referred to Knowlton blackballing McNulty and did not specifically mention Home City. *Id.* 105. But then, just moments later in the deposition, McNulty testified that Lewandowski only mentioned that Knowlton told him (Lewandowski) that McNulty was being blackballed and would never find a job in the ice industry. McNulty confirmed later in his deposition that Lewandowski never indicated that Knowlton had had conversations with representatives of any other ice company about blackballing McNulty. McNulty Dep. 312:21-24.

McNulty also claims that when he once called Home City's offices in Ohio from Michigan to follow up on his employment application, he was told that there were no openings for a sales position. He argues that this was a false and fraudulent communication in violation of the wire fraud statute, 18 U.S.C. § 1343, a separate predicate act from the witness retaliation. "When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

28

identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012). McNulty's evidence falls far short of meeting these basic pleading requirements, and shorter still from meeting his heightened burden on summary judgment to come forward with "evidence of evidentiary quality" to support his claims.

Home City replies, with evidence that stands unrebutted, that these statements were not false because there were no openings and no sales personnel were hired when McNulty submitted his application in September, 2005 (or for many years thereafter). Home City states that: "The undisputed evidence is that the alleged statement [that Home City had no openings] was true." Def.'s Reply 6. In support of this assertion, Home City offers the Declaration of Jay Stautberg, the Chief Financial Officer and Assistant Secretary of Home City Ice Company. ECF No. 284, Def.'s Mot. Ex. 6, Feb. 16, 2016 Declaration of Jay Stautberg. Mr. Stautberg has held this position with Home City since 1994 and has had authority over Home City's Human Resource function. *Id.* ¶ 2. Mr. Stautberg states that his review of Home City's records indicates that in September 2005, Martin McNulty sent an employment inquiry into Home City's website. *Id.* ¶¶ 3-4. Mr. Stautberg further testifies that at that time Home City was not soliciting resumes or seeking sales professionals and that prior to 2005 and for many years thereafter, Home City had the same sales representative, John Borchers, covering the State of Michigan. *Id.* ¶ 3. In fact, for several years prior to 2005 and for several years thereafter, the Home City sales management team consisted of just three people: Lou McGuire, Greg Geiser and Ed Tice. Mr. McGuire died in June, 2007, and was not replaced. *Id.* ¶¶ 6-7. After Mr. McGuire's death, Messrs. Tice and Geiser were Home City's entire sales management team until Mr. Tice retired years later. Not until 2013 did Home City hire an

29

independent contractor in sales. *Id.* ¶¶ 8-9.

This evidence is unrebutted. In support of his statement that "in fact he was being blackballed," McNulty cites his own deposition testimony. McNulty provides no evidence that in fact Home City did hire other sales personnel at the time that they declined McNulty's request for employment, or at anytime thereafter. McNulty asserts that "he could have won new business [for Home City] as a contractor," and that there was no reason for them not to hire him. This is pure conjecture on McNulty's part, but in any event the unrebutted evidence establishes that Home City never utilized independent contractors until some time in 2013. No reasonable juror could conclude, based on this evidence, that Home City committed wire fraud when someone at Home City informed McNulty in 2005 that the company was not hiring sales personnel.

Because Home City's evidence in support of its claim that it was not hiring at the time of McNulty's application (or at anytime thereafter) is undisputed by any evidence other than McNulty's conjecture, McNulty cannot establish the necessary element of causation for this alleged act of witness retaliation. "To allege a valid RICO claim . . . a plaintiff must show not only that the predicate act was a "but for" cause of plaintiff's injuries, but also that it was a proximate cause." *Heinrich*, 668 F.3d at 405 (citation omitted). "A plaintiff must show some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (quotation marks and citation omitted). To succeed on a § 1962(c) claim, this causation must be established as to *each* defendant's alleged predicate acts – it is not sufficient for McNulty to show that the "scheme" proximately caused his injuries. *Kerrigan*, 112 F. Supp. 3d at 609 ("[I]n order to state a § 1962[(c)] claim against any Defendant, Plaintiffs must allege a clear causal connection between that Defendant's alleged predicate acts and their injuries.") (alteration added).

30

McNulty has failed to produce sufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that the alleged predicate act of retaliation in 2005 was the "but for" and proximate cause of McNulty's claimed injury. The undisputed evidence is that Home City was not hiring sales people in any capacity at that time or for years before or after that time and would not have hired McNulty regardless of any claimed retaliatory motive. The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis*, 226 F.3d at 511. Failure to establish a genuine issue of material fact as to an essential element of a claim, here causation, renders all other facts immaterial for summary judgment purposes. *Elvis Presley*, 936 F.2d at 895. Accordingly, McNulty cannot establish Home City's RICO liability based on this alleged predicate act.

> **D.** **There is insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City retaliated against McNulty by not offering McNulty the position of Vice President of Sales in 2007 when Lou McGuire passed away or that such retaliation was the "but for" and proximate cause of McNulty's injury.**

McNulty argues that a jury could reasonably conclude that Home City "again boycotted" McNulty in 2007 in retaliation for his cooperation with the DOJ when there was "an opening for a VP of sales" and Keith Corbin (Arctic Glacier) did not recommend to Ted Sedler (Home City) that Home City hire McNulty. In support of this argument, McNulty relies on a tape recorded conversation between Keith Corbin and Ted Sedler of Home City, in which there was a discussion about "keeping the peace out there" among the ice companies. Pl.'s Resp. Ex. 2. The Court discussed this evidence in its 2016 Opinion and Order denying McNulty's motion for leave to amend and concluded that the conversation did not plausibly suggest an agreement to boycott sales people who refused to participate in the market allocation conspiracy. 2016 WL 465490, at *22. The Court

31

observed that if the conversation plausibly suggested any type of collusion, it would be an agreement among competitors to stay out of each other's territories, which is precisely the conduct targeted by the DOJ antitrust investigation. *Id.* That same evidence has no better traction here. In fact, the inferential leap grows even larger here, where the suggestion is that Corbin did not recommend McNulty to Sedler and that Home City acted on that "non-suggestion" and decided not to seek out McNulty and offer him the job. In fact, the undisputed evidence is that Home City never hired a replacement for Mr. McGuire and his job duties were assumed by Home City existing personnel, Messrs. Geiser and Tice. Def.'s Mot. Ex. 6, Stautberg Decl. ¶¶ 7-8.

Additionally, it is undisputed that at the time of this phone call in September, 2007, Ted Sedler was cooperating with the government and placed the call to Corbin at the behest of the government. Sedler was seeking to elicit inculpatory statements from Corbin for the government to use in its antitrust case. According to Sedler, he represented in the conversation with Corbin that Home City was looking for a new Vice President as a "talking point" in an attempt to gather evidence against Arctic Glacier for the government's antitrust investigation, but in fact Home City was not looking to, and never did, replace Lou McGuire. Def.'s Reply Ex. 5, March 21, 2016 Declaration of Ted Sedler ¶¶ 4-6. McNulty does not dispute that Home City never replaced Lou McGuire and does not dispute that Sedler was cooperating with the government in its antitrust investigation when he placed this call to Corbin.

In response to Home City's sworn testimony in support of its assertion that Lou McGuire was never replaced, and that Sedler was acting as a government witness on the phone call to Corbin, McNulty was required to come forward with more than just his conjecture that Home City did not seek him out to offer him the position of Vice President of Sales because of its participation in a

32

conspiracy to retaliate against him for his cooperation with the government. There is insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City committed the act of witness retaliation when it refused to hire McNulty to replace Lou McGuire 2007. Even assuming a genuine issue of material fact as to this predicate act, the evidence is undisputed that Home City did not replace McGuire in 2007 or at anytime thereafter. Thus, the same failure to establish causation that dooms McNulty's claim of retaliation based on his 2005 employment inquiry also defeats his claim based on this 2007 failure to hire. Accordingly, McNulty cannot establish Home City's RICO liability based on this alleged predicate act.

> **E.**   **There is insufficient evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude that Home City conspired with other members of the RICO enterprise to offer McNulty a bribe of at least $10,000 if he agreed to stop cooperating with the FBI and the DOJ in their antitrust investigation into the packaged ice industry.**

McNulty claims that Home City committed the predicate act of conspiring with Arctic Glacier to offer McNulty a bribe to stop cooperating with the government, presumably asserting an alleged violation of 18 U.S.C. § 1512(k), although in his brief McNulty cites § 1513, the retaliation statute. Pl.'s Resp. 17. In support of this assertion, McNulty relies on an audio recording in which McNulty asked Lewandowski about a payment that Knowlton tried to make to McNulty through Lewandowski and Lewandowski told McNulty that Knowlton wanted Lewandowski to convey to McNulty that there was "a little bit of cash there waiting for [him] if [he] just sits there and kind of forget anything you ever talked to anybody about." Pl.'s Mot. Ex. 4. Arctic Glacier emails in or around July, 2005, confirm that its employee Knowlton did express a desire to make a payment to McNulty but that Arctic Glacier "was against it 100 percent," suggesting to Knowlton that he

"handle it himself if he so chooses." Pl.'s Mot. Ex. 36. McNulty links this evidence to Home City's answers to interrogatories in which Home City responds that: "Ted Sedler and Greg Geiser recall only that Lou McGuire told them that Chuck Knowlton discussed with Lou McGuire a possible payment to McNulty. Messrs. Sedler and Geiser do not recall when they heard this or whether this was a result of a McNulty demand or not." Pl.'s Ex. 37, p. 2. Home City goes on to respond that because "Mr. McGuire is unavailable, the details of his conversation with Mr. Knowlton are unknown." *Id.* McNulty asserts that this is evidence that Knowlton and McGuire discussed the payment to McNulty and "agreed on a course of action." Pl.'s Resp. 17. Despite the fact that McNulty received this interrogatory response in September, 2011, McNulty never attempted to depose Messrs. Sedler or Geiser to try to drill down on their "recollection" of this comment. Thus, relying on this recollected statement allegedly made by a deceased individual, completely untethered to time or context, McNulty would have a jury conclude that Knowlton and McGuire discussed the "bribe" to McNulty and "agreed on a course of action."

Although Home City has its version of the facts related to a "payment" – that the money that Knowlton wanted to offer was actually McNulty's earnout that he was due from Arctic Glacier and had nothing to do with a bribe – the Court is required to accept McNulty's version of the facts at this stage of the proceedings. Def.'s Reply 8. It is undisputed that, in the end, Arctic Glacier's Knowlton did not make the payment for fear it would look like a bribe. *Id.* at 8, n. 12. Even viewing the facts exactly as McNulty presents them, there is simply nothing in this evidence to demonstrate that Home City and Knowlton "agreed to a plan of action." Even if the Lewandowski audio recording were admissible and added to the mix, *see supra* footnote 5, Lewandowski is giving his opinion of what he thought Knowlton was trying to accomplish with the payment to McNulty. And even if Knowlton

34

was hoping to persuade McNulty to cease cooperation with the $10,000 payment that was never made, there is no evidence to establish *when* Knowlton mentioned a $10,000 payment to McGuire, or that Knowlton communicated to McGuire the purpose of a possible payment to McNulty, or that McGuire agreed that a payment should be made to dissuade McNulty's coopertaion.  McNulty's assertion that McGuire and Knowlton "agreed on a plan of action" finds no support in the evidence and cannot be reasonably inferred from the evidence presented.  There is insufficient evidence on which a reasonable juror could conclude, based on a preponderance of the evidence, that Home City and Knowlton were "partners in a criminal plan" to bribe McNulty or that Home City knew about and agreed to Knowlton's alleged plan to offer a bribe of $10,000 to McNulty if he agreed to stop cooperating with the government.  McNulty has failed to unearth sufficient probative evidence, taking the evidence in the light most favorable to the non-moving party, on which a reasonable juror could conclude, based on a preponderance of the evidence standard, that Home City conspired to commit the predicate act of witness tampering in connection with this alleged "bribe."

## IV.    CONCLUSION

Although Home City pled guilty to committing certain antitrust violations in Southeastern Michigan, this is a RICO case in which an ex-employee of Arctic Glacier asserts that Home City was part of a different scheme to interfere with his cooperation with authorities and to retaliate against him for that cooperation.  The two are separate alleged schemes, alleging distinct crimes with separate victims, as recognized by the Sixth Circuit in its crime victim ruling and as conceded by McNulty himself in the course of discovery in this case.  *See supra* footnote 3.  There is simply insufficient evidence produced in this case on which a reasonable juror could conclude that Home City committed two predicate acts in furtherance of this separate alleged RICO scheme to retaliate

35

against McNulty for cooperating with the government or to interfere with his cooperation. McNulty cannot simply claim "guilty there, therefore guilty here" to survive summary judgment on this separate and distinct RICO claim. The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 772 (6th Cir. 2012) (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 246 (6th Cir. 2010)).

McNulty cannot meet his summary judgment "burden by relying on mere '[c]onclusory assertions, supported only by [his] own opinions.'" *Green*, 2016 WL 2586840, at *3 (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008)) (second alteration added). McNulty was required to "show sufficient probative evidence, based 'on more than mere speculation, conjecture or fantasy' that would enable a jury to find in [his] favor." *Id.* (quoting *Arendale*, 519 F.3d at 601) (alterations added). There is insufficient evidence presented here, even viewing that evidence in the light most favorable to McNulty, on which a reasonable juror could find that Home City committed two predicate acts in furtherance of a RICO scheme either to tamper with McNulty or to retaliate against him for his cooperation with the government.

Ultimately the Court must ask whether reasonable jurors, without resort to conjecture or speculation, "could find by a preponderance of evidence that the plaintiff is entitled to a verdict" on McNulty's RICO claim. *Anderson*, 477 U.S. at 254. McNulty has not crossed that evidentiary threshold here with respect to Home City.[8]

---

[9] Because the Court finds that McNulty has failed to establish a RICO violation, it does not address the issue of mitigation of damages.

36

Accordingly, the Court GRANTS Home City's motion to dismiss and DISMISSES Home City from this action WITH PREJUDICE.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated:   AUG 1 7 2016

37